## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARK D. MCDANIEL, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| LOYOLA UNIVERSITY MEDICAL | ) | **JURY TRIAL DEMANDED** |
| CENTER, TRINITY HEALTH | ) | |
| CORPORATION, LOYOLA | ) | |
| UNIVERSITY CHICAGO, WILLIAM | ) | |
| HOPKINSON, M.D., TERRY LIGHT, | ) | |
| M.D., WILLIAM CANNON, M.D., | ) | |
| DANE SALAZAR, M.D., and | ) | |
| ALEXANDER GHANAYEM, M.D., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, Mark D. McDaniel, M.D., through counsel, The Patterson Law Firm, LLC, complains of Defendants Loyola University Medical Center, Trinity Health Corporation, Loyola University Chicago, William Hopkinson, M.D., Terry Light, M.D., William Cannon, M.D., Dane Salazar, M.D., and Alexander Ghanayem, M.D., (collectively "Defendants") as follows:

## Introduction

1.     Plaintiff Mark D. McDaniel, M.D., a distinguished twenty-seven year military veteran, was wrongfully terminated from Loyola University Medical Center's five-year Orthopaedic Residency Program in his fifth year in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA") and his employment contract.  Defendants created a hostile work

environment and interfered with his ability to obtain a post-residency fellowship position and another residency position by falsely claiming he was unprofessional and aggressive in the workplace, especially against women. These false statements resulted in significant damages, including those to his reputation, his opportunities for future employment, and his earnings.

## **Parties**

2.     Plaintiff, Dr. Mark D. McDaniel, an individual, is a resident of Chicago, Illinois.

3.     Defendant Loyola University Medical Center is a corporation, with its principal place of business at 2160 S. First Avenue, Maywood, Illinois, 60153, and is incorporated in the state of Illinois.

4.     Defendant Trinity Health Corporation is a corporation, with its principal place of business at 20555 Victor Parkway, Livonia, Michigan, 48152, and is incorporated in the state of Indiana. Trinity transacts business in Illinois through the operation of Defendant Loyola University Medical Center.

5.     Defendant Loyola University Chicago is a corporation, with its principal place of business at 1032 W. Sheridan Rd., Chicago, Illinois, 60660, and is incorporated in the state of Illinois.

6.     Upon information and belief, Defendant William Hopkinson, M.D., an individual, is a resident of Illinois and an employee of Defendants Loyola University Medical Center, Trinity Health Corporation, and Loyola University Chicago.  At all times relevant to this complaint, Dr. Hopkinson served as

Program Director for the Orthopaedic Surgery Residency Training Program at the Loyola University Medical Center and was Dr. McDaniel's supervisor.

7.     Upon information and belief, Defendant Terry Light, M.D, an individual, is a resident of Illinois and an employee of Defendants Loyola University Medical Center, Trinity Health Corporation, and Loyola University Chicago.  Dr. Light was the Chair of Orthopaedic Surgery & Rehabilitation at all times relevant to this litigation.

8.     Upon information and belief, Defendant William Cannon, M.D, an individual, is a resident of Illinois and an employee of Defendants Loyola University Medical Center, Trinity Health Corporation, and Loyola University Chicago.  Dr. Cannon was the Chief of Staff at Loyola University Medical Center at all times relevant to this litigation.

9.     Upon information and belief, Defendant Dane Salazar, M.D., an individual, is a resident of Illinois and a former employee of Defendants Loyola University Medical Center, Trinity Health Corporation, and Loyola University Chicago.  Dr. Salazar was a co-resident with Dr. McDaniel at all times relevant to this litigation.

10.     Upon information and belief, Defendant Alexander Ghanayem, M.D., an individual, is a resident of Illinois and an employee of Defendants Loyola University Medical Center, Trinity Health Corporation, and Loyola University Chicago.  Dr. Ghanayem was an attending physician at Loyola University Medical Center at all times relevant to this litigation.

## Jurisdiction and Venue

11.    Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331 because Plaintiff Dr. McDaniel brings suit under 38 U.S.C. § 4301 *et al*, the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). All defendants either reside in Illinois or transact business in Illinois.

12.    Federal Jurisdiction is also appropriate pursuant to 28 U.S.C. § 1331 because Dr. McDaniel alleges a violation of due process granted to him under the Fifth and Fourteenth Amendments, U.S. Const. Amend. V and XIV.

13.    Supplemental jurisdiction is appropriate pursuant to 28 U.S.C. § 1367(a) because the state court claims are based on the same case or controversy.

14.    Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in the Northern District of Illinois.

## Facts Common to All Counts

15.    Dr. McDaniel is a twenty-seven year veteran of the United States Air Force and Air National Guard.  He entered service at age seventeen and has had an unblemished and distinguished military career, including receiving the Kansas Air National Guard Airman of the Year, the Air Force Commendation Medal for his work in Afghanistan, the Air Force Achievement Medal, the Air Force Outstanding Unit Award with Valor, the Air Reserve Forces Meritorious Service Medal, and many other recognitions.  His successful military career was a result of his dedication, motivation, attention to detail, professionalism, and interpersonal skills.

16.     Dr. McDaniel received extensive training in electronic warfare, civil engineering, and avionics.  His military service, however, delayed his receipt of a traditional education. Dr. McDaniel is a first-generation college graduate.  In 2002, Dr. McDaniel received a Bachelor of Science degree in computer science and biology from Friends University in Wichita, Kansas.  Dr. McDaniel received highest honors, was on the President's Honor roll for twelve semesters, was inducted into the Alpha Chi National Honor and Scholarship Society, and received multiple academic scholarships.

17.     Because of his lifelong commitment to service of his country and his excellence in his Air National Guard Unit, his superior officers allowed him to pursue a medical degree.

18.     Dr. McDaniel entered The University of Kansas Medical School in 2002. Following his second year of medical school, he received activation orders requiring him to deploy to Afghanistan for two years with the Air National Guard.

19.     Despite this educational disruption and with only three weeks to prepare following his return from deployment, Dr. McDaniel scored in the 90th percentile on rigorous national medical school board exams.  He graduated from medical school in 2008 after only three and a half years.

20.     Dr. McDaniel matched at Loyola University Medical Center for a residency program through the National Resident Matching Program during his last year of medical school. He was a highly sought-after candidate and was recruited by many top tier orthopaedic residency programs.

21.     Dr. McDaniel was accepted into the Loyola University Medical Center's Orthopedic Surgery residency program in 2008.  Dr. McDaniel accepted the offer from Loyola University Medical Center ("Loyola Medical").  A handbook governs the relationship between the residents and the program and the handbook incorporates the guidelines from the accreditation authority, as set forth below.

## Background

22.     Loyola Medical treats a wide variety of orthopaedic injuries and pathology.  Additionally, Chicago is home to the North American Spine Society ("NASS") and American Academy of Orthopaedic Surgery ("AAOS") training centers, allowing access to additional courses and laboratory experiences.

23.     Completion of this residency and a subsequent spine fellowship is required in order to be licensed by the AAOS and to practice as a spine surgeon.  This is unique to spine surgery as a sub-specialty.  For example, a spine surgeon may perform arthroscopic sports procedures without completing a sports surgery fellowship.  A sports surgeon, however, may not perform spine procedures unless he or she has completed an additional fellowship in spine surgery.

24.     Loyola Medical's Orthopedic Surgery residency program accepts five residents each year for five-year categorical residencies.  A categorical resident is distinguished from other residents in that categorical residents enter residency with the objective of completing the entire five-year program and are not required to compete for a position each year.

25.     Each residency year is a post graduate year ("PGY") and residents are referred to by their year in the program: PGY-1, PGY-2, PGY-3, PGY-4, or PGY-5.  Residents are expected to rotate among four facilities: the Loyola University Medical Center, the Hines Veteran Administration Hospital, Shriner's Hospital Chicago, and Gottlieb Memorial Hospital.  Each location provides distinct opportunities for training.

26.     In their first year, residents are trained in surgical trauma, plastic surgery, peripheral vascular surgery, critical care, general adult surgery, anesthesia, emergency medicine, rehabilitation, and general orthopaedic surgery.  The remaining four years require rotations in hand, pediatrics, foot, trauma, sports, shoulder, spine, and joints, and five months spent in two research rotations.

27.     Physician professors at Loyola Medical have primary responsibility for resident training and supervision.  Attending physicians are on site at all times to oversee the medical care provided by residents.  Residents are also trained and supervised by physicians at each of the other facilities.

28.     Loyola Medical requires all residents to abide by the policies and procedures contained in the Resident Handbook.  A true and correct copy of the Resident Handbook in effect during Dr. McDaniel's residency is attached hereto as Exhibit 1. This requirement is contained in the Graduate Medical Education Agreement signed by each resident each year to establish or renew their residency position. Exhibit 1, Resident Responsibilities, ¶ 3.  True and correct copies of Dr. McDaniel's Agreements are attached hereto as Exhibit 2.

29.     The Accreditation Council for Graduate Medical Education ("ACGME") is a professional organization responsible for the accreditation of residency education programs.

30.     ACGME accreditation is required in order for programs to receive graduate medical education funds from the federal Center for Medicare and Medicaid Services ("CMS"). Residents must graduate from ACGME-accredited programs to be eligible to take their board certification examinations. In addition, many states require completion of an ACGME-accredited residency program for physician licensure.

31.     The ACGME has a twofold purpose:

      a.     to establish and maintain accreditation standards that promote the educational quality of residency and subspecialty training programs; and

      b.     to promote conduct of the residency educational mission with sensitivity to the safety of care rendered to patients and in a humane environment that fosters the welfare, learning, and professionalism of residents.

32.     Loyola Medical's residency programs are accredited by the ACGME and therefore are required to follow ACGME policies and regulations, including work hour requirements, case log requirements, and overseeing the health and welfare of residents and patients.

33.     ACGME-accredited residency programs receive federal funding to cover the stipends and costs of training residents.  These funds come directly from CMS and indirectly from the Department of Veterans Affairs ("VA").

34.     Loyola Medical, and not the individual residents, is responsible for implementation and oversight of the ACGME policies and violations are managed at the program level.

*Relevant ACGME Requirements*

35.     <u>Work hours</u>.  ACGME dictates that no resident should be without rest for any period greater than thirty hours.  Residents must not be on-call for more than twenty-four hours with an added period of six hours for patient continuity and transfer of care, educational debriefing, and didactic activities.

36.     The ACGME sends out annual surveys in which residents are asked to anonymously document their hours for the preceding year.

37.     <u>Fit for duty</u>.  Loyola Medical policies and the ACGME also require that each resident be fit for duty and not participate in patient activities when they are ill or fatigued.

38.     <u>Case logs</u>.  Residents are required to enter all cases in an ACGME case log system to ensure the residency program is complying with ACGME accreditation standards.  The logs do not have any impact on patient files, patient safety, or hospital administration.

39.     Loyola Medical residents are not given any written institutional or departmental guidelines for entering cases in the log and are not trained on this system. Loyola Medical administrative staff are responsible for managing

the logging software. Certain codes must be entered by the staff before a resident can log a procedure, including attending physician codes and facility codes. In many circumstances, residents are unable to log cases because this critical data has not been entered.

40.   The lack of documentation, training, and system maintenance results in disparities in the data. Residents often log procedures well after they occur. Loyola Medical residents are not warned or terminated for errors in their ACGME case logs.

41.   Prior to 2012, ACGME guidelines required all residents to log a minimum number of cases, between 1,000 and 3,000, to successfully complete their residency program.

42.   As part of the ACGME's Next Accreditation System ("NAS"), a new accreditation model focused on objective-based learning, the ACGME overhauled case log requirements for each specialty program. NAS measures compliance with required minimums by specific billing codes ("CPT codes") instead of the prior total number of orthopaedic procedures methodology.

43.   Over the course of 2011, the ACGME changed its case log software to accommodate the NAS case minimum initiative. Due to his extensive experience in computer science and database management, Dr. McDaniel noticed these software changes. The new system allowed residents to log all procedures, orthopaedic and non-orthopaedic.

44.     Dr. McDaniel began entering procedures in the case log system to comply with these new requirements, focusing on the CPT codes that were required under the new system.

45.     Recognizing Loyola Medical's training deficiencies, during the summer of 2011, Dr. McDaniel completed three coding classes through the AAOS.  He continued taking formal coding courses through the North American Spine Society and the AAOS in 2011 and 2012.  As a result, Dr. McDaniel had significantly more training on coding than his co-residents and applied this training to the new NAS framework, allowing him to enter all procedures, not just those that were orthopaedic in nature.

46.     Dr. McDaniel explained the software changes and the changed functionality allowing residents to enter all procedures to Dr. Hopkinson and other physicians in the Loyola Medical Orthopaedic Department before they explained them to the residents and before ACGME even formally announced the changes.

47.     In August, 2011, the ACGME formally announced the new NAS requirements; signaling a formal shift from a total orthopaedic count system to measurement based on a CPT-code minimum system.

*Relevant USERRA Provisions*

48.     Congress enacted USERRA in order to "encourage non-career service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service" and

"prohibit discrimination against persons because of their service in the uniformed service." 38 U.S.C. 4301 (a), (c).

49.    USERRA precludes an employer from denying "initial employment, reemployment, retention in employment, promotion, or any benefit of employment" to any person "who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service" because of "that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C 4311 (a).

50.    Pursuant to regulations promulgated by the Department of Labor regarding implementation of USERRA, an "employee is not required to ask for or get his or her employer's permission to leave to perform service in the uniformed services." 20 CFR Part 1002.87. "The employee is only required to give the employer notice of pending service." Id.

51.    Notice is "any written or verbal notification of an obligation or intention to perform service in the uniformed services provided to an employer by the employee who will perform such service or by the uniformed service in which such service is to be performed." 38 USCS § 4303 (8).  "The notice may be informal and does not need to follow any particular format." 20 CFR Part 1002.85.

52.    Further, "[t]he employee is not required to accommodate his or her employer's interests or concerns regarding the timing, frequency, or duration of

uniformed service." 20 CFR Part 1002.104. An Employer may not require the Employee to alter his or her work schedule or find replacements.

53.　　In 2011, Congress amended USERRA to protect servicemembers from hostile work environments by changing the definition of benefit to include "the terms, conditions, or privileges of employment." 38 U.S.C 4303 (2). This language mimics that of other statues, including Title VII of the Civil Rights Act of 1964, where it has been used to allow for hostile work environment claims.

**Probation, Termination, and Violation of the Grievance Procedures**

54.　　The ACGME requires that, in order to be accredited and therefore receive federal funding, the "[s]ponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process." Resident Handbook, II.D.4.e, Institutional Procedures (Exhibit 1).

55.　　Loyola Medical implemented this procedure in Part III.C. of the Resident Handbook, detailing how the Grievance Procedure "provide[s] a forum for the fair resolution of grievances regarding a resident's clinical and educational performance, conduct, or eligibility to continue in Loyola's Graduate Medical Education Program." Resident Handbook, III.C.1, Introduction (Exhibit 1).

56.　　Residents have the right to grieve any written warning, suspension, termination, academic probation, or non-renewal of the Graduate Medical Education Agreement.

57.　　After an adverse employment action, the resident must notify the Department Chairperson within fifteen days of his or her opposition to the

action.  The resident may elect to have the issue reviewed solely on the documents submitted or request a hearing.

58.     Once the written notification is received requesting a hearing, the Department Chairperson is required to forward the request to the Chief of Staff within five calendar days.

59.     The Chief of Staff is required to appoint no more than three physicians to conduct the hearing.  The hearing must be held within forty-five calendar days of the Chief of Staff's receipt of the written request.

### *Loyola Medical's Misconduct*

60.     Prior to the events giving rise to this lawsuit, Dr. McDaniel received many positive evaluations from Loyola.  Loyola Medical physicians awarded him the Magis Star for outstanding service and care in 2010.  He was commended for his professionalism and communication skills.  He was widely regarded to have the best surgical hands of his residency class.  He passed every rotation.  He was honest.

61.     <u>Work hours</u>.  Defendants required Dr. McDaniel to work 37 consecutive hours between May 8, 2012, and May 9, 2012.  Dr. McDaniel arrived at Gottlieb at 5 a.m. on May 8th and spent his day assisting on four cases.  He then traveled to Loyola Medical and observed evening consultations.  He was on-call overnight and was advised by Dr. Evans to stay in the hospital.  Dr. McDaniel raised his concerns regarding the ACGME hour violation to his superiors, but was rebuked.  He then assisted Dr. Bindra at 3 a.m. on May 9th, attended a resident conference, and assisted on three cases with Dr. Tonino.

14

Dr. McDaniel was able to leave Loyola at 6 p.m. on May 9th, having worked 37 consecutive hours and assisted on 14 patients.

62.    Work hour violations also occurred on August 10, 2012 and August 13, 2012, due to non-emergency demands of Loyola Medical and the attending physicians.

63.    Defendants expect residents to lie on annual hours surveys submitted to the ACGME for compliance verification.

64.    Dr. McDaniel was unwilling to lie about his hours worked, which, because of the demands of Defendants, were well in excess of ACGME regulations, so he opted not to return the survey at the end of the 2011-2012 academic year, and so informed the Defendants.

65.    <u>Fit for duty</u>.  On July 8, 2012, Dr. McDaniel was diagnosed with a retinal detachment.  His treating physician conducted a retinal detachment repair on July 9, 2012, in which a gas bubble was inserted into his eye.  The gas bubble was expected to last between four and six weeks and would impair Dr. McDaniel's depth perception and ability to conduct surgical procedures.

66.    The retinal detachment and subsequent repair resulted in significant bleeding and bruising to Dr. McDaniel's eye.  These effects were obvious.

67.    Dr. McDaniel was instructed by his physician to take ten days off following the operation to ensure healing and because his vision was significantly affected.  Dr. McDaniel was also informed of the long term risk of cataracts if he did not allow the gas bubble to stay in place by limiting his movement and extensive use of his vision.

68.    Dr. McDaniel informed Dr. Hopkinson of the procedure and the instruction from his doctor that he was unable to conduct certain procedures while his eye was healing.  On three separate occasions, Dr. McDaniel requested that Dr. Hopkinson allow him time off to allow his eye to heal and to ensure patient safety.  Each time he was denied.

69.    Dr. McDaniel also informed Dr. Cannon of his medical situation and requested time off.  Dr. Cannon refused.

70.    For this reason, Dr. McDaniel was required to work long hours and operate on patients; there is a high likelihood that his eye will never fully heal and it is nearly certain that he will develop cataracts.

71.    In addition to risking Dr. McDaniel's wellbeing, Defendants' actions also put patients at risk and violated ACGME regulations.

72.    <u>USERRA</u>.  Dr. McDaniel has served in the Air National Guard Unit since 1985.  His unit, located in Missouri, placed extraordinary faith in him by allowing him to remain a part of the unit while completing medical school, residency, and his fellowship.  Dr. McDaniel hopes to eventually return and lead this unit.

73.    Throughout the residency program, Dr. McDaniel completed his military obligations on weekends and vacation days.

74.    During his PGY-4, Dr. McDaniel was required to complete three weeks of air national guard obligations.  In early June, 2012, Dr. McDaniel spoke to Dr. Hopkinson about his forth-coming orders and the necessity for military leaves

from the residency program. Dr. McDaniel also communicated with the Loyola Graduate Medical Education office to confirm the procedures for military leave.

75. Dr. Hopkinson demanded to see Dr. McDaniel's military orders before he would authorize leave.

76. Dr. Hopkinson scheduled a meeting for June 14, 2012, to discuss Dr. McDaniel's upcoming military leave.

### *Unjust Imposition of Probation*

77. At the June 14, 2012, meeting scheduled to discuss his upcoming military leave, and without any prior warning, Defendant Hopkinson notified Dr. McDaniel that he was being placed on academic probation. This probation was in retaliation for his request for leave to fulfill his armed forces duties. A true and correct copy of the probation letter ("Probation Letter") dated June 14, 2012, is attached hereto as Exhibit 3.

78. The probationary period was set to end on September 9, 2012.

79. In the meantime, on June 20, 2012, Dr. McDaniel received his orders for the first of what ultimately turned out to be three separate weeks of service during his PGY-4 year: June 25-29, 2012, July 20-29, 2012, and September 10-14, 2012.

80. He promptly forwarded his orders to Dr. Hopkinson, based on Dr. Hopkinson's demand, and obtained permission for the leave on the condition that he arrange for other residents to cover his tasks during his absence, in violation of USERRA.

81.    Dr. McDaniel submitted the necessary leave requests to the residency program office.

82.    In spite of his prior approval and leave requests, Dr. McDaniel was scheduled to work on July 25, 2012, while he was to be away on military orders, also in violation of USERRA.

83.    Dr. Hopkinson required that Dr. McDaniel find another resident to cover this shift, even though it was scheduled after Dr. Hopkinson and the program office was notified of Dr. McDaniel's orders.

84.    Dr. McDaniel went to great lengths to find coverage for his shifts and to notify his co-residents in advance of the dates he would be away on military orders.

85.    Dr. McDaniel's co-residents, including Defendant Salazar, were antagonistic and unreceptive to him when he requested they cover shifts that were scheduled during his military orders, creating a hostile work environment.

86.    His co-residents frequently requested access to Dr. McDaniel's private leave requests and leave schedule and refused to trade shifts or demanded Dr. McDaniel work multiple shifts in return for coverage for a single shift.

87.    Defendant Salazar, a co-resident in the Orthopaedic Surgery Residency Program, demanded to see Dr. McDaniel's military orders before agreeing to cover any shifts.

88.    Dr. McDaniel refused to provide his orders to Dr. Salazar, who ultimately agreed to cover Dr. McDaniel's call on June 28, 2012.  Dr. McDaniel informed Dr. Wu, who was the attending physician that day.

89.     Dr. Salazar falsely told Dr. Wu that he had not agreed to cover Dr. McDaniel's call that day.

90.     Dr. McDaniel repeatedly informed Dr. Hopkinson of Dr. Salazar's ongoing harassment.  Upon information and belief, no action was taken against Dr. Salazar and the harassment grew worse over time.

91.     The harassment from Drs. Hopkinson and Salazar was sufficiently severe and pervasive to alter the conditions of employment and create an abusive working environment.

92.     Dr. Hopkinson violated USERRA when he required Dr. McDaniel to arrange for his own substitute coverage while obeying military orders.

93.     Further, Loyola Medical violated USERRA when it scheduled him to work during a period covered by military orders.

94.     Drs. Hopkinson and Salazar violated USERRA by insisting on viewing the actual orders.

95.     The Probation Letter imposed remediation requirements, including weekly meetings with two professors, 100% attendance at department conferences and meetings, and "no instances of negative communications with or about attendings, residents or staff."

96.     Pursuant to the Resident Handbook, Section III.K., Dr. McDaniel was informed of his right to appeal the imposition of academic probation.  He followed the grievance procedure outlined in the handbook and filed a written appeal on July 11, 2012.

97.     After his written appeal was denied, Dr. McDaniel requested a hearing. He was entitled to a hearing within 45 days. Due to an oversight by the Associate Dean for Graduate Medical Education, Dr. Cannon, the hearing was not scheduled within the requisite 45 days.

98.     Dr. Cannon asked Dr. McDaniel to forgive the oversight and authorize the hearing outside the program requirements dictated by the Resident Handbook and the ACGME. Dr. McDaniel gave his permission so that he could clear his name.

99.     This hearing was scheduled for September 20, 2012.

### Unjust Termination Prior to Grievance Hearing on Probation

100.    The Defendants couldn't wait to see if the probation decision was correct or to see whether Dr. McDaniel had succeeded in remediating the alleged deficiencies. On September 4, 2012, at a hearing of the Education Committee Meeting led by Dr. Hopkinson, the committee voted to terminate Dr. McDaniel from the residency program. The committee was aware of the probation hearing scheduled for September 20th when this decision was made.

101.    This decision was in retaliation for the leave necessitated by receipt of Dr. McDaniel's military orders, his refusal to falsely report his work hours, his request for surgery leave while he recovered from a detached retina, and his initiation of the grievance procedures related to the probation decision.

102.    On September 6, 2012, knowing that the committee had previously voted on termination, Dr. Hopkinson notified Dr. McDaniel that his probation was

extended pending the outcome of his grievance appeal hearing on September 20, 2012.

103.   Dr. Hopkinson notified Dr. McDaniel of his termination on September 17, 2012, three days prior to the probation hearing and thirteen days after the committee's decision, with Dr. McDaniel being in full compliance with the remediation conditions. A true and correct copy of the termination letter ("Termination Letter") is attached hereto as Exhibit 4.

### Probation Hearing

104.   Three days after receiving the Termination Letter, on September, 20, 2012, Dr. McDaniel appeared before his probation hearing board.  This board consisted of Drs. Derhammer, Hardin, and Kenton.

105.   Also in attendance were Drs. Hopkinson, Light, Bindra, Wu, and Belich.

106.   Dr. McDaniel was told by Dr. Cannon that he was not to inform the board of his prior termination because it was not relevant.

107.     Dr. Light testified to the panel that Dr. McDaniel's "unilateral behavior" with respect to case logs gained the attention of the Residency Review Committee ("RRC") of the ACGME, and resulted in a citation.  Dr. Light made this statement knowing that it was false: the RRC in 2011 had reviewed case logs for residents in the 2011-2012 graduating class and had noted deficiencies, but Dr. McDaniel was not a member of the 2011-2012 graduating class and his case logs were not reviewed by the RRC and had not been criticized.  Further, Dr. Light was a member of the RRC and had access to information regarding program citations.

108.  Dr. Hardin asked Dr. McDaniel if he was superhuman for his ability to withstand the hostility and poor treatment from Dr. Light.  Dr. Derhammer also supported Dr. McDaniel, stating that Dr. McDaniel had done nothing wrong.

109.  Two of the three members of the probation hearing board, Drs. Hardin and Derhammer, refused to sign the letter affirming Dr. McDaniel's probation.

### *Pretextual Allegations for Termination*

110.  The termination letter set forth false, pretextual reasons for Dr. McDaniel's termination.

### *Allegation #1: Failed Evaluations*

111.  The Termination Letter referred to evaluations of Dr. Pinzur and Dr. Cappello that did not and do not justify termination, as a cursory juxtaposition of the Termination Letter and these evaluations demonstrates.

112.  <u>Compliance with remediation plan ordered by the probation.</u>  The Termination letter stated that Dr. McDaniel "disregarded the remediation plan," although Dr. Cappello's evaluation of Dr. McDaniel's compliance with the remediation plan—not even completed at the time of termination—stated that "Dr. McDaniel completed his required weekly meetings with me to discuss his performance on the service.  He always initiated them and was flexible to their time and location."

113.  <u>Performance vis a vis peers.</u>  The Termination Letter claimed that Dr. Cappello ranked Dr. McDaniel "slightly behind" his peers.  In fact, Dr. Cappello ranked Dr. McDaniel with a score of 4 out of 5, meaning that he was usually

"able to provide patient care that is compassionate, appropriate and effective for treatment of health problems and the promotion of health." This score does not establish Dr. McDaniel's ranking as slightly behind his peers, even though such a ranking would not in any event justify dismissal.

114.   <u>Surgeries with Dr. Pinzur.</u>  The Termination Letter accused Dr. McDaniel of not participating in surgery cases with Dr. Pinzur.  These surgeries were only delayed because of Dr. McDaniel's detached retina and were made up after his eye healed. Dr. Pinzur submitted a passing evaluation on August 13, 2012, just short of one month before the probationary period was to end and just longer than one month before termination.

<em>Allegation #2: Absent Without Leave</em>

115.   The Termination Letter cites three dates that Dr. McDaniel was allegedly "absent without leave": April 27, 2012, May 11, 2012, and May 18, 2012.

116.   These dates originate from a letter written by Dr. Wojewnik, Chief Resident of the Sports Service, on June 19, 2012, in which he stated to Dr. Hopkinson that Dr. McDaniel had taken off April 27th, May 8th, May 11th, and May 18th without submitting required paperwork.

117.   Contrary to Dr. Wojewnik's statements, Dr. McDaniel had not requested leave, but instead requested he not be put on the call schedule so he could pursue academic opportunities.  Loyola does not require formal requests to be submitted when a resident requests not to be put on call for academic or personal reasons such as training courses.

118.  On April 27, 2012 and May 18, 2012, Dr. McDaniel was preparing for and attending courses at the NASS facility in Burr Ridge, Illinois.  Dr. McDaniel had permission from Defendant Hopkinson as well as Drs. Tonino and Marra, the attending physicians for the days in question.  Dr. McDaniel had no clinical responsibilities on these days.  When he signed the termination letter, Dr. Hopkinson knew that he had given Dr. McDaniel permission to attend the courses at the NASS facility and that Dr. McDaniel had not improperly taken these days off without submitting required paperwork.

119.  On May 11, 2012, Dr. McDaniel, with the permission and knowledge of Defendant Hopkinson, was seated directly outside Defendant Hopkinson's office making phone calls to find a fellowship position.  Dr. Hopkinson knew when he signed the termination letter that Dr. McDaniel had not improperly taken this day off without submitting required paperwork.

120.  Dr. Wojewnik's listing of May 8th was so ridiculous that it was omitted from the termination letter.  Dr. McDaniel had withdrawn his request for leave on that date and actually worked 37 consecutive hours between May 8th and May 9th, in violation of ACGME rules.

121.  Dr. Wojewnik later admitted to Dr. McDaniel that he wrote his letter based on pressure from Dr. Salazar and Dr. Hopkinson to invent a justification for terminating Dr. McDaniel.  Dr. Salazar boasted to Dr. McDaniel that he read and discussed the Wojewnick letter and was confident the information would be enough to terminate Dr. McDaniel.

122.   The allegations that Dr. McDaniel was absent without leave are unfounded and Dr. Hopkinson knew this when he included the accusations in the Termination Letter.

123.   Further, the Termination Letter misstates the conversation between Defendant Hopkinson and Dr. McDaniel regarding these absences.  Dr. McDaniel provided Dr. Hopkinson with explanations for the approved absences.

*Allegation #3: Surgical Case Logs*

124.    The third termination justification alleges that Dr. McDaniel included non-orthopaedic procedures in his ACGME surgical case logs.

125.   The Resident Handbook states that the Loyola Orthopaedic department followed ACGME guidelines, which allowed him to log all procedures.

126.   Coding all procedures prevents misleading statistics and there is no justification for preventing residents from logging all work as long as it is coded correctly.

*Allegation #4: Procedures*

127.   The fourth allegation, that Dr. McDaniel recorded procedures in his case log that did not occur, is also unfounded.

128.   The Termination Letter alleges twelve procedures as falsified, of a total of 925 procedures.  These twelve entries account for only a .13% error rate and are attributable to data entry errors.

129.   Data errors are common in the case logs and Dr. McDaniel's errors were minor compared to his peers.  A report distributed to the residents at a meeting

25

on August 30, 2012, demonstrates that Dr. McDaniel's case logs were equivalent to those of his peers.

130.   Even this trivial .13% error rate is incorrect; Dr. McDaniel is able to identify the data errors and prove he completed the logged procedures.

### *Termination Hearing*

131.   The September 17, 2012, Termination Letter made four general allegations, none of which matched the justifications in the Probation Letter.

132.   Dr. McDaniel timely requested a grievance hearing on the termination.

133.   Dr. Cannon scheduled this hearing for October 5, 2012, and appointed Drs. Hotaling, Santaniello, and Steele to the termination hearing panel.

134.   Instead of throwing out the false and misleading charges of the Termination Letter, the panel changed the alleged deficiencies to "poor communication, poor professionalism, and lying."  No explanation of what was meant by these terms was provided.  No instance of lying was identified.  There was no affirmation of the four deficiencies identified Termination Letter.

135.   The panel's decision was pretextual, arbitrary, irrational, and made in bad faith.  They failed to consider the reasons Dr. McDaniel was put on probation and later terminated, focusing instead only on issues for which Loyola Medical may have been exposed to liability.

136.   Defendants' wrongful conduct against Dr. McDaniel did not cease after they fired him.  They acted in malicious, improper ways to prevent him from ever working in his chosen profession, as set forth below.

**Interference with Spine Fellowships**

137.   Residents interested in spine surgery participate in the San Francisco Match ("SF Match") Spine Surgery Fellowship Match ("SFM"), a nationally organized service that matches residents with fellowship programs.  Applicants submit a common application and submit all documentation directly to the SF Match and rank each program.  Programs also rank their choices of residents, and the SF Match coordinates appointments to fellowship programs.

138.   Dr. McDaniel participated in the Match process in 2012, and Defendant Dr. Ghanayem requested a copy of Dr. McDaniel's ranked list of residency programs, which Dr. McDaniel provided on April 5, 2012.

139.   Dr. McDaniel was invited to interview by 21 programs, chose 13 to interview with, and ranked all 13 of those programs.

140.   None of the 13 programs offered Dr. McDaniel a fellowship, and several did not rank him at all even though they ended up with unfilled fellowship positions.

141.   On information and belief, this rare occurrence was caused by Dr. Ghanayem's communications with these programs in which false information was provided about Dr. McDaniel, including that:

a.      he had low OITE scores for 2010, notwithstanding that AAOS policy does not allow institutions to rely on OITE scores for graduation, advancement, or probation decisions because the variations in scores are dramatic, and notwithstanding that Loyola orthopaedic surgery residents typically score at or below the national average;

b.     he was aggressive in the workplace, especially with women, notwithstanding that no complaint was made to him or about him in that regard;

c.     he was unprofessional or incompetent, notwithstanding that his performance was on par with or better than other residents;

d.     other false communications, as yet unknown.

142.   After he did not match, Dr. McDaniel contacted programs with open fellowship positions, a process referred to as the "Scramble." He contacted doctors and administrators and over ten fellowship programs to apply for an appointment.

143.   During Scramble, Dr. McDaniel was informed by multiple fellowship interviewers that his materials indicated that someone was sabotaging his attempts to find a spine fellowship.

144.   On information and belief, Dr. Ghanayem contacted several of these programs and provided false information about Dr. McDaniel, including that:

a.     he was a poor candidate, notwithstanding that receipt of the 2011 OITE scores showed him on a par with other residents at Loyola Medical;

b.     he was aggressive in the workplace, especially with women, notwithstanding that no complaint was made to him or about him in that regard;

c.     he was unprofessional or incompetent, notwithstanding that his performance was on a par with or better than other residents;

d.     other false communications, as yet unknown.

145.   In spite of the interference by Dr. Ghanayem, The University of Washington-Harborview extended a fellowship offer to Dr. McDaniel.

146.   After Defendants learned that he had obtained this position, Dr. McDaniel was terminated as a Loyola Medical resident, requiring the University of Washington-Harborview to revoke its offer because fellowship candidates must have completed five years of orthopaedic residency before qualifying for the spine fellowship.

### Post-Termination Interference with Residency Positions

147.   After his termination, Dr. Light sabotaged Dr. McDaniel's attempts to find another residency position.

148.   Dr. McDaniel applied to twelve residency programs that had unfilled resident positions, including Cooper University, Henry Ford Hospital, the University of Virginia, the University of South Carolina, the Mayo Clinic, the University of Kentucky, Saint Louis University, the University of Oklahoma, Carolinas Medical Center, John Peter Smith Hospital, and the University of Colorado.

149.   Dr. McDaniel was informed by representatives of Cooper University, the University of Virginia, Henry Ford Hospital, and the University of Colorado that he was being seriously considered for placement.

150.   Each institution subsequently denied Dr. McDaniel a position.

151.   On information and belief, Dr. Light communicated with these programs and provided false information about Dr. McDaniel, including that:

a.    he was a poor candidate, notwithstanding that receipt of the 2011

OITE scores showed him on a par with other residents at Loyola Medical;

b.    he was aggressive in the workplace, especially with women,

notwithstanding that no complaint was made to him or about him in that

regard;

c.    he was unprofessional or incompetent, notwithstanding that his

performance was on a par with or better than other residents;

d.    other false communications, as yet unknown.

152. Dr. McDaniel has never had a complaint lodged against him for

aggressive workplace behavior and has never been accused of any gender

discrimination or aggression.  No such allegations were raised in Dr.

McDaniel's probation and termination proceedings.

153.   Dr. Light knowingly made false statements in order to prohibit Dr.

McDaniel from being placed in a residency.

### COUNT ONE:
**VIOLATION OF USERRA, 38 U.S.C. §4311 – RETALIATION**
**Against Defendants Loyola University Medical Center, Trinity Health**
**Corporation, Loyola University Chicago, Hopkinson, and Salazar**

154.   Dr. McDaniel realleges and incorporates by reference the allegations of

fact contained in previous paragraphs.

155.   At all times relevant to this complaint, Dr. McDaniel was a member of the

Air National Guard.

156.    The Uniformed Services Employment and Reemployment Rights Act of

1994 (USERRA), forbids an employer from denying "employment,

reemployment, retention in employment, promotion, or any benefit of

employment" based on a person's "membership" in or "obligation to perform service in a uniformed service," 38 U.S.C. §4311(a), and provides that liability is established "if the person's membership ... is a motivating factor in the employer's action." 38 U.S.C. §4311(c).

157.   Further, an employer may not require an employee "to ask for or get his or her employer's permission to leave to perform service in the uniformed services," 20 CFR Part 1002.87, nor is the employee "required to accommodate his or her employer's interests or concerns regarding the timing, frequency, or duration of uniformed service." 20 CFR Part 1002.104.

158.   An employer may not require written notice, pursuant to 38 USCS § 4303 (8), and "the notice may be informal and does not need to follow any particular format."  20 CFR Part 1002.85.

159.   Defendants relied upon, took into account, considered, or conditioned their employment decision on Dr. McDaniel's military service.

160.   Direct and circumstantial evidence exists to establish the discriminatory motivation or intent under USERRA of Defendants in terminating Dr. McDaniel from the residency program.

161.   Dr. McDaniel notified Defendant Hopkinson of his military orders on or about May 29, 2012.

162.   Loyola Medical administrative staff, under the guidance of Dr. Hopkinson, scheduled Dr. McDaniel to work during periods when they knew he was scheduled to perform his military obligations, in violation of USERRA.

163. Dr. McDaniel was required by Defendant Hopkinson to find other residents to cover shifts for which he was scheduled, in violation of USERRA.

164. Drs. Hopkinson and Salazar insisted upon seeing paper copies of Dr. McDaniel's military orders, in violation of USERRA.

165. Dr. Salazar agreed to cover shifts assigned to Dr. McDaniel during his military service, then lied to hospital staff and doctors and stated that he had not agreed to do so. This contributed to the animosity suffered by Dr. McDaniel and resulted in Defendant Hopkinson placing negative notes in Dr. McDaniel's personnel file.

166. On June 14, 2012, Defendant Hopkinson placed Dr. McDaniel on probation, sixteen days after Dr. McDaniel notified Dr. Hopkinson of his orders.

167. Dr. McDaniel was later terminated based on the alleged failure to comply with the probation, which was imposed pursuant to antimilitary animus.

168. Defendants' statements and actions leading to probation and subsequent termination, together with the subsequent contradictory explanations, demonstrate that Plaintiff's military service was a motivating factor in Defendants' decision.

169. As a result of Defendants' actions, Dr. McDaniel has suffered lost wages, loss of benefits, loss of employment, reputational harm, and emotional distress.

**COUNT TWO:**
**VIOLATION OF USERRA, 38 U.S.C. §4311 –**
**HOSTILE WORK ENVIRONMENT**
**Against Defendants Loyola University Medical Center, Trinity Health**
**Corporation, Loyola University Chicago, Hopkinson, and Salazar**

170. Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

171. At all times relevant to this complaint, Dr. McDaniel was a member of the Air National Guard.

172. USERRA prevents employers from discriminating on the basis of military status by denying benefits, including "the terms, conditions, or privileges of employment." 38 U.S.C 4303 (2). Thus, an employer may not create a hostile work environment based on antimilitary animus.

173. An employer may not require written notice of military orders, pursuant to 38 USCS § 4303 (8), and "the notice may be informal and does not need to follow any particular format." 20 CFR Part 1002.85.

174. Drs. Hopkinson and Salazar created a hostile work environment for Dr. McDaniel based on his military service that was sufficiently severe and pervasive to alter the conditions of employment.

175. Direct and circumstantial evidence exists to establish the discriminatory motivation or intent under USERRA of Drs. Hopkinson and Salazar in their treatment of Dr. McDaniel.

176. Loyola Medical staff, under the direction of Dr. Hopkinson, scheduled Dr. McDaniel to work during periods when they knew he was scheduled to perform his military obligations, in violation of USERRA.

177.   Dr. McDaniel was required by Defendant Hopkinson to find other residents to cover shifts for which he was scheduled, in violation of USERRA.

178.   Drs. Hopkinson and Salazar insisted upon seeing paper copies of Dr. McDaniel's military orders, in violation of USERRA.

179.   Dr. Salazar agreed to cover shifts assigned to Dr. McDaniel during his military service, then lied to hospital staff and doctors and stated that he had not agreed to do so.  This contributed to the animosity suffered by Dr. McDaniel and resulted in Defendant Hopkinson placing negative notes in Dr. McDaniel's personnel file.

180.   Dr. Salazar was antagonistic and unreceptive to Dr. McDaniel when he requested they cover shifts that were schedule during his military orders, creating a hostile work environment.

181.   Dr. Salazar gained access to Dr. McDaniel's private leave requests and leave schedule, constituting harassment.

182.   Loyola Medical and Dr. Hopkinson were aware of Dr. Salazar's harassment of Dr. McDaniel and failed to take remedial action.

183.   Drs. Hopkinson and Salazar's harassment of Dr. McDaniel created a workplace environment that was objectively and subjectively offensive.

184.   Defendants' statements and actions demonstrate that Plaintiff's military service was a motivating factor in the creation of a hostile work environment, and denied Dr. McDaniel the benefits of employment enjoyed by other residents.

185.   As a result of Defendants' actions, Dr. McDaniel has suffered pain and suffering, lost wages, loss of benefits, loss of employment, reputational harm, and emotional distress.

**COUNT THREE:**
**VIOLATION OF DUE PROCESS**
**Against Defendants Loyola University Medical Center, Trinity Health Corporation, Loyola University Chicago, Light, and Ghanayem**

186.   Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

187.   Dr. McDaniel had a liberty interest and a property interest in his good name and reputation and his license to practice medicine under the Fifth and Fourteenth Amendments to the United States Constitution.  U.S. Const. Amend. V and XIV.

188.   Trinity Health Corporation, Loyola University Medical Center, and Loyola University Chicago receive federal funding from CMS for the direct costs of graduate medical education based on the number of residents.  Because the program receives federal funds, Defendants are required to provide procedural due process to residents.

189.   Drs. Light and Ghanayem, acting as agents of Loyola University Medical Center, publically disclosed defamatory statements regarding Dr. McDaniel to residency and fellowship programs.

190.   These false statements were incident to Dr. McDaniel's termination.

191.   Dr. McDaniel was stigmatized by the false statements made by Drs. Light and Ghanayem.

192.   Prior to the defamatory statements made by Drs. Light and Ghanayem, Dr. McDaniel had an excellent professional reputation.

193.   Following the publicized statements made by Drs. Light and Ghanayem regarding the reasons for Dr. McDaniel's termination, Dr. McDaniel's good name, reputation, honor and integrity were called into question in a manner that has made it impossible for Dr. McDaniel to find new employment in his chosen field.

194.   Dr. McDaniel suffered damages as a result of the publication of these false statements.

### COUNT FOUR:
### BREACH OF CONTRACT
### Against Defendants Loyola University Medical Center,
### Trinity Health Corporation, and Loyola University Chicago

195.   Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

196.   Pursuant to Dr. McDaniel's employment contract, Defendants were required to abide by the Resident Handbook.

197.   Section III.P.5 of the Resident Handbook forbids retaliation, adverse action, and disciplinary action against an employee who "reports a compliance problem or concern in good faith."  See Exhibit 1.

198.   Dr. McDaniel was an employee of Defendant organization and, as a resident in the ACGME-accredited program, required to abide by the rules and regulations of the ACGME.

199.   Dr. McDaniel was instructed by Defendants to lie to the ACGME regarding his hours worked.

200.  Dr. McDaniel was unwilling to lie to the ACGME, risking his professionalism, ethics, and future medical career.  Therefore, he opted not to turn in an ACGME-survey relating to his hours worked.

201.  Dr. McDaniel informed Defendant staff that he had not turned in this form.

202.  Dr. McDaniel also elected to log his cases pursuant to the new ACGME guidelines knowing that Loyola Medical claimed to follow these rules and regulations.

203.  Loyola Medical relied on his case logging procedures in his probation and termination decisions.

204.  Section III.C outlines the grievance procedure and the rights afforded to residents should they dispute an employment action taken against them.  A resident has a right to grieve written warnings, probation and termination decisions.

205.  Section III.G.11 requires that Loyola provide due process to all residents enrolled in multi-year programs who are denied promotion to the following PGY level.

206.  Defendants breached this contract by:

> a.     Failing to schedule Dr. McDaniel's probationary hearing within the required forty-five days of his request for such a hearing;
>
> b.     Terminating Dr. McDaniel prior to his probationary hearing;
>
> c.     Failing to adequately consider the allegations on which probation was imposed at his probation hearing;

d.    Failing to adequately consider the allegations on which termination was imposed at his termination hearing;

e.    Denying Dr. McDaniel due process as required by the Resident Handbook.

207.    Dr. McDaniel fully performed under the contract.

208.    As a direct and proximate cause of Defendants' wrongful actions, Dr. McDaniel suffered damages.

### COUNT FIVE:
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS EXPECTANCY – SPINE FELLOWSHIPS
### Against Defendant Ghanayem

209.    Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

210.    Dr. McDaniel had a reasonable expectation of entering into a valid business relationship with multiple fellowship programs, as evidenced by offers from the University of Washington-Harborview and from communications with other programs who were anxious to bring him in as a spine fellow.

211.    Dr. Ghayanem was aware of Dr. McDaniel's opportunities at the University of Washington-Harborview, the Mayo Clinic, and in other fellowship programs.

212.    Dr. Ghayanem purposefully interfered with Dr. McDaniel's opportunities by making false statements regarding his performance at Defendant institution, his treatment of women, his interactions with colleagues, his professionalism, and other defamatory statements.

213.   Dr. Ghayanem's interference was done without legal justification. Instead, Dr. Ghanayem intended to ruin Dr. McDaniel's career.

214.   These statements were the direct and proximate cause for the University of Washington-Harborview, The Mayo Clinic, and other programs denying or rescinding fellowship offers or further discussion regarding employment with Dr. McDaniel.

215.   Dr. McDaniel was prevented from finding other fellowship programs due directly to Dr. Ghanayem's actions.

216.   The denial of fellowship offers also impacted his ability to find another residency program following termination from Loyola Medical.

217.   Dr. McDaniel suffered loss of income, loss of benefits, loss of future employment, reputational harm, and emotional distress from the interference by Dr. Ghanayem.

## COUNT SIX:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS EXPECTANCY – RESIDENCY PROGRAMS
### Against Defendant Light

218.   Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

219.   Dr. McDaniel had a reasonable expectation of entering into a valid business relationship with multiple residency programs following his termination from Loyola.

220.   Dr. Light was aware of Dr. McDaniel's opportunities to find another orthopaedic surgery residency program.

221.  Dr. Light purposefully interfered with Dr. McDaniel's opportunities by making false statements regarding his performance at Defendant institution, his treatment of women, his interactions with colleagues, his professionalism, and other defamatory statements.

222.  Dr. Light acted with malice and intended to ruin Dr. McDaniel's prospective opportunities without legal justification.

223.  These statements were the direct and proximate cause for the residency programs to decline to extend an offer to Dr. McDaniel.

224.  Dr. McDaniel was prevented from finding other residencies due directly to Dr. Light's actions.

225.  Dr. McDaniel suffered loss of income, loss of benefits, loss of future employment, reputational harm, and emotional distress from the interference by Dr. Light.

**COUNT SEVEN:**
**DEFAMATION**
**Against Defendant Ghanayem**

226.  Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

227.  Dr. Ghanayem made false statements to administrators of fellowship programs regarding Dr. McDaniel's interactions with colleagues, aggression toward women, unprofessionalism, and inability to perform.

228.  Dr. Ghanayem knew these statements were false and made them in bad faith, with actual malice or reckless disregard for Dr. McDaniel's reputation and professional opportunities.

229.   Dr. Ghanayem published these statements when he shared them extensively with fellowship program directors.

230.   As a direct and proximate result of Dr. Ghanayem's false statements, Dr. McDaniel suffered damages; specifically, Dr. McDaniel was unable to find another fellowship program.

## COUNT EIGHT:
### DEFAMATION
### Against Defendant Light

231.   Dr. McDaniel realleges and incorporates by reference the allegations of fact contained in previous paragraphs.

232.   Dr. Light made false statements to administrators of residency programs regarding Dr. McDaniel's interactions with colleagues, aggression toward women, unprofessionalism, and inability to perform.

233.   Dr. Light knew these statements were false and made them in bad faith, with actual malice or reckless disregard for Dr. McDaniel's reputation and professional opportunities.

234.   Dr. Light published these statements when he shared them extensively with residency program directors.

235.   As a direct and proximate result of Dr. Light's false statements, Dr. McDaniel suffered damages; specifically, Dr. McDaniel was unable to find another residency program.

WHEREFORE, Dr. McDaniel prays that judgment be entered in his favor and against Defendants for compensatory damages, plus reasonable attorneys' fees and costs, and grant any other relief as this Court deems just.

**PLAINTIFF DEMANDS TRIAL BY JURY AS TO ALL RELIEF SOUGHT.**

Date: September 11, 2013

Respectfully Submitted,

/s/ Kristi L. Browne
Kristi L. Browne (ARDC #6195553)
Kathryn M. Walker (ARDC #6307258)
The Patterson Law Firm, LLC
One N. LaSalle St., Suite 2100
Chicago, Illinois, 60602
(312) 223-1699
Fax: (312) 223-8549
kbrowne@pattersonlawfirm.com
kwalker@pattersonlawfirm.com