**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK D. MCDANIEL, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-06500 |
| | ) | |
| LOYOLA UNIVERSITY MEDICAL | ) | Judge Robert M. Dow, Jr. |
| CENTER, TRINITY HEALTH | ) | |
| CORPORATION, LOYOLA | ) | |
| UNIVERSITY CHICAGO, WILLIAM | ) | |
| HOPKINSON, M.D., TERRY LIGHT, | ) | |
| M.D., WILLIAM CANNON, M.D., | ) | |
| DANE SALAZAR, M.D., and | ) | |
| ALEXANDER GHANAYEM, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' motion to dismiss [41] Plaintiff's amended complaint and motion to strike Plaintiff's affidavit [67]. For the reasons set forth below, the Court grants in part and denies in part Defendants' motion to dismiss [41] and denies Defendants' motion to strike [67]. Additionally, Defendants' unopposed motion for extension of time to reply in support of their motion to dismiss [59] is granted. Defendant Dane Salazar's motion to stay proceedings [39] until June 27, 2014 is denied as moot.

**I.     Background[1]**

Plaintiff Mark McDaniel is a veteran of the United States Air Force and Air National Guard who alleges that he was wrongfully terminated from Loyola University Medical Center's five-year Orthopaedic Residency Program in violation of the Uniformed Services Employment

---

[1] For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

and Reemployment Rights Act ("USERRA"), his due process rights, and his employment contract. He also alleges that certain Defendants tortiously interfered with his prospective business relationships and defamed him.

McDaniel entered the Air Force at age seventeen. Amend. Compl. ¶ 15. After fifteen years in military service, McDaniel graduated from Friends University in Wichita, Kansas with a degree in computer science and biology. *Id.* at ¶ 16. Because of his years in the service, his National Guard Unit permitted him to pursue a medical degree, and he enrolled at The University of Kansas Medical School in 2002. *Id.* at ¶¶ 17-18. Following graduation in 2008, McDaniel began his residency in Loyola University Medical Center's ("LUMC") Orthopaedic Surgery program. *Id.* at ¶ 21. According to McDaniel, LUMC requires all residents to abide by the policies contained in the Resident Handbook, a mandate that is memorialized in the Graduate Medical Education Agreement ("GMEA") that residents must sign each year. *Id.* at ¶¶ 27-28. The Accreditation Council for Graduate Medical Education ("ACGME") is the professional organization responsible for the accreditation of residency education programs. *Id.* at ¶ 29. For an institution to receive federal funding, it must be accredited. *Id.* at ¶ 30, 33. Moreover, only residents who graduate from ACGME-accredited programs are eligible to sit for board certification examinations, and many states only issue physician licenses to graduates of such programs. *Id.* at ¶ 30. LUMC is accredited by ACGME, and is therefore subject to a variety of ACGME-imposed requirements. *Id.* at ¶¶ 32, 35-38.

According to McDaniel's complaint, he was an outstanding resident, earning "the Magis Star for outstanding service and care" in 2010, commendation for his "professionalism and communication skills," and esteem for having the "best surgical hands" in his class. *Id.* at ¶ 60. In spite of these accolades, McDaniel's relationships with his superiors turned sour toward the

end of his fourth year in the program when he refused to lie on a 2011-2012 ACGME compliance survey concerning the number of consecutive hours he had worked that year. *Id.* at ¶¶ 61-64. Although ACGME mandates that no resident may work more than 30 consecutive hours, (*id.* ¶ 35), McDaniel had exceeded that cap by working a 37-hour shift on May 8 and 9, 2012. *Id.* at ¶¶ 61-64. Things got worse for McDaniel when his retina detached in July 2012 and Dr. William Hopkinson, the residency's program director, refused his request to miss ten days of work to recover from surgery. *Id.* at ¶¶ 6, 65-70. On top of that, Hopkinson took issue with McDaniel's three-week Air National Guard obligation that required him to miss work during the weeks of June 25-29, July 20-29, and September 10-14, 2012. *Id.* at ¶¶ 74-76.

McDaniel informed Hopkinson of his need for military leave in early June, 2012, and Hopkinson called a meeting with McDaniel to discuss this request on June 14, 2012. *Id.* at ¶¶ 74-77, 79, 161. At the meeting, Hopkinson demanded to see McDaniel's military orders and informed McDaniel that he was being placed on academic probation – an action that McDaniel alleges was in retaliation for his request for three weeks of leave to fulfill his military obligations. *Id.* at ¶¶ 75-77. McDaniel appealed the probation decision, and, ultimately, Hopkinson granted McDaniel's request for military leave on the condition that McDaniel arrange for other residents to cover his shifts. *Id.* at ¶¶ 80, 96. According to McDaniel, his co-residents (especially Dane Salazar) were hostile to the idea, demanding to see his orders and either refusing to work his shifts or demanding that McDaniel cover multiple shifts in return. *Id.* at ¶¶ 85-86. On one occasion, Salazar agreed to cover a shift for McDaniel, but then failed to show up for work and denied having agreed to cover it. *Id.* at ¶¶ 88-89. McDaniel alleges that he complained to Hopkinson about Salazar's behavior, but that Hopkinson took no action to curtail Salazar's harassment. *Id.* at ¶ 90. In addition, McDaniel complains that LUMC scheduled him

to work a shift on July 25, when he was supposed to be away on military orders. *Id.* at ¶ 82. When he brought this to Hopkinson's attention, Hopkinson required McDaniel to find another resident to cover the shift. *Id.* at ¶ 83.

McDaniel's appeal concerning his academic probation was denied, at which time he requested a hearing within 45 days, pursuant to the grievance procedures set forth in the Resident Handbook. *Id.* at ¶¶ 96-97. However, due to an oversight by LUMC's associate dean, Dr. William Cannon, LUMC failed to schedule McDaniel's hearing in the requisite 45-day timeframe. *Id.* at ¶¶ 8, 97. Nevertheless, McDaniel agreed "to forgive the oversight and authorize the hearing outside the program requirements," and so a hearing was scheduled for September 20, 2012. *Id.* at ¶¶ 98-99. But on September 4, before that hearing could take place, Hopkinson led a private meeting of the Education Committee, which voted to terminate McDaniel from the residency program. *Id.* at ¶ 100. McDaniel alleges that his termination was in retaliation for his taking military leave, his request for leave to recover from his retina surgery, and his invocation of the grievance procedures relating to his probation. *Id.* at ¶ 101.

On September 17, three days before McDaniel's grievance hearing, Hopkinson informed McDaniel of his termination from the program. *Id.* at ¶ 103. McDaniel's September 20 hearing went forward as scheduled, but Associate Dean Cannon instructed McDaniel beforehand not to mention his termination to the grievance board. *Id.* at ¶¶ 104-06. According to McDaniel, Dr. Terry Light, Chair of Orthopaedic Surgery and Rehabilitation, falsely testified before the grievance board that McDaniel had garnered the negative attention of ACGME by mishandling the logging of his cases into the hospital's case tracking software. *Id.* at ¶¶ 42-43, 107. Despite the false testimony, two of the three grievance board members "refused to sign the letter affirming McDaniel's probation," and one of them explicitly announced his belief that McDaniel

had done nothing wrong. *Id.* at ¶ 109. This was too little too late for McDaniel, however, because the Education Committee had already voted to terminate him from the program three days earlier.

McDaniel's termination letter set out, in his view, a number of false and pretextual reasons for his firing, including that McDaniel failed evaluations, missed assignments, was "absent without leave" on several occasions, and violated case-logging procedures. *Id.* at ¶¶ 111-130. McDaniel says the dates of his alleged absences stem from a letter written by Dr. Wojewnik, Chief Resident of Sports Services. *Id.* at ¶ 116. According to McDaniel, Dr. Wojewnik later admitted that he had been pressured to write the letter by Dr. Salazar and Dr. Hopkinson to invent a justification for termination, (*id.* at ¶ 121), and none of the allegations in the termination letter matched the justifications listed in his probation letter. *Id.* at ¶ 131. For these reasons, McDaniel again invoked LUMC's grievance procedures and requested a hearing on his termination, which Cannon set for October 5, 2012. *Id.* at ¶¶ 132-33. At the hearing, however, the termination panel altered the purported bases for McDaniel's dismissal that Wojewnik had invented, citing vague reasons such as "poor communication, poor professionalism, and lying" as justification for its decision. *Id.* at ¶ 134.

As McDaniel tells it, LUMC employees' efforts to subvert his career actually started in April 2012, before McDaniel had requested military leave, detached his retina, or worked the 37-hour shift that seemed to precipitate his downfall at LUMC. At that time, McDaniel participated in a fellowship match program in the hopes of landing a spine surgery fellowship to begin at the conclusion of his residency. *Id.* at ¶¶ 137-38. Upon learning of his participation in the match program, Dr. Alexander Ghanayem, an attending physician at LUMC, asked McDaniel for a list of the thirteen residency programs that had invited him to interview and that, subsequently, he

had ranked in the match process. *Id.* According to McDaniel, Ghanayem called each of these thirteen programs and falsely reported that McDaniel had low OITE scores (though McDaniel's amended complaint does not explain for what those initials stand), that "he was aggressive in the workplace, especially with women," and "was unprofessional or incompetent." *Id.* at ¶ 141. Consequently, McDaniel alleges, none of the thirteen programs offered him a fellowship. *Id.* at ¶ 140. In fact, several programs did not even rank him, despite ending up with unfilled fellowship positions. *Id.* Matchless, McDaniel then participated in the "scramble" process, whereby unmatched candidates attempt to find last-minute placement with those programs that did not fill each of their fellowship slots. *Id.* at ¶ 142. During the scramble process, "multiple fellowship interviewers" informed McDaniel that someone (who McDaniel believes to be Ghanayem) "was sabotaging his attempts to find a spine fellowship." *Id.* at ¶ 143. But in spite of those efforts, The University of Washington-Harborview extended a fellowship offer to McDaniel. *Id.* at ¶ 145. However, "[a]fter Defendants learned that he had obtained this position, Dr. McDaniel was terminated as a Loyola Medical resident, requiring the University of Washington-Harborview to revoke its offer because fellowship candidates must have completed five years of orthopaedic residency . . . ." *Id.* at ¶ 146.

Following his termination, subversion efforts by LUMC employees continued. Needing to complete the fifth year of his program, McDaniel applied to resident positions at twelve schools that had an open spot. *Id.* at ¶ 148. Four of the twelve specifically told McDaniel that "he was seriously being considered for placement." *Id.* at ¶ 149. Dr. Light, however, allegedly saw to it that none of the four went any further than that by – just as Ghanayem had done during McDaniel's fellowship match – informing these programs that McDaniel was a poor candidate, was aggressive with women in the workplace, and "was unprofessional or incompetent." *Id.* at ¶

151.

McDaniel commenced this suit on September 11, 2013 and filed his eight-count amended complaint [30] on October 30, 2013. Count I alleges that LUMC, Trinity Health Corporation ("Trinity"), Loyola University Chicago ("LUC"), Hopkinson, and Salazar violated USERRA by taking adverse employment actions against him in retaliation for his military service. Count II alleges that LUMC, Trinity, LUC, Hopkinson, Salazar, and Cannon violated USERRA by creating a hostile work environment based on antimilitary animus. Count III alleges that LUMC, Trinity, LUC, Light, and Ghanayem violated his due process rights, in contravention of the Fifth and Fourteenth Amendments, by making false statements about him to prospective residency and fellowship programs. Count IV alleges that LUMC, Trinity, and LUC breached a contract with him by retaliating against him when he refused to lie about his hours on the ACGME compliance survey, failing to schedule his probationary hearing within 45 days of his request, terminating him prior to the probationary hearing, failing to adequately consider the allegations on which probation was imposed at his probation hearing, failing to adequately consider the allegations on which termination was imposed at his termination hearing, and generally denying him the due process that the Resident Handbook required. Count V alleges that Ghanayem tortiously interfered with a prospective business expectancy by making false statements to fellowship programs. Count VI makes the same claim against Light based on the statements that he allegedly made to residency programs. And Counts VII and VIII allege that Ghanayem and Light, respectively, defamed McDaniel by making these statements.

Defendants moved to dismiss McDaniel's amended complaint [41] in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing, among other things, that many of McDaniel's claims should be dismissed for failure to allege sufficient facts.

McDaniel then filed a 63-paragraph affidavit along with his opposition brief, adding significant detail to his allegations in an attempt to bolster his complaint. Defendants replied to Plaintiff's opposition and moved to strike his affidavit [67], which Defendants characterize as "an attempt to file yet another amended complaint without the required leave from this Court."

## II.    Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility

as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

### A. USERRA Claims Against Dr. Salazar, Trinity, and Loyola University

#### 1. Salazar

Defendants first argue that Counts I and II should be dismissed as to Dr. Salazar, Plaintiff's co-resident, because he is not an "employer" for purposes of USERRA. USERRA defines "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including: (i) a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. § 4303(4)(A). No federal court of appeals has had occasion to comment on the scope of "employer" under USERRA, but the district courts that have considered the term agree that an "employer" is one within an organization with the power to directly hire and fire the employee. See, *e.g., Coulson v. Town of Kearny*, 2010 WL 331347, at *6 (D.N.J. Jan. 19, 2010) (defendant town's business administrator not employer of plaintiff firefighters when he had no independent authority to hire or fire); *Brooks v. Fiore*, 2001 WL 1218448, at *9 (D. Del. Oct. 11, 2001), *aff'd* 53 Fex. Appx. 662 (3d Cir. 2002) (supervisor who carried out firing decision but did not have power to initiate that decision not an employer).

Plaintiff urges the Court to rely on *Carter v. Siemens Business Services, LLC*, 2010 WL 3522949 (N.D. Ill. Sept. 2, 2010), a case that espouses a slightly broader interpretation of "employer," and one which Plaintiff argues sweeps Salazar within its purview. *Carter*

interpreted "employer" to include a defendant human resources consultant whose job was to "provide[] advice and make[] recommendations to managers regarding discipline and termination" in accordance with company policy, and who recommended the termination of the plaintiff. *Id*. at *9. The court reasoned that although some jurisdictions had confined the meaning of employer to those with final hiring and firing authority, the language of the statute "arguably support[s] a broader interpretation." *Id*. at *8. The statute provides that an employer is any person "that has control over employment opportunities" but makes an exception for anyone who performs "purely ministerial" functions, "such as maintenance of personnel files or the preparation of forms for submission to a government agency." *Id*. at *9. The court reasoned that because this exception did not apply to the defendant, and because the defendant's recommendation that the company fire Plaintiff resulted in his termination, there was evidence that the defendant had "control over [the plaintiff's] employment opportunities." *Id*. Consequently, the court denied the defendant company's motion for summary judgment. *Id.*

Under even *Carter*, Salazar is not an employer for USERRA purposes. According to McDaniel, Salazar, along with other co-residents, was "antagonistic and unreceptive" to Plaintiff's requests to cover shifts, sometimes demanding that Plaintiff work multiple shifts in exchange or show Salazar his leave requests. Amend. Compl. at ¶¶ 85-86. Salazar also demanded copies of Plaintiff's orders and, on one occasion, agreed to cover one of Plaintiff's shifts but then denied having done so after failing to show up for it. *Id*. at ¶ 87-89. Plaintiff alleges that he told Hopkinson of Salazar's conduct, but that "[u]pon information and belief, no action was taken against Dr. Salazar and the harassment grew worse over time." *Id.* at ¶ 90. These allegations portray an irritating, if not vindictive coworker, but they do not suggest that Salazar had any semblance of control over Plaintiff's employment opportunities.

Plaintiff further alleges that Wojewnik wrote a letter that was used by the committee that voted to terminate Plaintiff. That letter, Plaintiff alleges, stated that Plaintiff had been absent without leave when in reality he was on military duty. According to Plaintiff, Wojewnik "later admitted to Dr. McDaniel that he wrote his letter based on pressure from Dr. Salazar and Dr. Hopkinson to invent a justification for terminating Dr. McDaniel" and that Salazar "boasted to Dr. McDaniel that he read and discussed the Wojewnik letter and was confident the information would be enough to terminate Dr. McDaniel." *Id.* at ¶ 121. Even this allegation, taken as true, does not demonstrate that Salazar had *control* over the decision to terminate Plaintiff in the way that courts, including *Carter*, define it. That Salazar, Plaintiff's peer, desired to get Plaintiff fired, and even actively worked toward that end, is not enough to show that he had authority over the decision. Salazar was not Plaintiff's superior and had no supervisory charge over Plaintiff. Rather, Salazar was Plaintiff's co-resident, who voiced his opinions and, in Plaintiff's view, was able to influence the ultimate decision of his superiors. The fact that Salazar had to go through others in trying to get Plaintiff fired demonstrates that he was not in a position to make firing decisions. Therefore, Plaintiff's allegations are materially different than those in *Carter*, where the defendant was a human resources manager whose responsibilities included making formal termination recommendations, and thus the job, by its description, included the exercise of control that USERRRA contemplates. Plaintiff has cited no case (and the Court has not found one) in which a court has extended the meaning of "employer" under USERRA to encompass a peer, no matter how persuasive that peer may have been in persuading his superiors to fire a fellow employee. Accordingly, Defendants' motion to dismiss Counts I and II is granted with respect to Salazar and, since the USERRA claims are the only ones in which Salazar is named, Salazar is dismissed as a Defendant in this case.

2.      *Trinity and Loyola University*

Defendants argue that Counts I and II also should be dismissed as to Trinity and LUC because they, too, are not employers for purposes of USERRA.  Defendants note that the stated purpose of LUMC's resident handbook is to "establish guidelines regarding *Loyola University Medical Center*" only.  And Defendants point out that while Plaintiff alleges that he "was accepted into [LUMC's] orthopaedic residency program," he makes no similar allegation relating to LUC or Trinity.  True enough, but Plaintiff does allege that LUC owned LUMC until 2011, when LUMC was sold to Trinity, and that Trinity, as LUC's successor in interest, "transacts business in Illinois through the operation of" LUMC.  Plaintiff further alleges that Defendants Hopkinson, Light, Ghanayem and Cannon are all jointly employed by LUMC, LUC, and Trinity.  Notably, Defendants do not challenge LUMC as a proper Defendant to Plaintiff's USERRA claims.

In light of Plaintiff's allegations, it is reasonable at this early juncture to infer that these parent health corporations may have controlled employment decisions at the medical center that they operated during Plaintiff's tenure at LUMC.  Courts in the Title VII context, for instance, have held that under certain circumstances a parent company and its subsidiary can be considered a single employer for purposes of Title VII liability.  See *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999) ("[A] defendant that does not directly employ the plaintiff may still be considered an employer under [civil rights] statutes."), abrogated on other grounds by *Reynolds v. American Nat. Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012).  And the Seventh Circuit, albeit in the Family Medical Leave Act context, has recognized that multiple entities may exercise "control" over a single employee.  *Moldenhauer v. Tazewell-Pekin Consol. Comm. Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008).  Discovery will shed light on the corporate

interconnectivity among LUC, Trinity, and LUMC and should reveal the degree to which LUMC's parent companies controlled its decisions and employees. For now, the Court determines that Defendants, who cite no case law or legal authority in support of their two-sentence argument, have not met their burden of establishing that Plaintiff has failed to state a USERRA claim with respect to LUC and Trinity. Therefore, the Court denies Defendants' motion to dismiss, as it pertains to Counts I and II, with respect to LUC and Trinity.

**B.      Count I: Termination in Violation of USERRA**

USERRA provides broad protection against employment discrimination for military service members in "employment, reemployment, promotion or any benefit of employment." 38 U.S.C. §4311(a). In order to allege a violation of USERRA, a plaintiff must establish that he was subject to an adverse employment action and that his military service was a motivating factor in that action. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011). That Plaintiff in this case was subject to an adverse employment action – probation, then termination – is undisputed. As to whether his military status was a motivating factor, Defendants argue that there was no demonstrated anti-military animus, and that because Hopkinson's imposition of probation did not occur immediately following Plaintiff's initial request for leave, Plaintiff is not entitled to rely on the timing of his probation coinciding with his military leave to establish such animus. Plaintiff alleges that he notified Hopkinson of his leave in "early June" and that Hopkinson called a meeting to discuss the issue on June 14. At the meeting, however, Hopkinson never addressed his military leave, and instead placed Plaintiff on academic probation (Plaintiff's alleges) in retaliation for his military status.

The Seventh Circuit permits an inference of retaliation to be drawn when there is close proximity between a protected activity and an employer's adverse action. See *Dey v. Colt*

*Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (four weeks between employee's harassment complaint and termination supported inference of causal link); *Collins v. State of Ill.*, 830 F.2d 692, 705 (7th Cir. 1987) (sufficient causal link that employer sought to transfer employee "within days" of receiving EEOC memorandum of discrimination complaints). However, the longer the elapsed time between the initial event and the adverse action, the more attenuated the link. See *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (four months between the filing of an EEOC complaint and a disciplinary letter "does not sufficiently raise the inference" of retaliation to defeat summary judgment). In this case, Plaintiff alleges that he notified Defendant Hopkinson of his military leave in "early June" and that Hopkinson placed him on probation on June 14. Drawing all reasonable inferences in Plaintiff's favor, at most one or two weeks separated Plaintiff's notification of his military orders and his placement on probation. Moreover, Hopkinson placed Plaintiff on probation at a meeting scheduled to discuss his military leave.

Defendants cite two cases – *Rebello v. City of New Bedford*, 2013 WL 6018824, at *2 (D. Mass. Nov. 13, 2013), and *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 29 (1st Cir. 2010) – in support of their contention that "temporal proximity, without more, will not support a claim for relief." But those cases were at summary judgment, and the Supreme Court itself has recognized that courts around the country have accepted "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case" if that that the temporal proximity is, as in this case, "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001). Besides, here there is more than temporal proximity: Hopkinson placed Plaintiff on probation at a meeting expressly called *to discuss his military orders*. That alone is enough to support an inference of retaliation at this stage, but, as discussed in more detail *infra*, the affidavit that Plaintiff attaches to his opposition

brief adds significant detail to his claims and makes additional, more explicit, allegations of antimilitary animus. For all of these reasons, Defendants' motion to dismiss is denied with respect to Count I.

### C. Count II: Hostile Work Environment Under USERRA

Defendants next argue that Count II fails to state a claim of a hostile work environment under USERRA. Neither the Supreme Court nor the Seventh Circuit has explicitly decided whether a claim of hostile work environment is cognizable under USERRA. Only the Fifth Circuit has fully considered the issue. In *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 177-79 (5th Cir. 2011), the court noted the similarity of USERRA to Title VII, and found that the language "terms, conditions, or privileges of employment" was central to the Supreme Court's recognition of Title VII hostile work environment claims. See *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). On the basis that this language from Title VII was absent from USERRA, the court concluded that a hostile work environment claim was not cognizable. *Carder*, 636 F.3d at 179. But, shortly thereafter, Congress amended USERRA to add to the definition of "benefit" the "terms, conditions, or privileges of employment." 38 U.S.C. § 4303. In light of the amendment addressing the Fifth Circuit's precise concern, it seems clear that the Fifth Circuit now would find a hostile work environment claim cognizable under USERRA, and indeed, at least one federal district court has since done so. See *Montoya v. Orange County Sheriff's Dep't.*, 2013 WL 6662707 at *79 (C.D. Cal. Aug, 13, 2013).

Even before *Carder*, both the First and Eleventh Circuits assumed for the sake of argument that the claim was cognizable. *Vega-Colon v. Wyeth Pharmaceuticals*, 625 F.3d 22, 32 (1st Cir. 2010) ("For purposes of this decision we assume, without deciding" that a hostile work environment claim is cognizable under USERRA); *Dees v. Hyundai Motor Mfg. Alabama, LLC*,

368 F. App'x. 49, 53 (11th Cir. 2010) ("Assuming without deciding that harassment or hostile work environment is a cognizable claim under USERRA, [plaintiff] lacks standing to bring such a claim."). Moreover, the Supreme Court has observed the similarity between USERRA and Title VII, in *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1191 (2011), and the Seventh Circuit has applied Title VII analysis in USERRA cases. *Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) (applying Title VII's "materially adverse" requirement for retaliation claims to USERRA). In light of the foregoing, the Court concludes that a hostile work environment claim is cognizable under USERRA.

A hostile work environment claim requires the plaintiff to show that he was subject to harassment, that the harassment was based on his protected status, that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive atmosphere, and that there is a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). A hostile work environment must be both objectively and subjectively offensive. *Id.* at 714. Whether the environment is objectively offensive is determined by considering the frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's ability to perform his duties. *Id.* The Amended Complaint alleges continued demands by Salazar, Plaintiff's peer, for his orders and leave schedule. Plaintiff claims that Hopkinson similarly harassed him by asking for copies of his orders. Plaintiff also claims that Salazar and other co-residents refused to cover his shifts while he was on military leave, and were "antagonistic and unreceptive" to his requests, demanding that he work multiple shifts in return. Amend. Compl. ¶ 85-86. Salazar also allegedly agreed to work a shift, failed to show, and then lied and claimed he had never agreed to cover. Finally, Salazar allegedly pressured Dr.

Wojewnik, Chief Resident of Sports Services, to write a letter falsely stating Plaintiff was absent without leave so as to invent a justification for termination.

The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment" establishing a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Factors to be considered include "the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Patt v. Family Health Systems*, 280 F.3d 749 (7th Cir. 2002). "Relatively isolated instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993). Compare *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264 (7th Cir. 1991) (hostile work environment claim established on basis of black employee encountering a black and bloodied dummy hung from his office doorway, obscene racial graffiti and KKK references spray-painted on walls at work, repeated use of racial slurs, and verbal threats to beat the employee and his young son), with *Patt*, 280 F.3d at 754 (eight separate gender-based offensive comments, including that "the only valuable thing to a woman is that she has breasts and a vagina," not sufficient to establish a hostile environment). Here, Plaintiff's allegations in the Amended Complaint, while no doubt describing rude and unpleasant conduct, by themselves do not seem to rise to the level of the hostile and abusive atmosphere found in the case law. The alleged incident did not occur frequently, nor are demands for paperwork or refusals to cover shifts severe, humiliating, or in any way physically threatening. Based on the amended complaint alone, the conduct does not ultimately seem to have impeded Plaintiff's ability to do his job, as he maintains his claim of competent medical skills up until his termination.

However, the affidavit attached to Plaintiff's Response alleges significantly more facts that elaborate on and provide color for some of the allegations that might seem relatively mild otherwise. The Seventh Circuit permits a plaintiff attempting to defeat a motion to dismiss to submit affidavits illustrating in greater detail the facts alleged in the complaint, as long as the additional facts are consistent with those in the complaint. *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963-64 (7th Cir. 1992). "A plaintiff need not put all of the essential facts in the complaint. He may add to them by affidavit or brief." *Id.* This allowance is limited by the "basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). This limiting principle is intended to protect defendants from a plaintiff who continually shifts the factual grounds of his complaint such that defendants, and the Court, are no longer certain which allegations the case is actually based upon. *Ahr v. Commonwealth Edison Co.*, 2005 WL 6115023, at *8 (N.D. Ill. Feb. 24, 2005). Defendants rely on *Ahr*, in which there were "absolutely no allegations in the amended complaint" of a particular claim that was then alleged in multiple affidavits "which contain an entire body of facts" not previously stated, as the basis for excluding the affidavit. *Id.* at *7-8.

In the instant case, Plaintiff, responding to Defendants' arguments that the Amended Complaint did not allege sufficiently severe and pervasive conduct, submitted a lengthy affidavit expounding upon his claim of a hostile work environment. Plaintiff sketches the origins of the anti-military animus in his work place, detailing an encounter with Hopkinson and later Salazar surrounding a student lecture on medical school and the military in which Hopkinson found his story disruptive, and Salazar thought Plaintiff's military "deal" better than his own. Plaintiff further alleges that his detached retina was actually caused by his work environment. Plaintiff

elaborates extensively on his treatment by Defendants, ranging from name-calling ("Airman Snuffy" – a derogatory military name), derogatory comments about Plaintiff's military status and "blue-collar" ways to public humiliation and being screamed at in the middle of the hallway by a Dr. Stover for his military attitude. These allegations put into context Plaintiff's claim that he felt harassed by Salazar's repeated requests for his orders and his struggle to find coverage for his shifts while on military leave. The allegations in the affidavit are far more detailed than those in the Amended Complaint, and all of the additional facts serve to illustrate the original claims. Taking all the allegations in the affidavit to be true, Plaintiff provides ample factual basis to show that the conduct did occur frequently, was severe, was humiliating, and did impede Plaintiff's ability to do his job. Plaintiff alleges that he was harassed because of his military status, that the harassment was so severe and pervasive as to alter the conditions of his employment, and that because he reported the harassment to Hopkinson to no avail, that there is a basis for employer liability. Plaintiff therefore has stated a claim for hostile work environment, and, accordingly, Defendants' motion to dismiss Count II is denied.

For the same reasons, the Court denies Defendants' motion to strike Plaintiff's affidavit. Defendants contend first that the affidavit contradicts the Amended Complaint, and second that the affidavit seeks to amend the complaint with new allegations. Defendants cite *Dausch v. Rykse*, 52 F.3d 1425, 1428 n.3 (7th Cir. 1994), for the proposition that the affidavit may not contradict the complaint. The cited footnote observes that "facts asserted in the memorandum in opposition to the motion to dismiss, but not contained in the complaint, are relevant to the extent that they 'could be proved consistent with the allegations.'" Defendants argue, for example, that the affidavit, by expanding the number of individuals who contributed to the hostile work environment, contradicts the Amended Complaint, which claimed that hostile work environment

was created by Hopkinson, Salazar and Cannon. But the Court fails to see the contradiction in first describing the actions of three individuals and later explaining that, in fact, others acted in a similar fashion. Defendants would also have the court find that the affidavit goes into too much detail to be considered proper, thereby amending the complaint. But as discussed above, all the allegations in the affidavit serve to elaborate on allegations previously stated. The Court sees no reason to penalize Plaintiff for including more detail than was absolutely necessary to state a claim in an effort to assure that the Court understands the full extent of the harassing behavior to which he alleges he fell victim.[2]

For these reasons, Defendants' motion to strike Plaintiff's affidavit is denied.

### D.     Count III: 42 U.S.C. §1983

Defendants argue that Count III should be dismissed in its entirety because none of the Defendants are state actors. Plaintiff alleges that his termination in violation of the grievance procedures set out by the LUMC Resident Handbook amounts to a violation of his right to due process. The Amended Complaint does not supply the statutory authority for Plaintiff's claim, but Defendants couch it as a claim under 42 U.S.C §1983, and Plaintiff's opposition brief does not take issue, and therefore implicitly agrees, with that characterization.

In order to state a claim under §1983, a plaintiff must show that: (1) his constitutional rights were violated (2) by a person acting under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). The person acting under color of state law must be fairly

---

[2] For substantially similar reasons, the Court rejects Defendants' arguments that the amended complaint should be dismissed for failure to comply with Rule 8 and Rule 10 of the Federal Rules of Civil Procedure. Rule 8 requires plaintiffs to provide "a short and plain statement of the claim." Fed. R. Civ. P. 8. Again, the Court declines to punish Plaintiff for including more than the absolutely essential facts, recognizing that background facts are relevant support for the context of his claims. Rule 10 requires that plaintiffs state claims in numbered paragraphs and allows later paragraphs to adopt earlier paragraphs by reference, which Plaintiff has done. The Court declines to hold against him that each count reincorporates all previously alleged facts, rather than only the facts relevant to that claim, especially since Defendants appear to have had little difficulty matching facts to claims.

characterized as a state actor, either a state official or, if a private actor, his conduct must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). Plaintiff's opposition brief makes clear that his claim in this regard is based primarily on the fact that LUMC receives federal funding for its residency program, and therefore qualifies as a state actor. The Supreme Court has squarely rejected this claim. In *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982), an employee brought suit under Section 1983 against her former employer, a private school for troubled students that received the vast majority of its funds from several state and federal agencies, alleging termination in violation of her right to due process. The Court held that "the school's receipt of public funds does not make the discharge decisions acts of the State." *Id.*

Plaintiff also alleges that the receipt of federal funding is premised on ACGME accreditation, such that ACGME effectively controls LUMC's policies and regulations. Yet Plaintiff makes no allegation that ACGME itself is a state actor, only a "professional organization" and so the Court fails to see the relevance of this relationship or its impact on LUMC's status as a private corporation. Even the fact of regulation by a government agency does not necessarily make a private actor a state actor. See *Cohen v. Illinois Institute of Technology*, 524 F. 2d 818, 826 (7th Cir. 1975) (private university receiving state funds and controlled by state regulation not a state actor under Section 1983 where Plaintiff made no allegation that the State "has affirmatively encouraged or approved…employment discrimination.").

Plaintiff's reliance on *Daniel v. Am. Bd. of Emergency Med.*, 235 F. Supp. 2d 194 (W.D.N.Y 2002) is misplaced. That case was brought by physician employees against several defendants under the Sherman Antitrust Act alleging a conspiracy of various organizations to

control emergency medicine residency programs, and two defendants, a hospital and a medical center, claimed state actor immunity. *Id.* at 204. Whether a private party qualifies as a state actor in the antitrust context is determined by whether the challenged restraint imposed by the parties is "clearly articulated and affirmatively expressed as state policy" and whether the policy is "actively supervised by the State itself." *Id.* at 205. This standard is distinct from, and in a sense the inverse of, the standard under Section 1983, and is inapplicable in this case. See *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 896 (7th Cir. 2004) ("[A] private party will be deemed to have acted under 'color of state law' when the state either (1) effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision; or (2) delegates a public function to a private entity."). Taking all of Plaintiff's allegations about LUMC's receipt of federal funds to be true, he has failed to state a claim under Section 1983. Accordingly, Count III is dismissed in its entirety.

### E.    Count IV: Breach of Contract

In Count IV, Plaintiff alleges a breach of his employment contract against LUMC, LUC and Trinity.[3] Plaintiff contends that Defendants are in breach of his employment contract because they failed to follow the grievance procedure set out in the Resident Handbook. Defendants disagree that a failure to follow the grievance procedure constitutes a breach of contract, because the disclaimer printed on the Handbook explicitly states that it is not an employment contract. However, the GMEA, not the Handbook, is Plaintiff's employment

---

[3] Defendants argue that LUC and Trinity should be dismissed from this count with the passing statement that "the stated purpose of the Resident Handbook was to 'establish guidelines regarding *Loyola University Medical Center*,' and not either Trinity or Loyola University of Chicago." Opp. Br. at p. 11. Defendants supply no legal theory and cite no authority relevant to this fact. Defendants, therefore, have failed to meets their burden on the breach of contract claim with respect to LUC and Trinity, to the extent they intended to put the issue before the Court at all. See *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) (a "court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel") (internal quotations and citation omitted).

contract. The GMEA refers to itself repeatedly as an Agreement and states the dates and terms of Plaintiff's employment and each party's responsibilities to the other. And Defendants do not argue to the contrary. Given that, the relevant inquiry here is not limited to whether the Handbook itself constitutes a contract.

The Illinois Supreme Court has held that where an employee would otherwise be considered at will, an employee handbook may be an enforceable employment contract under certain conditions. *Duldulao v. St. Mary of Nazareth Hosp. Center*, 505 N.E.2d 314, 318 (Ill. 1987). This principle has not been extended in cases where an employee handbook contains a clear disclaimer that it is not a contract of employment. *Workman v. United Parcel Service, Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000) (finding under Indiana law that even if Indiana were to find some employee handbooks enforceable contracts as Illinois does, there could be no contract where the handbook explicitly stated it was not a contract of employment); *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 617 (7th Cir. 1999) (distinguishing *Duldulao* and finding no contract where an employee handbook clearly disclaimed that it was a contract). The question presented by Plaintiff is slightly different. In this case, Plaintiff was not an at will employee; the GMEA sets out, among other things, the dates of his employment term and the provision that a Resident can be terminated if it is determined that "the Resident has failed to perform his/her duties" – essentially, that a Resident can be terminated for cause. Ex. 2. The GMEA refers residents to the Resident Handbook and requires that they familiarize themselves with and "abide by" the procedures set forth within. The Resident Handbook states explicitly that it is not a contract. The question, then, is not whether the Resident Handbook is a contract – the GMEA already serves that function, and the Resident Handbook clearly disclaims it – but whether the contract incorporates the Resident Handbook by reference, binding both parties to its terms.

Whether a document is incorporated by reference into the parties' agreement is determined by the parties' intent to do so. *188 LLC v. Trinity Industries Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). An employee handbook or policy manual can be incorporated into an employment contract where the document is clearly referenced. See *Piper v. Bd. of Trs. of Cmty. Coll. Dist. No. 514*, 99 Ill. App. 3d 752, 760 (4th Dist. 1981) (finding that a teacher's written employment contract that stated it was "subject to" the bylaws, policies, rules and regulations of the Board of Trustees incorporated by reference the College's Personnel Manual). In this case, the GMEA refers clearly to the Resident Handbook. Under the heading "Resident Responsibilities" the GMEA provides, "The Resident shall . . . abide by the policies and procedures set forth in the Resident Handbook, including, but not limited to, the Resident Wellness policy, the Duty/On-call Hours policy and the Harassment in the Workplace policy." Ex. 2. The GMEA also provides that "the Graduate Medical Education Grievance Procedure shall be the sole grievance procedure available to a Resident . . . Resolution of Resident Issues is described in Section III of the Resident Handbook." *Id.* The GMEA clearly and unambiguously refers to Section III of the Resident Handbook, and so, for purposes of Defendants' motion to dismiss, the Court deems that section to be incorporated into Plaintiff's contract, thus binding LUMC to honor and abide by the Handbook's grievance procedures.

Plaintiff alleges breach of contract on the basis that his probationary hearing was not scheduled within the required 45 days, that he was improperly terminated before his probationary hearing, that Defendants did not adequately consider the allegations on which probation was imposed at the probation hearing, that Defendants did not adequately consider the allegations on which termination was imposed at his termination hearing, and general failure to accord due process as required by the Resident Handbook. In addition to the references described above, the

Resident Handbook reiterates that "any resident…who, under normal circumstances would receive an agreement for the following academic year, and is denied due to the action of the program director…is entitled to due process, including all grievances, as described in the Grievance Procedure." Ex. 2. Sec. III.G.11. Defendants terminated Plaintiff before his probationary hearing, even though at the probationary hearing two of the three members of the hearing board refused to sign the letter affirming Plaintiff's probation. Defendants held a probation hearing after Plaintiff was already terminated, told Plaintiff not to inform the probationary hearing board of the termination, and terminated him for reasons different from those supporting probation – the justifications for which are unclear. Taking these allegations to be true, though, the Court concludes that Plaintiff has sufficiently alleged that the grievance procedure was not undertaken in good faith, and therefore deprived Plaintiff of the procedure outlined in the Handbook, in breach of his contract.

Defendants also claim that Plaintiff waived the issue of the delayed probationary hearing when he gave permission for it to occur after the 45 days provided. Even if this were true, Plaintiff states several more reasons for breach of contract, and so the claim is not defeated if Plaintiff were deemed to have waived the issue of the hearing. Moreover, waiver is an affirmative defense, (see Fed. R. Civ. P. 8(c)), that does not justify dismissal at this stage, especially where the circumstances surrounding Plaintiff's agreement to participate in a hearing outside the 45-day window are unknown. *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003).

For the reasons stated, Defendants' motion to dismiss with respect to Count IV is denied.

## F.    Counts V and VI: Tortious Interference

In Counts V and VI, Plaintiff alleges tortious interference against Drs. Light and Ghanayem, respectively. Plaintiff alleges that Light interfered with his expectation of being

admitted to another residency program after he was terminated by LUMC, and that Ghanayem interfered with his expectation of receiving a spine fellowship following his residency. In order to state a claim for tortious interference, Plaintiff must allege: (1) a reasonable expectation of entering into a business relationship, (2) defendant's knowledge of the expectation, (3) intentional interference by the defendant that caused the expectancy to terminate, and (4) damage to the plaintiff because of the defendant's interference. *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996). On both counts, Defendants argue that because Plaintiff had no firm job offer, he had no reasonable expectation of earning a spinal fellowship or placement in another residency program.

With regard to Ghanayem, the Amended Complaint alleges that Plaintiff did not match with any spine fellowships he had ranked, even though some of those programs ended up with unfilled fellowship positions. According to Plaintiff, "this rare occurrence was caused by" Ghanayem, who demanded that Plaintiff show him a list of the programs to which he was applying and then called these programs to ensure that they would not make Plaintiff an offer. Plaintiff alleges that Light interfered in a similar way after Plaintiff applied to residency programs following his termination from LUMC. Consequently, none of the twelve programs to which he applied offered him a spot in their program, even though four of the programs had told Plaintiff that "he was being seriously considered for placement."

Defendants rely on *Anderson* for the proposition that the hope of receiving a job offer, without more, is insufficient to establish a legally protectable interest. 667 N.E.2d at 1299. In that case, the Supreme Court of Illinois determined that a plaintiff's representations that he had been told by a prospective employer that he was the "leading candidate" and "was being seriously considered" for the job were not enough to survive a motion to dismiss. *Id.* In his

opposition brief, Plaintiff specifically alleges that he was ranked second by the Mayo Clinic during the spinal fellowship match process, "virtually ensur[ed] that he would receive a fellowship offer if desired." In *McGreal v. Vill. of Orland Park*, 2013 WL 3984477, at *10 (N.D. Ill. Aug. 2, 2013), the court found that a police officer who was ranked first on the hiring list for an open position, but was not hired, sufficiently established a reasonable expectancy because unlike in *Anderson*, his status as the top candidate was objective and not just his subjective belief. Plaintiff's claim to be ranked second is analogous. Additionally, the University of Washington-Harborview actually offered Plaintiff a fellowship during the scramble process, further legitimizing his status as a qualified candidate with a reasonable expectation in receiving an offer. Accordingly, Plaintiff's allegations establish that his expectancy in receiving a spinal fellowship offer was a reasonable one, and Defendants' motion to dismiss is denied as to Count V.

The same cannot be said regarding his pursuit of a spot in a residency program, however, Plaintiff alleges that four of the programs informed him that he was being "seriously considered" – precisely the language that *Anderson* determined not to be legally protectable. Therefore, Plaintiff alleges no facts from which the Court can infer that he had a reasonable expectation of being granted a residency position. Without a detail akin to the allegation that he was ranked second by the Mayo Clinic, or that any of the programs seriously considering him did not fill their residency quotas, Plaintiff's claims are more like those in *Anderson*, not those in *McGreal*. But as the *Anderson* court noted, "[g]enerally people don't tell you that interviews went badly." 667 N.E.2d at 1300.

Plaintiff relies on *James v. Intercontinental Hotels Grp, Res., Inc.*, 2010 WL 529444, at *5 (N.D. Ill. Feb. 10, 2010), for the proposition that his record of success is relevant to the

determination of whether his expectation was reasonable. *James* considered the plaintiff's exemplary work record and positive performance reviews relevant to her continued expectation of remaining in the same job, "essentially, an expectation not to be demoted." *Id.* at *4. That case is distinguishable from the instant case, though, because an expectation of being hired is a different and more speculative expectation, requiring more significant factual allegations to establish objectivity, than simply an expectation not to be demoted, which by its nature requires less factual support for an inference of reasonable expectation.

For these reasons, the Court concludes that Plaintiff has not alleged sufficient facts to state a claim for tortious interference as to Light. Accordingly, Defendants' motion to dismiss is granted as to Count VI.

## G. Counts VII and VIII: Defamation

In his final two counts, Plaintiff alleges defamation against Drs. Light and Ghanayem, respectively. Plaintiff alleges that Light told other residency programs that he was a poor candidate, that he was aggressive in the workplace, especially with women, and that he was unprofessional or incompetent. Amend. Compl. ¶ 151. Plaintiff alleges Ghanayem made the same statements to spine fellowship programs, with the slight variation that Ghanayem also reported that Plaintiff had low OITE scores. *Id.* at ¶ 141.

"A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with…him." *Solaia Technology LLC v. Specialty Pub. Co.*, 221 Ill. 2d 558, 579 (2006). In order to state a claim for defamation, a plaintiff must allege that: (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication to a third party, and (3) the publication damaged the plaintiff. *Id.* Plaintiff alleges, and Defendants do not

dispute, that Defendants made an unprivileged publication and that the publication damaged Plaintiff, and so Defendants' motion to dismiss hinges on the first element.

Defendants argue that both defamation claims should be dismissed for Plaintiff's failure to plead the specific words alleged to be actionable, and, in the alternative, because the alleged defamatory statements are protected expressions of opinion. Defendants rely on *Marron v. Eby-Brown Co., LLC*, 2012 WL 182234, at *4 (N.D. Ill. Jan 23, 2013), for the proposition that a plaintiff must plead the specific words alleged to be defamatory in order to allow the defendant to form responsive pleadings. In that case, the single defamatory statement that the plaintiff alleged was that he was "discharged because of his having failed to properly perform his job." *Id. Marron* found that the plaintiff had failed to specifically identify the alleged false statements. *Id.* But, the requirement of specificity is not so strict as to require that the Plaintiff quote the alleged defamatory language verbatim. *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1284 (N.D. Ill. 1996) ("Plaintiff has alleged the basic substance of the statements (that plaintiff was terminated for 'double dealing') and that they were made by [the defendant]. The exact details of the exchange may be discerned through discovery."). In this case, Plaintiff's allegations are that Defendants said he was incompetent or unprofessional, aggressive at work with women, and a poor residency or fellowship candidate based on his OITE scores. All of these allegations are sufficiently specific to establish the basic substance of the statements, and to put the Defendants on notice of the claims against them to allow them to respond.

Defendants further argue that Plaintiff's allegations should be dismissed because the statements are protected opinion. The Supreme Court rejected the wholesale protection of opinion in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). Statements of opinion are protected from defamation claims by the First Amendment only when the opinion does not

misstate actual facts. *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 533 (7th Cir. 2009). Illinois courts have followed *Milkovich* in finding that an opinion is only protected if it "cannot be reasonably interpreted as stating actual facts about the plaintiff." See, *e.g., Hopewell v. Vitullo*, 701 N.E.2d 99, 103 (Ill. App. Ct. 1st Dist. 1998). Whether a statement reasonably implies facts about the plaintiff is determined by evaluating: (1) whether the language used has a readily understood meaning, (2) whether the context of the statement negates the impression that it has factual content, and (3) whether the statement is susceptible of being objectively verified. *Id.* at 518-519. The emphasis of this inquiry is on "whether the statement contains an objectively verifiable assertion." *Id.* at 519. In *Hopewell*, the plaintiff alleged that the statement that he was "fired because of incompetence" was defamatory. *Id.* at 516. The court reasoned that the statement had too broad a scope to create any readily understood meaning, that it was made in the context of "posturing" before a legal battle, and that it was not capable of verification because "incompetent" had no more specific reference – and therefore the statement was not actionable. *Id.* at 519-520.

In this case, that Plaintiff is a poor candidate is a claim linked to his OITE scores, and therefore provides the context and factual basis missing in *Hopewell* – the simple fact that there is an exam suggests that Plaintiff has an objective score that can be compared to other residents. Statements that Plaintiff was aggressive in the workplace with women also are rooted in fact. It is reasonable to infer that female coworkers and employees could attest to aggressive encounters with Plaintiff, and other employees could potentially also attest to having observed such conduct. While the characterization of "aggressive" may ultimately be an opinion, the context "with women" narrows the field of reference and creates a statement that is susceptible to being

objectively verified.[4]  Finally, as Defendants point out, statements that a plaintiff is incompetent have been found to be protected opinion when a plaintiff fails to allege the "factual context necessary to render these statements susceptible of objective verification." *Manjarres v. Nalco Co.*, 2010 WL 918072, at *3 (N.D. Ill. Mar. 9, 2010).  In *Manjarres*, a defamation claim based on statements that the plaintiff was unprofessional and incompetent was dismissed because the plaintiff made no further allegations that would have shown the meaning or context of those statements.  In this case, Plaintiff alleges that the statements that he is unprofessional or incompetent are verifiably false because "his performance was on a par with or better than other residents."  Amend. Compl. ¶ 144(c).  Given Plaintiff's various claims of awards and honors for his surgical skill and competence, there is an objective context in which his skill as a surgeon, and the truth of Defendants' statements of incompetence, can be considered.  Therefore, at this stage, Plaintiff has sufficiently stated a claim for defamation, and Defendants' motion to dismiss with respect to Counts VII and VIII is denied.

## IV.    Conclusion

For the reasons stated, the Court grants in part and denies in part Defendants' motion to dismiss [41].  Specifically, Defendants' motion is granted as to Counts III and VI and as it relates to Defendant Salazar.  The Court denies Defendants' motion to strike [67].  Defendants' unopposed motion for extension of time to reply in support of their motion to dismiss [59] is granted.  Defendant Dane Salazar's motion to stay proceedings [39] until June 27, 2014 is denied as moot.

---

[4] Defendants also cite *Quinn v. Jewel Food Stores, Inc.*, 658 N.E.2d 1225, 1232 (Ill. App. Ct. 1st Dist. 1995), to argue that "aggressive" is not an actionable statement.  *Quinn* is of limited persuasive value.  It was decided five years after *Milkovich*'s lengthy discussion of opinion and defamation and the Court's ultimate rejection of the need for a separate category of protection for opinion.  Yet *Quinn* did not address *Milkovich* at all, relying instead on older cases that maintained the separate category for opinion.

Dated:  August 28, 2014

Robert M. Dow, Jr.
United States District Judge