**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK D. MCDANIEL, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-6500 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| LOYOLA UNIVERSITY MEDICAL | ) | |
| CENTER, TRINITY HEALTH | ) | |
| CORPORATION, LOYOLA | ) | |
| UNIVERSITY CHICAGO, LOYOLA | ) | |
| UNIVERSITY HEALTH SYSTEMS, | ) | |
| WILLIAM HOPKINSON, M.D., TERRY | ) | |
| LIGHT, M.D., WILLIAM CANNON, | ) | |
| M.D., and ALEXANDER GHANAYEM, | ) | |
| M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In his governing second amended complaint ("Complaint" [233]), Plaintiff Mark McDaniel, M.D. ("Plaintiff") brings claims against Defendants Loyola University Medical Center ("LUMC"), CHE Trinity, Inc. ("Trinity"), Loyola University of Chicago ("LUC"), and Loyola University Health System ("LUHS") (collectively, the "Corporate Defendants"), and William Hopkinson, M.D. ("Hopkinson"), Terry Light, M.D. ("Light"), William Cannon, M.D. ("Cannon") and Alexander Ghanayem, M.D. ("Ghanayem") for alleged violations of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), breach of contract, tortious interference, and defamation. Currently before the Court is Defendants' motion for summary judgment [398] on all claims. For the reasons explained below, Defendants' motion for summary judgment [398] is granted in part and denied in part. Summary judgment is denied as to Plaintiff's USERRA discrimination claim against all named Defendants who have not previously been

dismissed; granted as to Plaintiff's USERRA hostile work environment claim against Cannon and denied as to Plaintiff's USERRA hostile work environment claim against the remaining named Defendants who have not previously been dismissed; granted as to Plaintiff's breach of contract claim against LUC and denied as to Plaintiff's breach of contract claim against the other Corporate Defendants; granted as to Plaintiff's tortious interference claims against Ghanayem and Light; and granted as to Plaintiff's defamation claim against Ghanayem. Each party is ordered to submit, by April 12, 2019, a supplemental brief, no more than five pages in length, addressing 1) whether Trinity should be dismissed from the lawsuit on the basis that it has no relationship to the claims alleged by Plaintiff; and 2) whether the grievance hearings concerning Plaintiff's probation and termination should be considered "quasi-judicial proceedings" to which an absolute privilege should apply for purposes of Illinois defamation law. Defendants' motion for summary judgment is denied as to the defamation claims against Hopkinson and Light, with the rulings on these two defamation claims to be reconsidered by the Court *sua sponte* after its consideration of the parties' supplemental briefs. At that time, the Court will also determine whether Trinity should be dismissed from the case.

## I. Background

The following facts are taken from the parties' Local Rule 56.1 statements and the exhibits submitted with those statements.[1] The facts are undisputed except where a dispute is noted.

---

[1] These statements of material facts "are the vehicle through which counsel identifies the relevant facts and the evidence establishing those facts." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). The statements are to consist of "short numbered paragraphs with citations to admissible evidence." *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003). Absent prior leave of Court, the movant's statement of facts is limited to 80 paragraphs and the respondent's statement of additional facts to 40 paragraphs. In this case, the parties were given permission to file oversize briefs and Local Rule 56.1 statements [356]. Nonetheless, the statements that the parties have been filed are so long and cumbersome that they risk losing the forest for the trees. Defendants' statement is 99 pages and contains 185 paragraphs, most of which are long and contain multiple statements of fact, and many of which are argumentative. Plaintiff's response is 171 pages and contains many dozens of evidentiary objections. Plaintiff's Rule 56.1 statement of additional facts is

## A.    Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  Supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367(a).  The Complaint alleges events that occurred in the judicial district in which this Court sits from 2008 to roughly 2013.  Venue is appropriate under 28 U.S.C. § 1391(b).

## B.    Plaintiff

Plaintiff enrolled in the Kansas Air National Guard (the "KANG") following his graduation from high school in 1985.  Plaintiff was the First Sergeant for the Civil Engineering Squadron.  In 2002, while working for the KANG, Plaintiff completed college at Friend's University in Wichita, Kansas, graduating with two bachelor's degrees.  In Fall 2002, Plaintiff transitioned from full-time service in the KANG to part-time service and began medical school at the University of Kansas.  Plaintiff s position as a First Sergeant was not conducive to his medical studies, so he found a different position in the 139th Airlift Wing of the Missouri Air National Guard (the "MOANG").  Plaintiff attended medical school full-time until 2004, when he was deployed by the United States Air Force for two years activation in Afghanistan.  Plaintiff returned to medical school in 2006 and resumed work as a traditional part-time reservist in the MOANG.

---

141 pages long, with 692 paragraphs, and Defendants' response is 290 pages and contains objections to nearly every paragraph.  The statements are accompanied by three full boxes of exhibits.  The sheer size and argumentative nature of these submissions places a disproportionate burden on the Court's limited resources—which must be stretched to cover approximately four hundred civil and criminal cases—in what should be a fairly straightforward employment discrimination suit.  As the litigation proceeds forward, the parties will be required to streamline their arguments and evidence to avoid overwhelming and confusing the jury.  If necessary, the Court will employ time- and space-management techniques (i.e., a chess clock at trial) to rein in this proclivity for prolixity.  To keep this opinion to a manageable length, the Court has summarized and condensed the background section as much as possible and, in some cases, chosen to discuss the relevant facts only in the analysis section.

### C.     The Residency Program

In 2006 or 2007, Plaintiff applied for a residency in orthopedic surgery through the National Resident Matching Program (the "NRMP").   His application highlighted his military career and identified him as a member of the MOANG with an ongoing service obligation of one weekend per month.    Based on his application, Plaintiff was invited to interview with LUMC's Orthopedic Surgery Residency Program (the "Residency Program" or the "Program").

LUMC is an Illinois not-for-profit healthcare corporation with its headquarters in Maywood, Illinois.  LUHS, also an Illinois not-for-profit corporation, is the sole corporate member of LUMC.  Prior to July 1, 2011, LUHS's sole corporate member was LUC, a non-profit university that owns and operates various educational institutions in Chicago, including the Stritch School of Medicine ("SSOM").  There is a factual dispute concerning how Trinity is related to the other Corporate Defendants.  Defendants assert that since July 1, 2011, Trinity has been LUC's sole corporate member.  [371] at 8.  Plaintiff disputes this on the basis of LUC's interrogatory answers, which according to Plaintiff state that LUC is not legally related to Trinity or to LUHS.  *Id.*

LUHS, LUMC, and LUC are signatories to an Academic Affiliation Agreement ("AAA") memorializing the terms of their relationship.  Under the AAA, LUMC (through its Graduate Medical Education Office ( "GME Office")) is responsible for the Residency Program.  The AAA provides that "[r]esidents and clinical fellows shall be the employees of LUMC."  [371] at 9. Defendants take the position that LUC does not employ residents; Plaintiff admits that residents are not paid but otherwise disputes Defendant's characterization that residents are not LUC's "employees."  See *id*.  According to Plaintiff, residents work in the medical school training, lecturing, and teaching classes attended by medical students.

In the course of his interviews with the Program, Plaintiff met with both Hopkinson, the Director of the Program, and Light, the Chair of the Department of Orthopedic Surgery ("Department"). Hopkinson is a board-certified orthopedic surgeon. He, like Plaintiff, has a military background, graduating from West Point, serving in the army, and completing residency and fellowships at military medical centers. Light is also a board-certified orthopedic surgeon who comes from a military family and previously served as an attending physician at Veterans' Administration hospitals. Light became a member of the Accreditation Council for Graduate Medical Education ("ACGME") Residency Review Committee for Orthopedic Surgery in 2012 or 2013. Hopkinson and Light were both aware of Plaintiff's military background when they interviewed him, and Hopkinson recalls being generally aware that Plaintiff had an ongoing service obligation. Both doctors were happy when Plaintiff matched into the Program.

Plaintiff was accepted by LUMC in 2008. There were four other residents in Plaintiff's residency class: Jennifer Beck, M.D., Meredith Larsen, M.D., Dane Salazar, M.D., and Adam Schiff, M.D. Salazar has a military background in the Air Force, the Virginia Air National Guard, and the Air Force Inactive Reserve.

Upon joining the Program, Plaintiff entered into a Graduate Medical Education Agreement ("GME Agreement") with LUMC. The GME Agreement references the 2011-2012 LUMC Resident Handbook ( "Resident Handbook"). Other applicable policies and procedures are set forth in the Orthopedic Surgery Residency Program Handbook ("Program Handbook"). Relevant portions of these policies are set out as necessary in the analysis section below.

During Plaintiff s residency, Cannon was employed by LUMC as its Chief of Staff, Assistant Dean for Graduate Medical Education, and Designated Informational Officer ("DIO"). His responsibilities included, among other things, overseeing LUMC's medical staff and

communicating with the ACGME. Ghanayem, a board-certified orthopedic surgeon specializing in surgery of the spine, was an attending physician and a member of SSOM's faculty during Plaintiff's Residency.

The Residency Program lasts for five years, with each academic year beginning on July 1. Residents are referred to by class year, from PGY1 to PGY5. PGY1s are also called "interns"; PGY2s and 3s are "junior residents"; and PGY4s and 5s are "senior residents." Hopkinson testified that residents were required to be at the hospital from 7:00 a.m. to 5:00 p.m. Monday through Friday in the absence of an approved leave request. Plaintiff disputes this requirement on this basis that it is not detailed in the Resident Handbook. Residents are also supposed to comply with the ACGME's duty hour requirements.

Each residency class cycles through certain assignments or "rotations" during the year. Clinical activities take place at different locations, including LUMC, Hines, Gottlieb Memorial Hospital ("Gottlieb"), Shriner's Hospital, and Loyola Ambulatory Surgical Center in Oakbrook ("LASCO"). Rotations generally include one junior and one senior resident, with the senior resident serving as a professional role model and instructor for the junior resident. At the end of each rotation, residents are evaluated by the attending physicians and (in the case of junior residents) the senior resident. The performance of each resident over the rotation is rated on a scale of one through five in the following categories: (1) patient care; (2) interpersonal and communication skills; (3) professionalism; (4) medical knowledge; (5) practice-based learning and improvement; and (6) systems-based practice. Residents are also evaluated on a scale of 1 to 9 in different categories on a particular case the attending observed. Residents also meet with Hopkinson twice a year for biannual reviews.

In addition to completing rotations, residents are also responsible for taking call beginning in PGY2. Residents on a particular duty assignment are responsible for preparing the call schedules for the rotation. Residents are required to log their surgical cases in their ACGME case logs in a timely fashion. Residents were encouraged to log cases on a daily basis, a practice which was consistent with ACGME recommendations. There is a factual dispute concerning whether residents were directed to log only orthopedic procedures (as Defendants contend) or all procedures that they performed (as Plaintiff contends, and asserts is consistent with ACGME instructions). It is undisputed, however, that Plaintiff's fellow residents typically did not log routine, non-orthopedic procedures such as placing Foley catheters or applying compression boots. Light and Hopkinson, among others, regularly discussed case logs with residents. Residents also received continuous training on CPT codes during biweekly practice management sessions and monthly "Chairman's Hour" meetings.

In addition to completing rotations and taking call, residents are expected to attend formal educational conferences. Attendance at conferences is tracked via attendance sheets that attendees are expected to sign. There is a factual dispute concerning whether residents are expected to be physically present for certain or all conferences, as Defendants maintain. Plaintiff contends that attendance depends on the residents' patient care responsibilities and rotations.

### D.    Plaintiff's Military Activities

According to his declaration [373-1], Plaintiff experienced problems early on in his residency when he attempted to take military leave in 2009. While on rotation at Hines, Plaintiff learned that he would need two weeks during an upcoming rotation for military duty. Plaintiff asked Amy Wickman, M.D., the senior resident on the Hines Rotation, about taking vacation. Wickman told him that he would not be allowed to take two weeks of leave because residents are

only allowed one week of vacation per rotation. Plaintiff asked Wickman if he could take two consecutive weeks of vacation split over two rotations, but she told him no and warned him that asking for "special privileges" would not be "well received." [371] at 40. Wickman also allegedly told Plaintiff not to talk about military leave with Hopkinson as "residents are particularly vulnerable to expulsion during their junior residency years." *Id*. In his answers to written discovery, Plaintiff referenced both Wickman's alleged comments and similar comments allegedly made by Hopkinson and Salazar.

Plaintiff took approved leave from January 24 through February 3, 2009 so he could report for annual training with MOANG. According to Plaintiff, he was required to drive to base after 72 hours of straight call and being on 24-hour call five out of the prior seven days. [371] at 43.

Plaintiff had military service again in February 2010, though the extent of that service is disputed. According to Plaintiff's declaration, he performed his military service by using vacation, "traveled on February 22, 2010 to his military base in St. Joe, Missouri, and performed military activities and obligations through February 26, 2010, including many unpaid activities that are nonetheless required by the Air National Guard." [371] at 44. Before leaving for duty, Plaintiff contends, he "was scheduled for 24 hour call for five of the prior seven days [and] he was on call for 72 hours straight before his leave (having told the senior resident about his military duty)." *Id*. According to Defendants, "Plaintiff did not have any Title 32 orders in 2010[2] and did not perform any documented military service at all that month until February 25th, four days after he took First Call for Dr. Schiff, three days after Plaintiff's own last scheduled call, and several days after Plaintiff had already been on vacation." *Id*.

---

[2] None of the parties explain what the term "Title 32 orders" means.

From February 2009 until June 2012, Plaintiff earned "constructive credit" from the MOANG for, among other things, activities he performed in the Residency Program. According to Plaintiff, he made this arrangement with MOANG because he was not able to get time off for military service from LUMC. Plaintiff tracked the activities for which he was claiming constructive credit on various forms that he submitted to Colonel Kevin Echterling. By submitting this paperwork, Plaintiff was able to earn pay and points from the MOANG without reporting for annual training or unit training assemblies. Plaintiff earned enough points to have a "good year" in the years beginning on his service anniversary (June 11) in 2009, 2010, and 2011, all of which overlapped his time in the Residency Program.

### E.    Plaintiff's MBA Program

In March 2009, while he was a resident, Plaintiff applied to the University of Chicago Booth School of Business Executive Masters' of Business Administration Program ("EMBA Program"). The EMBA Program is designed for "working professionals" who have full-time jobs while participating in the program. The EMBA Program typically spans seven quarter (21 months), with classes meeting during the day every other Friday and Saturday. There are also four "residential sessions," including one-week international sessions in London and Singapore.

Plaintiff did not discuss his decision to enroll in the EMBA Program with Hopkinson or Light. All of his recommendation letters for the program came from military colleagues. The EMBA Program requires its students to submit a "Letter of Company Support" before starting the program. The application for the program explains that the letter is a "simple statement that your company is aware of and supports your time commitment to the Executive MBA Program" and "should attest to the company's willingness to provide you time away from work on class days." [344-2] at 205. Plaintiff disputes, however, that this was the purpose of the Letter of Company

Support.  Instead, he contends that he was told by EMBA admission staff "to submit a letter from whoever would make the strongest impression."  [371] at 50.

When he applied for the EMBA Program, Plaintiff knew it would require him to take time away from the Residency Program.  Nevertheless, he did not ask for a letter of support from the Department.  Instead, Plaintiff told the EMBA Program in one of his application essays that he would provide a letter of support from the MOANG, his part-time employer, because he would "miss days from [his] military job while working for an EMBA."  [371] at 51.

### F.  Defendants' Alleged Anti-Military Animus

According to Plaintiff, the individual Defendants, as well as his co-residents and various attending physicians, repeatedly made comments and engaged in acts demonstrating anti-military animus throughout his time in the Program.  These facts are virtually all disputed by Defendants.  According to Plaintiff, he was told by a senior resident early on in his residency that asking for leave to perform military service would not be well-received at LUMC, and that he would have the "deck stacked" against him from the beginning if he made such a request.  [406] at 32.  Plaintiff also reports that early on in the residency Hopkinson invited or encouraged Plaintiff and Salazar to attend "Military Day" at SSOM to discuss their military experiences, but after that, told Plaintiff that he did not want Plaintiff to attend the meeting in the future.  Hopkinson allegedly then began discussing the fact that Plaintiff was earning pay and points from MOANG in the form of constructive credit and suggested that this might constitute moonlighting under applicable policies.  Plaintiff could not say how often this happened but testified that it happened at multiple bi-annual reviews.  Plaintiff felt that Hopkinson's comments were inappropriate and harassing.  Hopkinson also allegedly told Plaintiff that he had "the former enlisted taint" on him.  *Id*. at 62.

In January 2011, Hopkinson allegedly told Plaintiff that Light did not approve of Plaintiff's military activities and warned him that a resident could be placed on academic remediation or probation for "moonlighting." [406] at 56-57. During subsequent remediation sessions, Plaintiff maintains that Light repeatedly expressed that he and Plaintiff's co-residents were upset about Plaintiff's outside paid activity, which Plaintiff understood to mean his military service. *Id.* at 58. Light also allegedly told Plaintiff that he was "unable to take the military servile attitude out of the man." *Id*. at 68.

Plaintiff further asserts that during their rotation together, Ghanayem imitated a "shiftless, lazy enlisted man" along the lines of the television character "Gomer Pyle," and require Plaintiff to open doors for him while doing the imitation. [406] at 64. According to Plaintiff, another attending physician, Dr. Stover (no first name provided), shouted at him "using drill sergeant remarks" and told him that he was insubordinate to his commanding officers and that he was "dismissed." [371] at 88.

Plaintiff also reports alleged anti-military animus by his co-residents. The senior resident on Plaintiff's rotation with Ghanayem was Brian Foster, MD. According to Plaintiff, Foster harassed him by going through 'his book bag in the resident room, pulling his books out, and "interrogat[ing]" him about what he was reading and why." [371] at 59. According to Plaintiff, one of the books that Foster found was Plaintiff's copy of the Air Force Officer's Training Manual. Foster allegedly told Plaintiff that it was wrong for him to "spend [his] reading time on alternative ways to earn money" and that the Department expected residents to read "orthopedic surgical material exclusively or material of a non-professional nature." *Id*. at 59-60.

Plaintiff also reports that Salazar began harassing him during their PGY2 by making late night calls to Plaintiff. Plaintiff could not say specifically when these calls occurred and did not

recall how many there were. He did, however, recall Salazar complaining that Plaintiff's military deal was better than his and that Plaintiff was getting an MBA. Salazar also allegedly referred to Plaintiff as "airman snuffy," who was described in officer handbooks pejoratively as a screw-up. [406] at 63. More generally, Plaintiff contends that his co-residents were upset about having to cover his military leave and refused to trade calls with him when he needed time off. When Plaintiff's co-residents complained to Hopkinson about Plaintiff's military leave, Hopkinson allegedly did not tell them to cover Plaintiff's call but instead faulted Plaintiff for having a poor relationship with his co-residents.

### G.  Plaintiff's Alleged Performance Issues

Plaintiff passed all of his rotations and never received any patient complaints during his residency. However, Defendants contend that Plaintiff's performance was deficient in a number of respects. One issue was Plaintiff's low scores on the annual Orthopedic In Training Examination (the "OITE"), which is designed to measure residents' orthopedic knowledge and predict their success on the examination for board certification. During PGY1, Plaintiff scored in the bottom two percent of test-takers nationwide; in PGY2, he scored in the bottom ten percent; and in PGY3, he scored in the bottom one percent. As discussed below, Plaintiff's scores had improved by the end of his time in the Program and were higher than at least one of his co-residents. See [406] at 220-21. According to Defendants, Plaintiff also had a problem with the timely completion of charts and records and had a poor record of attendance at conferences. Also according to Defendants, Plaintiff had ongoing communication and trust issues with his co-residents concerning call scheduling, which are discussed further below and in the analysis section of this opinion.

**H.      Academic Remediation and Alleged Continuing Performance Problems**

In January 2011, Plaintiff met with Hopkinson for his biannual review. Hopkinson noted that while Plaintiff had done very well on his spine rotation and was "[e]nthusiastic with med students," Plaintiff's surgical log "seem[ed] light" and his most recent score on the OITE was of "real concern." [371] at 65. According to Hopkinson, he had concerns about Plaintiff's performance based on his OITE score and "feedback from the attendings, what he understood about disease processes and treatments." [345] at 30. Plaintiff disputes that his attending physicians had such concerns and points to the positive deposition testimony of a handful of physicians concerning his performance. See [371] at 65-66. Plaintiff was placed on a program of academic remediation and Light became his academic advisor.

Plaintiff met with Light periodically beginning in February 2011. One of the issues that came up during the sessions was Plaintiff's case logs and coding of procedures. According to Light, Plaintiff recorded substantially fewer procedures that the other residents in his class (390 versus between 952 and 1322). Plaintiff disputes whether Light told him this. According to Light's notes, Light told Plaintiff that his failure to log cases was the basis of a recent citation that the Program had received from ACGME; Plaintiff disputes this as hearsay. Plaintiff also notes that Light has admitted that he believes that "the trigger was the case logs of a prior graduating class" and that Light testified solely to his belief that Plaintiff's actions were a cause of the "second half of the citation." [371] at 78.

In October 2011, Plaintiff updated his case log to reflect all of his cases during the Program. Hopkinson objected to the updated log on the basis that it included a number of procedures that, according to Hopkinson, should not have been logged, such as reviewing x-rays and inserting Foley catheters, because these were not procedures that reflected Plaintiff's surgical experience.

13

Hopkinson contends, but Plaintiff disputes, that Hopkinson had repeatedly told the residents that they should log only orthopedic procedures because that was what ACGME was interested in seeing. Plaintiff removed the codes to which Hopkinson objected.

Later that month, Plaintiff, in his academic remediation session with Light, allegedly argued about whether it was appropriate to list things such as Foley catheter insertions and intra-operative x-ray readings in his surgical logs but told Light that he had nevertheless removed the offending codes. Light told Plaintiff that he needed to interact productively in a collegial fashion with colleagues at his same level. It is disputed whether Plaintiff told Light that he and his classmates were "relatively estranged" or said "I carry out all of my responsibilities to the attendings and that's where my responsibilities lie"; Plaintiff denies making these statements. [371] at 82.

On January 26, 2012, Hopkinson met with Plaintiff for his bi-annual review. Hopkinson told Plaintiff that he was average or above average in terms of his evaluations but raised issues with Plaintiff s surgical log, advising him to remove the codes relating to radiology procedures. Hopkinson also noted that Plaintiff "still need[ed] a lot of work" with respect to his OITE scores, but that they had improved with "much studying." [371] at 90. Hopkinson further noted that Plaintiff "need[ed] to improve communication skills and patient care." *Id.* In addition, Hopkinson gave Plaintiff a letter of warning in relation to an incident involving Dr. Stover's patient approximately a month earlier (the details of this incident are not relevant to the Court's analysis). According to Plaintiff's declaration, Hopkinson also told him that Stover was "gold collar" (a term that refers to professionals like doctors and lawyers) but that Plaintiff was "blue collar" and had an "enlisted taint." *Id.* at 90-91.

## I.    Fellowships

Sometime in 2011, Plaintiff began planning for a spine fellowship. Plaintiff requested a letter of recommendation from Hopkinson in support of his fellowship application. Hopkinson told Plaintiff that he would write a letter, but it would not be a particularly strong recommendation based on Plaintiff's OITE scores. Plaintiff also requested a letter of recommendation from Ghanayem, which Ghanayem agreed to provide. In January 2012, Plaintiff and his classmates began to interview for fellowships, which precipitated conflicts concerning call scheduling. In May 2012, Plaintiff learned that he had not received any of the twelve fellowships for which he applied during the fellowship "match" process. Plaintiff subsequently was able to obtain a fellowship through the "scramble" that followed the "match" process.

## J.    Probation

In May 2012, Light wrote Hopkinson to document concerns about Plaintiffs performance, and in particular his professionalism, recordkeeping, poor attendance at conferences, and relationship with fellow residents. Light met with the GME Office and LUMC legal counsel about placing Plaintiff on probation. In June 2012, Hopkinson gave Plaintiff a letter advising him of the decision to place him on probation until September 2012 because his professionalism and communication/interpersonal skills were not at the level expected of a PGY4. Plaintiff was also advised that a lack of significant progress could lead to his termination. According to the probation letter, to remediate the professionalism and communication issues, he was required to: 1) meet weekly with Michael Pinzur, M.D. and Teresa Capello, M.D.; 2) have 100% attendance at departmental conferences and meetings; 3) have no instances of negative communications with or about attending physicians, residents, or staff; and 4) receive satisfactory evaluations for his rotations. At his deposition, Hopkinson admitted that Plaintiff complied with these requirements;

however, Hopkinson's testimony on this issue was not entirely consistent or definite. See [406] at 147-51.

### K.    2012 Military Leave

Plaintiff needed time off from the Program in June and July 2012 to complete the EMBA abroad class requirements. Plaintiff requested and received from Colonel Echterling military leave orders that would allow him to take off the necessary time periods. According to Plaintiff, although MOANG did not require him to obtain the MBA, he planned to use the MBA in his military service, MOANG was supportive of him obtaining the EMBA, and he was using the study abroad sessions to fulfill MOANG's annual training requirement, with MOANG's approval. According to Plaintiff, it was important to complete the annual training requirement in order to be competitive for a promotion in MOANG. According to Defendants, and as discussed in more detail in the analysis below, Plaintiff was dishonest with the Program and MOANG when he requested time off for military leave when, in fact, he was using the time to complete EMBA requirements. Plaintiff took EMBA abroad classes from June 24 to 29 and July 22 to 27, 2012.

### L.    Termination

In early September 2012, the Clinical Competency Committee ("CCC") convened a meeting about terminating Plaintiff from the Program. The CCC consisted of Hopkinson, Light, and Randy Bindra, M.D., Dr. Belich (no first name provided), and Doug Evans, M.D. Hopkinson recommended termination. The CCC approved termination. The CCC meeting minutes record: "The committee unanimously voted to recommend dismissal for Dr. McDaniel from the residency program. Dr. McDaniel has not upheld the standards of residency training. There have been cases of lack of honesty. Case log reports have shown that Dr. McDaniel has entered cases on dates when faculty have not been available, or more cases than were scheduled on that date. Fraudulent

submission of reports to the Accreditation Council on Graduate Medical Education can put the program in jeopardy. Dr. McDaniel has failed to show for many mentorship and academic remediation sessions. Dr. McDaniel has been absent from duty on several occasions during the last PGY4 rotation, as noted by a statement from one of the senior residents." [406] at 152. Further details concerning these grounds for termination are discussed in the analysis section below.

On September 17, 2012, Hopkinson met with Plaintiff to advise him that he was being terminated from the Program. The termination letter that Hopkinson provided Plaintiff at that meeting stated that "the reasons for your termination are unprofessional and unethical behavior, failure to demonstrate substantial improvement while on academic probation, being absent from a duty assignment without departmental consent and falsifying surgical logs." [406] at 151. The letter also cited the following: Dr. Cappello's assessment that Dr. McDaniel was "slightly behind [his] peers in both knowledge and surgical skills"; being absent on April 27, May 11, and May 18; not performing any surgeries with Pinzur; logging non-orthopedic procedures; and logging procedures that did not take place. *Id.* Plaintiff disputes the factual basis for most if not all of these purported reasons for termination and denies that any of these reasons were sufficient to justify termination, as discussed in the analysis section below.

## M. Grievance Proceedings

Plaintiff filed timely grievances of the Program's probation and termination decisions. Specifically, Plaintiff requested a grievance hearing on probation on July 11, 2012. The Resident Handbook required the hearing to be scheduled within 45 days. However, due to an alleged oversight, Cannon failed to arrange for the hearing until the 45-day period was almost up. At that time, he asked Plaintiff to agree to an extension and told him it would be in his best interest to wait rather than hastily convene a panel. Plaintiff agreed to the extension.

The grievance hearing on probation took place on September 20, 2012, shortly after Plaintiff had been terminated from the Program. Prior to this hearing, Cannon told Plaintiff to "try to keep his probation appeal separate from his termination appeal," [406] at 200, which Plaintiff interpreted to mean that he should not tell the panel about his termination; Plaintiff followed this advice. At least one panel member did not know that Plaintiff had been terminated before the hearing and "walked into the room believing that he had a role to play that could lead to a positive outcome" for Plaintiff. *Id*. at 201. The grievance panel upheld Plaintiff's probation. The panel's letter noted "lack of clinical knowledge and operative skill, unprofessional behavior, lack of interpersonal skill and *** vulnerability to process problems," along with failing to appreciate the consequences of not following department protocols, working within a team environment and making independent decisions. *Id*. at 204.

Plaintiff requested a grievance hearing on termination on September 24, 2012. The grievance hearing took place on October 24, 2012. The panel consisted of Cannon, Andrew Hotaling, M.D., John Santaniello, M.D., and Brigid Steele, M.D. Except for Cannon, the panel members all had military experience. The grievance procedure in the Resident Handbook provided that the hearing committee was to consider all information for relevance and reliability. Plaintiff, citing to testimony from Santaniello, asserts that the panel nonetheless simply relied on Hopkinson's report and assumed that everything had been vetted before the hearing took place. Defendants object on the basis that Santaniello's testimony referred only to certain surgical logs. See [406] at 207. Hopkinson told the panel, among other things, that Plaintiff had to retake Step 1 of his boards, which was false. The panel affirmed Plaintiff's termination by letter dated November 13, 2012, citing poor communication, poor professionalism, and lying as the reasons for Plaintiff's termination. The panel did not list failure to demonstrate substantial improvement

on academic probation, failure to attend mentorship and academic remediation sessions, absence from duty assignments without departmental consent, lack of medical knowledge and surgical skill, or failing to do procedures as bases for termination.

## II. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent

and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* The Court must resolve all evidentiary conflicts in Plaintiff's favor and accord him the benefit of all reasonable inferences that may be drawn from the record. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2013). "It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony." *Id.* (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). Nevertheless, summary judgment in favor of the defendant "is hardly unknown or, for that matter rare, in employment discrimination cases." *Wallace*, 103 F.3d at 1396.

## III. Analysis

### A. USERRA Discrimination

In Count I of his Complaint, Plaintiff alleges that LUMC, LUHS, Trinity, LUC, and Hopkinson violated USERRA's prohibition against discrimination on the basis of an employee's service membership.[3] USERRA is a veterans' employment rights law that, among other things, "prohibit[s] discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a).[4] USERRA affords broad protections to service members against employment discrimination, providing that members "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership." 38 U.S.C. 4311(a). A "benefit of employment" means "any advantage,

---

[3] Plaintiff's USERRA claims against Salazar were previously dismissed on the basis that Salazar, a co-resident of Plaintiff, was not Plaintiff's employer. See *McDaniel v. Loyola Univ. Med. Ctr.*, 2014 WL 4269126, at *4-5 (N.D. Ill. Aug. 28, 2014).

[4] "In enacting USERRA, Congress emphasized USERRA's continuity" with its predecessor statute, the Veterans' Reemployment Rights Act ("VRRA"). 20 C.F.R. § 1002.2. Therefore, "the large body of case law that had developed under [earlier] statutes remained in full force and effect, to the extent it is consistent with USERRA." *Id.*

profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." *Id.* § 4303(2). In order to allege a violation of USERRA, a plaintiff must establish that he was subject to an adverse employment action and that his military service was a motivating factor in that action. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011). Under the burden-shifting framework of § 4311, a plaintiff makes out a prima facie case of discrimination by showing that his service membership was "a motivating factor in the employer's action." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009). The employer must then "prove that the action would have been taken in the absence of such membership." *Id.*

### 1.     Preliminary Issues

#### a.     LUC

LUC argues that it is entitled to summary judgment on Plaintiff's USERRA claims because (1) Plaintiff was an employee of LUMC/LUHS only under the AAA and Plaintiff's GME Agreement; (2) Cannon and the GME Office were exclusively part of LUMC and LUHS; and (3) all of the attending physicians who supervised Plaintiff were, in that capacity, employees of LUMC/LUHS. Plaintiff responds that LUC was also his employer because LUMC residents served as teaching assistants for LUC medical school courses and medical student rotations.

Neither party addresses the Court's prior analysis of this issue in its order deciding Defendants' motion to dismiss Plaintiff's amended complaint. In that order, the Court denied the motion to dismiss LUC as a Defendant to Plaintiff's USERRA claims because Plaintiff alleged that LUC owned LUMC until 2011 and that Hopkinson, Light, Ghanayem and Cannon were jointly employed by LUMC, LUC, and Trinity. Courts in the analogous context of Title VII actions "have held that under certain circumstances a parent company and its subsidiary can be considered a

single employer for purposes of Title VII liability." *McDaniel*, 2014 WL 4269126, at *6. According to the parties' Local Rule 56.1 statements, LUMC's sole corporate member is LUHS and, prior to July 1, 2011, LUHS's sole corporate member was LUC. [371] at 8. In their motion for summary judgment, Defendants do not shed any additional light on the corporate interconnectivity among these entities or "the degree to which LUMC's parent companies," including LUC until July 1, 2011, "controlled its decisions and employees." *McDaniel*, 2014 4269126, at *6. Therefore, much as the Court concluded at the motion to dismiss stage, Defendants "have not met their burden of establishing that Plaintiff" will be unable to prove "a USERRA claim with respect to LUC." *Id*.

### b. Trinity

Although the parties do not address this issue in their briefs, the Court is at a loss to understand why Trinity is named as a Defendant to any of the claims in this lawsuit. As far as the Court understands it, Trinity's only relationship to the case is derivative through a subsidiary. While Plaintiff alleged in his Complaint that LUMC was sold to Trinity in 2011, see *McDaniel*, 2014 WL 4269126, at *5, the parties' Local Rule 56.1 statements do not establish this to be the case. Defendants contend that since July 1, 2011, Trinity has been LUC's sole corporate member, [371] at 8; but as of that date, LUC was no longer the sole corporate member of LUHS (which in turn is the sole corporate member of LUMC). Plaintiff contends that "LUC is not legally related to either LUHS or Trinity." [371] at 8. Regardless of which position is true, it is not apparent from the parties' statements or briefs that Trinity has any relationship to LUMC, which ran the Residency Program. Therefore, the parties are directed to address in their supplemental briefs whether Trinity should be dismissed from the lawsuit on the basis that it has no relationship to the claims alleged by Plaintiff.

### c.      Deference to Academic Decisions

Defendants contend that their employment decisions are entitled to greater deference than would be given in an ordinary employment discrimination case because Plaintiff is a medical resident and their employment decisions involve "academic judgment." [400] at 18. While Plaintiff does not address this issue in his response, Defendants have not established that their legal position is a correct statement of the governing law in this circuit. The only in-circuit case cited by Defendants, *Fenje v. Feld*, 301 F. Supp. 2d 781 (N.D. Ill. 2003), involved a medical resident but did not include a USERRA claim or any other type of discrimination claim. Instead, the court held, in the context of deciding a due process claim, that "dismissal on academic grounds, unlike dismissal on disciplinary grounds, requires only minimal due process protections," because academic evaluations of a student "bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement" and the "determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id*. at 801.

The other cases cited by Defendants are all from outside this Circuit, and none involve a USERRA claim. See *Al-Dabagh v. Case Western Reserve Univ*., 777 F.3d 355, 360 (6th Cir. 2015) (student's claim against university for violation of duties of good faith and fair dealing; applying Ohio law that academic judgment of medical school could be overturned only if arbitrary and capricious); *Hajjar–Nejad v. George Washington Univ*., 37 F. Supp. 3d 90, 124 (D.D.C. 2014) (holding that decisions involving academic dismissal merit summary judgment on breach of contract claim, under District of Columbia law, unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it

was motivated by bad faith or ill will unrelated to academic performance); *Abdel-Raoufv. Yale Univ.*, 2015 WL 687440, at *3 (D. Conn. Feb. 18, 2015) (recognizing that, for purposes of Title VII and Section 1981 discrimination claims, "[w]here an employment relationship is primarily educational, *** judges and juries are singularly unequipped to review judgments about professional qualification," but not adopting a specific legal standard for evaluating claims; also finding that there was no evidence in the record from which to infer that plaintiff's termination from medical residency program was motivated by racial or religious enmity); *Nigro v. Virginia Commonwealth Univ. Med. College*, 2010 WL 4879076, * 9 (W.D. Va. Nov. 23, 2010) (Title VII discrimination claim brought by former medical resident against faculty of residency program; holding that "'[w]hile a plaintiff is entitled to establish by showing disparate treatment that illegal discriminatory animus was the basis for an adverse action, administrators of professional schools are entitled to deference in their decisions to admit, retain, or dismiss a student when such evidence is lacking'" (quoting *Herron v. Virginia Com. University*, 366 F. Supp. 2d 355, 368 n.16 (E.D. Va. 2004)). To the extent that these cases have any applicability at all, they appear to recognize that even an academic decision is subject to legal challenge on the basis that it was motivated by illegal discriminatory animus, as Plaintiff alleges here.

### d.     Plaintiff's 2012 Military Orders

Defendants argue that the Court should not consider Plaintiff's 2012 military orders in evaluating his USERRA claims, because Plaintiff allegedly obtained those orders and military leave based on misrepresentations that he made to MOANG and the Program. The Court declines to ignore those orders because Defendants do not cite any precedent that would allow the Court to consider the 2012 military orders void and there are, at the very least, disputed questions of fact

concerning whether Plaintiff made any material misrepresentations in the process of procuring those orders.

Defendants cite three cases for the proposition that the "orders Plaintiff obtained from the MOANG in the summer of 2012 were invalid as a matter of law." [343] at 30. Two of those cases, *United States v. Watson,* 69 M.J. 415 (Ct. App. A.F. 2011), and *Wickham v. Hall,* 12 M.J. 145 (CMA 1981), are from military courts and contain no suggestion that a civilian court has any authority to declare a military order "void" or "invalid" on the basis of an alleged fraud. Defendants contend that in the third case, *Hilliard v. New Jersey Army Nat'l Guard,* 527 F. Supp. 405 (D.N.J. 1981), the district court held that "a police officer who had fraudulently obtained orders and subsequently resigned his employment as the part of an arrangement with the Army National Guard and his private employer was not entitled to reinstatement under USERRA's predecessor, VRRA." [340] at 30. But in fact, the district court denied reinstatement under the VRRA because the police officer had already resigned from the police department before he obtained his military leave orders. *Hilliard*, 527 F. Supp. at 409-10. The district court also denied plaintiff the equitable relief of 90 days' pay, which was available under a New Jersey statute, because the plaintiff, "by intentionally misrepresenting his employment relationship in order to obtain reserve duty orders c[ame] into th[e] court with unclean hands." *Id*. at 411. Defendants have not raised or supported an unclean hands defense in their summary judgment brief. Further, in *Hilliard*, when the Guard discovered the plaintiff had lied about who his civilian employer was and that he did not have their consent to serve, the military, not a civilian court, revoked his orders. *Id*. at 407. There are no allegations or evidence in this case that Plaintiff's 2012 orders were ever revoked, let alone investigated or questioned, by MOANG.

In addition, Defendants have not come forward with undisputed evidence that Plaintiff obtained his 2012 military leave orders based on any material misrepresentations. Defendants identify three alleged misrepresentations: 1) Plaintiff told Hopkinson had to take leave to fulfill "a professional obligation required by the Air Guard for the past three years"; 2) Plaintiff "suggest[ed] to Colonel Echterling that the Program was aware of his efforts to get an MBA but were 'without care' of the fact he would lose the opportunity if he did not get leave to study abroad"; and 3) Plaintiff "withheld from MOANG that the Program had placed him on probation or he was in danger of not becoming a credentialed medical provider." [343] at 29-30.

The first statement was not made to MOANG and was not relied on by MOANG in deciding to issue leave orders. The second statement is not clearly false nor is there evidence that it was in any way material to MOANG's decision to issue the leave orders. Defendants have not demonstrated that they were wholly unaware of Plaintiff's efforts to obtain an MBA through the EMBA program, and Plaintiff contends some of his co-residents' animosity against him was based on jealously that Plaintiff was also obtaining an MBA during his time in the Residency Program. Even if Plaintiff did withhold this information from the Program, Defendants have not demonstrated that this would have influenced MOANG's decision to issue leave orders. MOANG supported Plaintiff's participation in the program (including by giving him constructive credit for it) and sent letters of support to the program on his behalf. As to the third statement, Defendants have not shown that Plaintiff was under any obligation to disclose to MOANG that he was on probation or in danger of not completing the Program or that this information was material to MOANG's decision to issue the 2012 leave orders. Further, Plaintiff has identified (disputed) evidence that he did, in fact, tell Echterling that he was on probation with the Program. See [406] at 109-10.

## 2. Adverse Employment Actions

Defendants concede that Plaintiff was subjected to two adverse employment actions, both of which occurred in the Spring or Summer of 2012: (1) Defendants' decision not to provide Plaintiff with a contract as a PGY5 and (2) Defendants' decision to terminate Plaintiff from the Program. According to Defendants, these are the only two adverse actions at issue in this case. In response, Plaintiff asserts that the Program's decision to place him on probation in June 2012 was also an adverse action, which must be considered in analyzing his USERRA discrimination claim.[5]

"'An adverse employment action is one that significantly alters the terms and conditions of the employee's job,'" which includes "termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities" but does not include "'everything that makes an employee unhappy.'" *Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) (quoting *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008)). The Seventh Circuit has "suggested that placing an employee on probation, in some cases, may constitute a materially adverse employment action." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996)); *see also Thompson v. Memorial Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010).

Based on the record and limited briefing before it, the Court cannot say as a matter of law that the decision to place Plaintiff on probation was not an adverse employment action. As Plaintiff points out, "[p]robation must be reported on applications for state licenses for the rest of the physician's career and, according to Dr. Cannon, 'has a pretty big impact.'" [372] at 45; *see also* [406] at 133. Defendants cite two cases in their reply brief for the proposition that "whether or not

---

[5] Defendants claim that Plaintiff waives this issue by raising it solely in a footnote. Even assuming that it would be appropriate to apply the waiver doctrine so strictly, it would not bar Plaintiff's argument because Plaintiff argues in multiple places in the body of his brief that military service was a motivating factor in Defendants placing him on probation. See [372] at 43 44; 54-55.

Defendants were required to report it to the state licensing board, the decision to place Plaintiff on probation was not an adverse action." [405] at 19. But in the first case they cite, *Odeluga v. PCC Community Wellness Ctr.*, 2015 WL 1586244, at *8 (N.D. Ill. Apr. 1, 2015), there is no indication that the medical fellow who was placed on academic probation would ever have to report that fact to any third parties. The second case they cite, an unpublished decision from the First Circuit, cannot be found on Westlaw using the citation or the case name that Defendants provide, and therefore the Court cannot consider it. See [405] at 19. In any event, Defendants fail to discuss or apply the Seventh Circuit case law recognizing that probation may in some cases constitute an adverse employment action. Therefore, the Court will consider the placement of Plaintiff on probation to be an "adverse employment action" for purposes of analyzing his USERRA discrimination claim.

### 3. Service Membership as Motivating Factor

Defendants argue that they are entitled to summary judgment on the USERRA discrimination claim because Plaintiff will be unable to show that his military membership was a motivating factor behind Defendants' adverse employment actions. Plaintiff, of course, disputes this. The "motivating factor" standard does not require a "direct admission from the employer" but instead allows an employee to rely on "circumstantial evidence that creates a 'convincing mosaic' from which a reasonable jury could infer discriminatory motive." *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 284 (7th Cir. 2015). "Such evidence could include, for example, suspicious timing, statements, or behavior" that, "[i]n the aggregate *** prove—or at least *** create a genuine issue about—the employer's ill motive." *Id*. at 285.

The Court agrees with Plaintiff that there is enough evidence to go to a jury on the issue of whether Plaintiff's service membership was a motivating factor in Defendants' alleged adverse

actions (probation, failure to promote, and termination). Taking the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that, from the beginning of Plaintiff's residency, Defendants responded negatively to Plaintiff's need to take military leave and his status as a MOANG enlistee, that this fostered conflicts between Plaintiff and his co-residents over call coverage and hostility toward Plaintiff's military status, and that these conflicts were unfairly blamed on Plaintiff's alleged lack of professionalism and communications skills, which ultimately led to Plaintiff being placed on probation and terminated from the Program.

The parties have come forward with a huge volume of disputed and undisputed facts and associated records supporting and refuting Plaintiff's version of events. It is not necessary for the Court to discuss them all in order to conclude that a jury must be allowed to decide whether Plaintiff's service membership was a motivating factor behind Defendants' adverse employment actions.[6] For example, Plaintiff was allegedly told by a senior resident that asking for leave to perform military service would not be well-received at LUMC, and that he would have the "deck stacked" against him from the beginning if he made such a request. [406] at 32. When Plaintiff requested two days leave to attend a military awards ceremony in April 2010, Hopkinson allegedly told Plaintiff that he should not take any leave not approved by the Program, which Plaintiff interpreted as meaning military leave. *Id.* at 33. Hopkinson also allegedly told Plaintiff that his

_____

[6] Many of the alleged statements of the individual Defendants are supported by Plaintiff's declarations and deposition testimony. To the extent that Plaintiff is reporting on statements the individual Defendants made to him, they are admissible non-hearsay statements by party opponents. See Fed. R. Evid. 801(d)(2)(A); *Jordan v. Binns*, 712 F.3d 1123, 1128 (7th Cir. 2013). In their nearly 300-page response to Plaintiff's statement of additional facts, Defendants raise many evidentiary objections based on alleged inconsistencies between Plaintiff's written discovery responses, declarations, and testimony. But for the most part Defendants do not identify actual "contradictions" created to create 'sham' issues of fact to avoid summary judgment," *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005), but instead instances where Plaintiff expanded on the many ways in which Defendants allegedly expressed their anti-military hostility and discriminated against him on the basis of his military membership. Plaintiff's alleged inconsistencies go to his credibility—an issue for the jury, see *Alexander*, 263 F.3d at 681—rather than to the admissibility of his statements.

military work might be considered "moonlighting" in violation of the Program's policies.  See *id.* at 56-57.

Plaintiff's co-residents, in emails that have been included in the record, expressed frustration about being required to cover Plaintiff's military leave and also made sarcastic and snarky comments about Plaintiff's military service and devotion to serving the country.  See [406] at 142-43.  When Plaintiff's co-residents complained to Hopkinson about Plaintiff's military leave, Hopkinson allegedly did not tell them to cover Plaintiff's call but instead faulted Plaintiff for having a poor relationship with his co-residents.  For instance, Hopkinson reported "military leave coverage issues" to be one of the "things going on with" Plaintiff that led to his conclusion that Plaintiff's professional and communication/interpersonal skills were not at the level expected of residents.  *Id.* at 216.

The timing of certain actions by Defendants also provides some support for Plaintiff's theory that Defendants were motivated by his military status.  According to Plaintiff, when he met with Hopkinson in January 2011, Hopkinson told him that Light did not approve of Plaintiff's military activities and warned him that a resident could be placed on academic remediation or probation for "moonlighting."  [406] at 56-57.  A few weeks late, Hopkinson put Plaintiff on academic remediation.  During his remediation sessions with Light, Plaintiff avers, Light repeatedly expressed that he and Plaintiff's co-residents were upset about Plaintiff's outside paid activity, which Plaintiff understood to mean his military service.  *Id.* at 58.

In June 2012, Hopkinson placed Plaintiff on probation during a meeting that Plaintiff had requested to discuss his upcoming leave to perform military duty.  [406] at 107-08.  The probation letter stated that Plaintiff was deficient in professionalism and communication/interpersonal skills.  Hopkinson admitted at his deposition that one of the communications issues was that Plaintiff

should have organized leave further in advance and "can't just pop this up in the last moment barring a national emergency when the reserves are called up.'" [406] at 216. Ultimately, Plaintiff was terminated in September 2012. The termination letter stated that "the reasons for your termination are unprofessional and unethical behavior, failure to demonstrate substantial improvement while on academic probation, being absent from a duty assignment without departmental consent and falsifying surgical logs." [406] at 151. According to Plaintiff's theory of the case, the allegations of unprofessional behavior unfairly arose from Defendants' and his co-residents anti-military animus and the other reasons given for his termination were pretextual (as discussed in detail below).

Apart from the timing and reasons that Defendants provided for disciplining and ultimately terminating Plaintiff, Plaintiff also points to derogatory comments that certain individual Defendants and other attending physicians made about his military status. According to Plaintiff, Ghanayem imitated a "shiftless, lazy enlisted man" along the lines of the television character "Gomer Pyle" while he was in clinic with Plaintiff. [406] at 63. Light allegedly told Plaintiff that he was "unable to take the military servile attitude out of the man." *Id*. at 68. Hopkinson allegedly told Plaintiff that he had "the former enlisted taint" on him. *Id*. at 62. And Stover allegedly angrily told Plaintiff that he was acting too military by using the term "sir," although the use of "sir" to address attending physicians is common among residents. *Id*. at 69. Stover also allegedly yelled drill sergeant remarks at Plaintiff and told Plaintiff that he was insubordinate to commanding officers. *Id*. at 70.

Despite this evidence and the many material factual disputes raised by it, Defendants argue that any claim of antimilitary animus is undermined by the record as a whole. But the evidence cited by Defendants simply creates more factual disputes that a jury must be allowed to evaluate.

For instance, Defendants point out that another resident (Salazar) also had a military background and ongoing service obligation and that Hopkinson had a long and distinguished military career. As the Supreme Court and the Seventh Circuit have cautioned, however, that "'it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.'" *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 678 (7th Cir. 2014) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). The Court cannot say that Plaintiff's description of Hopkinson's and Salazar's behavior is inconceivable simply because they were also military members. According to Plaintiff's theory of the case, Salazar and Hopkinson's animosity toward him arose in part from the fact that he was getting paid by MOANG for receiving constructive credit, which was a better deal that Salazar received from his own military unit.

Defendants also point out that Plaintiff requested and received 7 days military leave in 2009 without adverse action, even though policy normally limits leave to 5 days. Although Plaintiff was allowed to take leave (as USERRA requires), Plaintiff has presented evidence that Defendants and his co-residents responded negatively to all of his requests for leave, including in 2009. Defendants argue further that there is no evidence that the Program treated other residents with similar work records or problems differently. Plaintiff disputes this. Regardless, a plaintiff is not required to show that his employer treated another, non-military employee more favorably in order to establish that his service membership was a motivating factor in his employer's adverse action. Instead, under the burden-shifting test, once the plaintiff meets his burden of establishing service membership was a motivating factor, the defendant has the burden to show that it would have taken the adverse action against the employee regardless of his military service. The Court now turns to whether Defendants have satisfied that burden.

### 4.      Adverse Employment Actions Absent Military Membership

Defendants argue that even if Plaintiff could make out a prima facie case of discrimination, they are nonetheless entitled to summary judgment because the undisputed evidence in the record demonstrates that they would have taken the same adverse actions against Plaintiff even if he was not a service member. According to Defendants, Plaintiff would not have been advanced in the Program and would have been terminated even in absence of military membership because "his professionalism and communication/interpersonal skills were not at the expected level." [343] at 28. Plaintiff disputes many of the facts relied upon by Defendants, and contends that even if they had support in the record, they were a pretext and would not have resulted in Plaintiff's termination if he was not a service member.

The Court agrees with Plaintiff that this issue cannot be resolved on summary judgment. As an initial matter, Defendants have not come forward with any clear standards concerning what behaviors are sufficiently severe to justify termination of a resident from the Program for an alleged lack of professionalism and communications skills. According to Defendants, "[b]oth the ACGME and the ABOS place the duty on the Program, the Program Director, and the Department Chair to ensure that a resident has the qualifications—including the professionalism, communication skills, and ethics—to independently practice medicine." [343] at 29. This is a subjective and vague standard, and Defendants provide no examples of how the standard has been applied in other instances where residents were believed to have been lacking in the requisite skills. Further, even in cases where a terminated employee indisputably committed a "fireable offense"— such as arriving late at work three times, when the employer's policy states that an employee will be terminated after three late arrivals—this is "only the beginning of the analysis." *Arroyo*, 805

F.3d at 286. The employer still must "conclusively establish[] that it necessarily would have terminated" the employee for the offense, regardless of his military service. *Id*.

As evidence of Plaintiff's lack of professionalism and communication/interpersonal skills, Defendants first assert that Plaintiff alienated classmates by "freely committing to take call on Easter weekend and then backpedaling on that commitment, as well as not being honest with them." [343] at 28. Plaintiff explains that the Easter scheduling issue arose because the resident who made the call schedule, Obermeyer, had scheduled him for a date that he had already requested off for a fellowship interview, requiring Plaintiff to trade Salazar for Easter to avoid missing his interview. According to Plaintiff, when he told Obermeyer about the error, Obermeyer assigned Easter to Larsen and when Larsen brought this up, Plaintiff agreed to take more call over Memorial Day, which Larsen conceded was fair. A reasonable factfinder could certainly conclude that this scheduling conflict, considered over the course of Plaintiff's four years in the Program, was relatively minor and did not justify termination.

Next, Defendants point to Plaintiff's "shouting match" with his co-residents in the resident room in March 2012 as evidence of his lack of professionalism and communication skills. But it is disputed what really occurred during that conversation. Plaintiff contends that his co-residents accosted him and berated him for taking time off for military leave, that he did not yell at anyone, and that Larsen and Beck yelled at him. In support, he points to testimony from LUMC employee Ordonez that she heard only a female voice being loud. [406] at 84. Yet, Larsen and Beck were not disciplined and were allowed to graduate from the Program.

Defendants also justify Plaintiff's termination on the fact that his co-residents revealed to Light that they had been having problems with Plaintiff for years. As Plaintiff points out, Light solicited these peer evaluations of Plaintiff even though this is not a routine procedure. See [406]

at 87-88. A factfinder might conclude that this "deviation from [the] typical procedure is circumstantial evidence" that Defendants' adverse employment decisions were motivated by discriminatory animus. *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017).

Defendants further contend that Plaintiff's case log had been a long-standing concern of Light and Hopkinson. But according to evidence offered by Plaintiff, he was not the only resident who had issues with his case log. One resident's case logs were "inadequate numerous times." [406] at 175. And each of Plaintiff's co-residents allegedly recorded cases on dates when the procedures did not take place. *Id.* at 169-72. Yet none of Plaintiff's co-residents were terminated from the program, and Santaniello testified that if a procedure was done but recorded on the wrong day, this was not a reason to fire someone. *Id.* at 210. Moreover, Plaintiff contends that there was no standardization in the entry of case logs, a problem that prompted Hopkinson to publish a paper on this lack of standardization. *Id*. at 168. These facts could support an inference that Plaintiff's alleged case log errors were simply a pretext. See *Coleman v. Donahoe*, 667 F.3d 835, 857-58 (7th Cir. 2012) (evidence of selective enforcement of punishment by an employer sufficient to create genuine issue of material fact whether reason for adverse employment decision was pretextual).

Defendants also point to Plaintiff's conference attendance as a justification for his termination. It is undisputed, however, that after Plaintiff was placed on probation, he attended 100 percent of conferences and lectures, as required by his remediation plan. [406] at 150. Also, there is no evidence in the record concerning what level of conference attendance is required in order to advance in the Program, and Plaintiff points to evidence that sometimes, patient care needs must take precedence over conference attendance. Further, Plaintiff's co-residents had less than perfect attendance, as well.

Next, Defendants assert that Hopkinson learned from senior resident Dr. Wojewnik (no first name provided) that Plaintiff had not officially gotten leave for several days he took off. But this is heavily disputed. According to Defendant, the alleged absences were verifiably false and Plaintiff was working or attending approved educational activities on each of the days. [406] at 122-23.

Defendants also cite to Plaintiff's alleged interactions with Cappello, who allegedly commented that Plaintiff was slightly behind his peers in knowledge and surgical skill. Nonetheless, Plaintiff received evaluations from Cappello that were satisfactory or higher. [406] at 151. Cappello also opined that Plaintiff "communicated effectively." *Id.* at 149. Finally, Defendants point to evidence that Plaintiff did not log any cases with Pinzur, even though he was on Pinzur's rotation. Plaintiff points to evidence, however, that he performed at least one case with Pinzur and that Pinzur evaluated and passed him. [406] at 153-54, 158. Also, during Plaintiff's rotation with Pinzur, Plaintiff had a detached retina that, according to Plaintiff, prevented him from safely operating with Pinzur while his eye healed. *Id*. at 157.

Most significantly, although Defendants list a number of discrete disputed facts to justify their decision not to promote and to terminate Plaintiff, they do not explain how these facts alone or cumulatively demonstrate that Plaintiff is unfit to "independently practice medicine." [343] at 29. By contrast, Plaintiff points to evidence of his capability, including that he passed all of his rotations—which required his attending physicians to rate his professionalism and communication ability—and had no complaints from patients. According to Cannon, no other resident other than Plaintiff was ever placed on probation without failing a rotation. Plaintiff also notes that he met the requirements of his remediation plan during his probation. Among other things, he attended all conferences and meetings and had no instances of negative communications with or about other

residents, attending physicians, or staff. [406] at 151. Finally, it is disputed whether the grievance panels that considered Plaintiff's grievances actually evaluated the relevant evidence and came to their own conclusions, or simply rubber-stamped Hopkinson's recommendations.

Given this highly disputed factual record and the numerous inferences that the factfinder could draw therefrom, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's USERRA discrimination claim.

### B.      USERRA Hostile Work Environment

In Count Two of the Complaint, Plaintiff alleges a USERRA hostile work environment claim against the Corporate Defendants, Hopkinson, and Cannon. A USERRA hostile work environment claim "requires the plaintiff to show that he was subject to harassment, that the harassment was based on his protected status, that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive atmosphere, and that there is a basis for employer liability." *McDaniel*, 2014 WL 4269126, at *7 (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004)); see also *Miller v. City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002) (USERRA harassment claim "must be supported by evidence that the employer's conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"). A showing that the work environment is "severe or pervasive" "requires proof of both an objective and subjective component." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018). "[T]o determine whether a particular work environment is objectively offensive, we must consider the severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Id*. The Court looks at the "cumulative effect of individual acts," which occur "over a series of days or perhaps years"

and may include individual actions of harassment that are "not *** actionable on [their] own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

### 1. Cannon

Defendants argue that Cannon is entitled to summary judgment on the USERRA hostile work environment claim because there is no evidence of any harassment by Cannon. Plaintiff does not respond to this argument. The Court concludes that Cannon is entitled to summary judgment on the USERRA hostile work environment claim. The only arguably relevant evidence concerning Cannon is that he asked Plaintiff to stop calling him "sir," even though according to Plaintiff it was common for residents to use this term. According to the record, Cannon thought that this was a term that should only be used for service members and that Plaintiff, by continuing to use the term after Cannon asked him to stop, was trying to be offensive because he knew Cannon had not served in the military. See [406] at 71-72. This evidence falls far short of showing that Cannon engaged in any severe or pervasive discriminatory conduct.

### 2. The Corporate Defendants and Hopkinson

The remaining Defendants argue that they are entitled to summary judgment on Plaintiff's USERRA hostile work environment claim, as well. According to Defendants, Plaintiff's claim is supported only by his own testimony, which is contrary to written statements he made before filing suit, and which shows only a handful of isolated comments that were not severe or pervasive enough to create a hostile work environment.

The Court concludes that a jury must be allowed to decide whether Plaintiff was subjected to a hostile work environment in violation of USERRA. The evidence presented by Plaintiff, taken as a whole and considered in the light most favorable to him, paints a picture of Hopkinson, along with Plaintiff's co-residents and some attending physicians, engaging in a campaign to harass and

punish him based on his military membership, his need to take military leave, and the perceived sweet deal he had receiving pay from MOANG for constructive credit. According to Plaintiff, the individual Defendants and other supervising physicians repeatedly made explicitly anti-military derogatory comments about him, including Ghanayem's "Gomer Pyle" impersonations and refusal to stop, *id*. at 64-65; Light's statement about Plaintiff's "military servile attitude," *id*. at 68; Hopkinson's comment about Plaintiff's "former enlisted taint" and references to Plaintiff as a "mutt animal" and "airman dufflebag," *id.* at 66; Stover's statement that Plaintiff acted too military and yelling drill sergeant remarks at him, *id.* at 69-70, and Stover's angry reaction to Plaintiff using the term "sir," *id*. at 71.

Plaintiff also presents evidence that Defendants' hostility toward Plaintiff's military status and need to take leave in turn encouraged his co-residents to respond with hostility, as well. For instance, according to Plaintiff, Foster went through Plaintiff's bookbag without permission and criticized him for reading military materials, *id.* at 66; Salazar referred to him as "airman snuffy," who was described in officer handbooks pejoratively as a screw-up, *id.* at 63; Salazar repeatedly demanded to see written leave orders, *id.* at 136, and lied about agreeing to cover Plaintiff's call when he was on leave, *id.* at 138; and co-residents allegedly accosted and yelled at him when they learned he needed time off for military activities, *id*. at 84, and refused to trade call with him, see *id*. at 141. According to Plaintiff, Hopkinson allowed this behavior, did not tell co-residents to cover for Plaintiff, and instead faulted Plaintiff for having poor professionalism and communications skills and punished him on that basis. Further, according to Plaintiff, Light gave his co-residents additional power over him by using an unprecedented peer-review process to solicit their feedback and using their responses to justify taking adverse employment actions against Plaintiff. According to Plaintiff, this campaign of harassment culminated in Plaintiff being

placed on probation and terminated from the Program after four years of work. This evidence suggests not only that Plaintiff was subjected to severe and pervasive harassment, but also that he was impeded (especially by his co-residents alleged refusal to trade call) from effectively performing his job duties as a result. See *Swyear*, 911 F.3d at 880.

Defendants contend that the evidence cited by Plaintiff is insufficient to support a hostile work environment claim because it is based on Plaintiff's own statements, which have not been consistent throughout the litigation and before the litigation began. But at most, Defendants have chipped away at the edges of the evidence by questioning Plaintiff's credibility and reliability, rather than undermining the totality of the evidence. Defendants also assert that Plaintiff's testimony concerning the alleged harassment is "completely at odds with other undisputed facts of record," including 1) calling Hopkinson a mentor and telling the probationary panel that he wished other attending physicians were like him; 2) calling Foster and Salazar "awesome" and Foster his "friend"; and 3) inviting Ghanayem to his wedding, requesting him as a mentor, and asking him to write a recommendation letter. [343] at 31. But these friendly overtures and compliments could be interpreted in a variety of ways—including as attempts by Plaintiff to improve his relationship with his harassers, with whom he was required to work on a daily basis. Unfortunately, Defendants make little effort to compare the facts of this case to the facts of other hostile work environment cases, which would have been helpful in determining whether the harassment alleged here rises to the "severe and pervasive" level. Ultimately, the Court concludes that whether Plaintiff's testimony is believable, and whether the alleged harassment he experienced was severe and pervasive, are issues for a jury to decide at trial. Therefore, the Corporate Defendants' and Hopkinson's motion for summary judgment on the USERRA hostile work environment claim is denied.

### C.    Breach of Contract

As clarified in his response to summary judgment, Plaintiff alleges in Count Four of his Complaint that all of the Corporate Defendants breached the GME Agreement by 1) failing to schedule Plaintiff's probationary hearing within 45 days of his request for a hearing, as required by the Resident Handbook; and 2) failing to provide him with due process, as required by the Resident Handbook.[7]

#### 1.    LUC

Defendants argue that LUC is entitled to summary judgment on Plaintiff's breach of contract claim because it was not a party to either the GME Agreement or the Resident Handbook on which the breach of contract claim is based. See [343] at 35. Plaintiff does not respond to this argument. The Court has reviewed the cited documents. The GME Agreement states that it is between Plaintiff and LUMC. While the Handbook does not specifically identify its "parties," Plaintiff does not point to any evidence that the Handbook is binding on LUC. Therefore, the Court concludes that LUC is entitled to summary judgment on Plaintiff's breach of contract claim.

#### 2.    The Other Corporate Defendants

"Under Illinois law, to prevail on a breach of contract claim the plaintiff must show: (1) the existence of a valid and enforceable contract, (2) []he substantially performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract." *Swyear v. Fare Foods Corporation*, 911 F.3d 874, 886 (7th Cir. 2018). Defendants move for summary judgment based on Plaintiff's alleged inability to prove the first, second, and third elements of his breach of contract claim.

---

[7] The complaint alleges additional breaches, see [233] at 47-48, which Defendants address in their summary judgment brief, see [343] at 36-37. However, Plaintiff's response identifies only the two breaches identified above, see [372] at 89-90, and therefore the Court will limit its analysis to the arguments advanced by Plaintiff in opposition to summary judgment.

### a.      Existence of Contract

Defendants argue that they did not breach the GME Agreement by allegedly failing to abide by provisions of the Resident Handbook, because the Resident Handbook specifically provides that it does not constitute a contract and the GME Agreement's reference to the Resident Handbook is insufficient to incorporate it into the GME Agreement.  Defendants also argue that to the extent the GME Agreement incorporates the Resident Handbook, "it is only under the provision that requires a 'Resident' to abide by its terms."  [343] at 35.

The Court addressed the issue of incorporation by reference in its prior opinion on Defendants' motion to dismiss, which Defendants do not acknowledge in their opening brief.  See *McDaniel*, 2014 WL 4269126, at *10.  For purposes of the motion to dismiss, the Court deemed Section III of the Resident Handbook—which describes the grievance procedure available to Residents—to be incorporated into the GME Agreement.  *Id.*  Defendants fail to demonstrate that the Court should come to a different result now, at the summary judgment stage.  As the Court previously determined, the GME Agreement "clearly refers to the Resident Handbook" and provides that the grievance procedure described in the Resident Handbook is the "sole grievance procedure available to a Resident," thereby "binding LUMC to honor and abide by the Handbook's grievance procedures."  *Id.*; see also [344-1] at 150 ("The Grievance Procedure can be found in the Resident Handbook in Section II").  The two Seventh Circuit cases cited by Defendants, see [343] at 34, support this conclusion.  *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730 (7th Cir. 2002), recognizes that where, as here, "the contract incorporates a specific document by name, both parties are on notice and are bound by the terms of that document."  *Id.* at 737.  In *Rosenblum v. Travelbyus.com*, 299 F.3d 657, 663 (7th Cir. 2002), the court declined to find incorporation by reference where the two contracts at issue were "separate, free-standing contracts," with each

"deliniat[ing] rights and duties independent of the other."  *Id.* at 663.  Here, by contrast, the GME Agreement specifies that the grievance procedures available to a Resident are solely those set forth in the Handbook.  Further, as Plaintiff points out, Defendants' argument that the GME Agreement does not incorporate the Resident Handbook is inconsistent with its position that Plaintiff failed to substantially perform his obligations under the GME Agreement by allegedly violating the Resident Handbook's policy on moonlighting.

### b.    Substantial Performance by Plaintiff

Defendants argue that they are also entitled to summary judgment on the breach of contract claim because Plaintiff cannot demonstrate that he substantially performed his obligations under the GME Agreement.  "What constitutes substantial performance depends on the circumstances of each case" and is a "question of fact."  *Doornbos Heating and Air Conditioning, Inc. v. James D. Schlenker, M.D.*, S.C., 932 N.E.2d 1073, 1088 (Ill. App. 2010).

In this case, the Court cannot determine as a matter of law whether any of Plaintiff's three alleged breaches of the GME Agreement were significant enough to constitute a material breach of the contract and, in turn, justify Defendants' own allegedly failure to comply with the contract. First, Defendants contend that Plaintiff "effectively" violated "the moonlighting policy in the GME Agreements and the Resident Handbook" by failing to obtain Hopkinson or Light's permission before enrolling in the EMBA program.  [343] at 35.  The Court cannot determine based on the record before it whether the "moonlighting" policy applies to educational activities like the EMBA program.  The GME Agreement requires residents to "[s]ecure Program Director approval prior to beginning outside professional activities not otherwise assigned, such as moonlighting."  [344-1] at 150.  Similarly, the Handbook provides that a resident who participates in "moonlighting"— which is defined as "[p]rofessional and patient care activities that are external to the educational

program"—must have prior written permission by the program director and/or chair of the department." [344-1] at 174. But there is nothing in either document, nor any testimony or other evidence cited by Defendants, discussing whether an MBA program should be considered, or in other cases has been considered, a "professional activity" for which permission is required.

Second, Defendants argue that Plaintiff breached the GME Agreement by failing to fill out the 2012 duty hours survey. Plaintiff maintains, based on testimony from Goslawski, that he was not the only resident who did not complete the survey and that residents were "strongly encouraged" but not required to fill out the survey. See [406] at 234. Even if Plaintiff's failure to fill out the survey violated the GME Agreement, the Court cannot say that the violation was so substantial as to constitute a material breach of the GME Agreement.

Third, Defendants argue that Plaintiff did not substantially perform his contractual duties because he "did not participate fully in the educational conferences and lectures the Department offered him, having the lowest attendance of anyone who was required to attend them." [343] at 35. Plaintiff disputes that conference attendance was a critical aspect of the contract, as evidenced by the fact that LUMC did not accurately or electronically track conference attendance, as it committed in the Resident Handbook to doing. Plaintiff also points out that some of the conferences that he missed occurred when Plaintiff was on military leave, and asserts that requiring him to attend on those days would be a violation of USERRA. Further, Defendants do not identify a specific percentage of conferences that residents must attend, and the record show that other residents did not have 100% attendance, either. The Court cannot say on this record whether Plaintiff's conference attendance was so poor as to constitute a material breach of his contract.

### c.      Breach

Defendants argue that they are entitled to summary judgment because Plaintiff will be unable to establish that they breached the GME Agreement. First, Defendants contend that the failure to schedule Plaintiff's probationary hearing within 45 days of his request for a hearing, as required by the Resident Handbook, was not a breach because Plaintiff waived that contractual provision by agreeing to give Cannon additional time to schedule the hearing even though Cannon—after failing to contact Plaintiff until only a few days were left in the 45-day period—offered to convene a panel right away. Plaintiff responds that whether his agreement to give Defendants additional time to schedule the hearing constituted a voluntary waiver under the specific facts at issue here is a question of fact for the jury.

"In the context of a breach of contract, waiver is the express or implied voluntary and intentional relinquishment of a known and existing right*." Galesburg Clinic Ass'n v. West*, 706 N.E.2d 1035, 1037 (Ill. App. 1999). "Waiver is a question of fact when the facts necessary to support waiver are disputed or reasonable minds could draw different inferences from the evidence." *Id*. Here, it is undisputed that "Dr. Cannon testified that the first option he gave to [Plaintiff] was to 'hastily put together a grievance panel, but [he] didn't think it was necessarily in [Plaintiff's] best interest because it would have been hastily done. [He] said the house staff handbook allows the Chief of Staff to hear the grievance himself, but [he] didn't think this was in [Plaintiff's] best interest, because it involves a single decision maker, rather than a panel. [He] said, or we could agree to extend the time frame.'" [406] at 146. In essence, Plaintiff was given a choice of waiving the 45-day scheduling requirement and putting himself in a weaker position at the hearing, or agreeing to give Cannon additional time to put together a panel. A reasonable mind might infer from this evidence that Plaintiff's waiver of the 45-day scheduling requirement

was not, in fact, "voluntary." Defendants contend that Plaintiff's decision to waive the requirement was not rendered involuntary simply because Cannon told Plaintiff that it would not be in his best interest. However, Defendants cite no case law in support of their position, despite having been allowed more than 100 pages of summary judgment briefing. Therefore, the Court will allow Plaintiff's breach of contract claim based on Defendants' failure to schedule a hearing within 45 days to go forward.

The Court now turns to the alleged breach of the Resident Handbook's requirement that Plaintiff be provided with due process. Defendants assert that Plaintiff was afforded the right to grieve his probation and termination in accordance with the grievance procedure set out in the Resident Handbook and has no claim for any other process. Plaintiff asserts, and Defendants do not dispute, that "[t]he grievance procedure in the Resident Handbook provide[s] that the hearing committee was to consider all information for relevance and reliability." [406] at 206. According to Plaintiff, the termination panel did not do so, and instead "served as a rubber stamp for Dr. Hopkinson, assuming everything he said was correct and just making sure the procedure was followed." [372] at 89; see also [406] at 205 (testimony from termination panel member Dr. John Santaniello that "the review committee was to review the process that they had gone through to terminate [Plaintiff] as far as I understood"; *id.* at 206 (admission by Defendants that Santiello testified "that while he was reviewing the documents (which included Plaintiff's appeal letter), he assumed they were correct, and it was not his job 'at [that] point' to determine whether the substantive facts in them were true or false"); *id.* at 207 (admission by Defendants that Santiello testified that "the panel did not perform an independent investigation or evaluation of Plaintiff's case logs" because he "assumed the program would have looked at the log entries before Plaintiff was terminated to determine whether it was 'an honest mistake' or 'no, he's lying'"). Based on

the record before it, the Court cannot say as a matter of law that the panel who heard Plaintiff's termination appeal "consider[ed] all information for relevance and reliability," as the parties agree is required by the Handbook. [406] at 206. Therefore, Defendants are not entitled to summary judgment on Plaintiff's breach of contract claim to the extent it is based on Defendants' alleged failure to provide him with due process.

### D. Tortious Interference and Defamation

Plaintiff alleges state law claims for tortious interference against Defendants Ghanayem (Count Five) and Light (Count Six) and defamation against Defendants Ghanayem (Count Seven), Light (Count Eight), and Hopkinson (Count Nine). The parties group the two types of claims in their briefing, and therefore the Court will do the same.

To prevail on a claim for intentional interference with prospective economic advantage, the plaintiff must prove "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Foster v. Principal Life Ins., Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles v. Sandia Mortgage Co.*, 751 N.E.2d 1126, 1133 (Ill. 2001)).

To prove defamation, a plaintiff must present evidence that the "defendant made a false statement concerning the plaintiff" and that "there was an unprivileged publication of the defamatory statement to a third party by the defendant." *Giant Screen Sports v. Canadian Imperial Bank Of Commerce*, 553 F.3d 527, 532–33 (7th Cir. 2009). Whether the plaintiff must also prove damages depends on the type of defamation claim. "Some statements are considered defamatory *per se* because they are 'so obviously and materially harmful' to a plaintiff that his injury may be

presumed and he does not need to prove actual damages to recover, as the defamatory character is apparent on its face." *Id.* (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006)). As is relevant here, Illinois recognizes as actionable *per se* statements that (1) "imput[e] an inability to perform or want of integrity in the discharge of one's duties of office or employment," or (2) "prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Id.* (citing *Bryson v. News America Publications, Inc*., 672 N.E.2d 1207, 1214 (Ill. 1996)).

### 1. Ghanayem

Applying the standards set out above, the Court concludes that Ghanayem is entitled to summary judgment on Plaintiff's tortious interference claim because Plaintiff has not shown that he will be able to establish any damages. In particular, Plaintiff fails to respond to Defendants' argument that there is no evidence that Plaintiff suffered any damages as a result of any statements that Ghanayem alleged made to other fellowship programs because Plaintiff nonetheless obtained a fellowship during the "scramble" that occurred after fellowships were assigned using the "match" process. See [343] at 39.

Ghanayem is also entitled to summary judgment on Plaintiff's defamation claim. In his response brief, Plaintiff identifies three allegedly false statements made by Ghanayem: 1) a statement to unidentified prospective fellowship employers that he was concerned Plaintiff may not finish the Program; 2) a statement to "others" that Plaintiff had a low OITE score in 2010; and 3) a statement to Hopkinson that Plaintiff lied about having scheduled and cancelled certain fellowship interviews. [372] at 91. The first statement is not actionable because it is a statement of opinion about what might happen in the future. See *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1103 (N.D. Ill. 2016) ("Statements that do not contain verifiable facts—such as rhetorical hyperbole or opinions—are not actionable as defamation; it is a question of law whether a

statement is factual in nature."). The second statement is not actionable because it was true. Plaintiff does not dispute this, but contends that OITE scores are supposed to be used for residents' guidance rather than for punishment, so Ghanayem should not have said anything about the scores. But a defamation action requires proof of a false statement, not simply a negative statement that the plaintiff believes the defendant should not have made. The third statement is not supported by any citation to the record. Nor can the Court find any reference to the alleged statement in Plaintiff's Rule 56.1 statement. For these reasons, judgment will be entered in favor of Ghanayem on Plaintiff's tortious interference and defamation claims.

### 2.    Light

In his response to summary judgment, Plaintiff identifies two allegedly false and defamatory statements that Light made about him: 1) a statement to Dr. Yaszemski that one of LUMC's residents (Dr. Larsen) was "physically afraid" of Plaintiff; and 2) statements to the probation and termination panels that Plaintiff was the source of an ACGME citation.

The Court agrees with Defendants that Plaintiff cannot pursue a tortious interference claim against Light based on his alleged statements, because Plaintiff has not come forward with any evidence that Light made the statements to other residency or fellowship programs (it is not even clear who Yaszemski is) and, therefore, will be unable to prove damages.

As to Plaintiff's defamation claim against Light, the Court finds it premature to resolve this claim without giving Plaintiff an opportunity to respond to Defendant's argument—made for the first time in their reply brief—that Light's (and Hopkinson's) statements to the probation and termination panels were subject to an absolute privilege and therefore cannot support a defamation claim under Illinois law. See [405] at 56, 57.

### 3. Hopkinson

In his response to summary judgment, Plaintiff identifies two allegedly defamatory statements made by Hopkinson: (1) a statement at Plaintiff's termination hearing that Plaintiff failed the boards; and (2) allegedly false reports concerning Plaintiff's case logs, which were transmitted to third parties during Plaintiff's search for another residency program following his termination.

As with Light, the Court will require the parties to provide supplemental briefing on Defendants' absolute privilege argument before the Court rules on Defendants' motion for summary judgment on Plaintiff's defamation claim against Hopkinson.

## IV. Conclusion

For these reasons, Defendants' motion for summary judgment [398] is granted in part and denied in part. Summary judgment is denied as to Plaintiff's USERRA discrimination claim against all named Defendants who have not previously been dismissed; granted as to Plaintiff's USERRA hostile work environment claim against Cannon and denied as to Plaintiff's USERRA hostile work environment claim against the remaining named Defendants who have not previously been dismissed; granted as to Plaintiff's breach of contract claim against LUC and denied as to Plaintiff's breach of contract claim against the other Corporate Defendants; granted as to Plaintiff's tortious interference claims against Ghanayem and Light; and granted as to Plaintiff's defamation claim against Ghanayem. Each party is ordered to submit, by April 12, 2019, a supplemental brief, no more than five pages in length, addressing 1) whether Trinity should be dismissed from the lawsuit on the basis that it has no relationship to the claims alleged by Plaintiff; and 2) whether the grievance hearings concerning Plaintiff's probation and termination should be considered "quasi-judicial proceedings" to which an absolute privilege should apply for purposes of Illinois

defamation law.  Defendants' motion for summary judgment is denied as to the defamation claims against Hopkinson and Light, with the rulings on these two defamation claims to be reconsidered by the Court *sua sponte* after its review of the parties' supplemental briefs.  At that time, the Court will also determine whether Trinity should be dismissed from the case.


Dated: March 20, 2019

                                                      _____
Robert M. Dow, Jr.
United States District Judge