**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARK D. MCDANIEL, M.D.,   )
            )
   Plaintiff,     )
            )
  v.         )  Case No. 13-cv-6500
            )
LOYOLA UNIVERSITY MEDICAL )  Judge Robert M. Dow, Jr.
CENTER, LOYOLA UNIVERSITY  )
CHICAGO, LOYOLA UNIVERSITY )
HEALTH SYSTEMS, WILLIAM   )
HOPKINSON, M.D., and TERRY  )
LIGHT, M.D.,       )
            )
   Defendants.    )

**MEMORANDUM OPINION AND ORDER**

This case is set for a jury trial to begin on June 24, 2022. Now before the Court are the parties' motions in limine and related pre-trial motions. For the reasons set forth below, Defendants' motions in limine [449] are granted in part and denied in part. One of Plaintiff's motions in limine [450] is granted and the other [451] is denied. Defendants' motion to exclude expert testimony or to bifurcate [478] remains under advisement and will be discussed with counsel at the final pre-trial conference on June 10, 2022.

I. **Background**[1]

A. **Plaintiff's National Guard Service, Medical Residency, and EMBA Program.**

Plaintiff Mark McDaniel has a medical degree and is a former Missouri Air National Guard ("MOANG") officer who spent four years in the Orthopedic Surgery Residency Program

---

[1] In the following discussion, the Court assumes familiarity with the facts and the law, as discussed in the Court's previous opinions [81, 408, 417]. The Court provides a general summary of the factual background necessary to place the pending motions *in limine* in context. Like all motion *in limine* rulings, these rulings remain subject to modification and/or reconsideration as warranted based on developments at trial. See *United States v. Connelly,* 874 F.2d 412, 416 (7th Cir. 1989).

("Residency Program") at Loyola University Medical Center ("LUMC") from 2008-2012. Plaintiff enrolled in the University of Chicago's Executive MBA Program in the Spring of 2009, after his first year of residency. At the time he enrolled in 2009, the EMBA Program advised Plaintiff that the London class required to obtain the master's degree was held only once each year, during the last weeks of June and July. The EMBA Program required prospective students to obtain their employer's signature to ensure notice to the employer that the student would need to be approved to take the last week of June, during the third year of the Program, to travel to London to complete the study-abroad course. To fulfill this requirement, Plaintiff obtained a signature from MOANG, but not from anyone at Loyola. As best the Court can tell, precisely when Defendants knew Plaintiff was seeking the EMBA degree and that Plaintiff would need to take the last week of the Residency Program's academic year to study abroad is not conclusively established. Plaintiff spent several years (2009-2012) juggling the requirements of both programs, as well as his military service with MOANG – a juggling act that appears to have created some tension between Plaintiff and his co-residents.

**B.      Plaintiff's 2012 Probation, Military Leave, and Termination.**

In the Spring of 2012, the Residency Program Director, Dr. William Hopkinson, placed Plaintiff on an academic remediation program, assigning Dr. Terry Light to serve as Plaintiff's academic advisor. The record contains disputed evidence from that time-period concerning Defendants' allegations that Plaintiff continued to have academic and clinical performance issues, interpersonal communication issues with residents and attending physicians, and that he occasionally exhibited unprofessional behavior, such as not being present when assigned to clinical calls.

According to the Second Amended Complaint, in early June 2012, Plaintiff advised Dr. Hopkinson that he would be requesting leave time to attend required military service, [233 at 19], during three separate weeks later in the year:  June 25-29, July 20-29, and September 10-14.  The Residency Program did not permit residents to request leave during the last week of June or the first week of July because LUMC needed to ensure full coverage of all clinical calls during the transition from graduating fifth year residents to incoming first year residents.  Exceptions were rare, but the need for a resident to fulfill military orders for service or training would count.

On June 14, 2012, Dr. Hopkinson placed Plaintiff on academic probation.  In his letter to Plaintiff, Dr. Hopkinson referenced lack of professionalism and poor communication/interpersonal skills below the level expected for a fourth-year resident.  [233, Ex. 3 (Probation Letter).]  The Probation Letter also advised Plaintiff that a lack of significant progress with identified remediation goals could lead to his termination on September 9, 2012, at the end of his Graduate Education Medicine Agreement ("GEMA") with LUMC as a fourth-year resident.

On June 20, 2012, Plaintiff received his military orders authorizing leave for military service during the week of June 25-29, 2012.  The military orders characterized the leave time as necessary to complete military service.  There is no dispute that the military orders were valid.[2]

In compliance with the orders, Dr. Hopkinson granted permission for Plaintiff's leave time during the week of June 25-29 on the condition that he arrange for other residents to cover the

---

[2] As discussed at the May 24 final pre-trial conference, the Court has distinguished the military orders themselves from the statements made by Plaintiff (and others) relating to the procurement of those orders. As the Court explained, the validity of the orders and the obligation of Plaintiff and Defendants to follow them is not—and cannot be—disputed. With that said, there is a legitimate dispute between the parties over whether Plaintiff was forthcoming with his superiors, both in the MOANG and the hospital, in his efforts to obtain those orders.  As explained below, testimony illuminating the particulars of that dispute is admissible as it is probative of both sides' credibility and bears on certain substantive aspects of the claims and defenses as well—including whether Defendants terminated Plaintiff based on anti-military animus (as he claims) or based on other perceived deficiencies in his performance and character (as Defendants claim).

clinical calls and tasks for which he was scheduled during this time-period. Plaintiff alleges that the Loyola Defendants and Dr. Hopkinson violated USERRA by (a) scheduling him for clinical service on June 25, 2012, and (b) requiring him to find his own substitute coverage while subject to military orders [233 ¶¶ 105-106].

Despite being scheduled for a clinical call with Dr. Wu on June 25, Plaintiff took the leave approved by Dr. Hopkinson and traveled to London to complete required coursework for the EMBA Program. The parties agree that Plaintiff asked Dr. Salazar, another resident, to cover the call on June 25, 2012, but he did not show up, leaving Dr. Wu without the coverage necessary that day. The Defendants, however, say this fact is immaterial because that absence did not figure in their determination to terminate Plaintiff.

In a letter dated September 17, 2012, Dr. Hopkinson dismissed Plaintiff from the Residency Program based on a determination made by the Clinical Competency Committee ("CCC"), which had met earlier that month. According to Defendants, the CCC determination was based on evidence, including peer-evaluations by co-residents, that reflected various problems, including "unprofessional and unethical behavior, failure to demonstrate substantial improvement while on academic probation, being absent from a duty assignment without departmental consent and falsifying surgical logs." [233, Ex. 4.] [See also 408, at 17 (citing [406], at 151).] The letter also cited Dr. Capello's assessment that Plaintiff was "slightly behind [his] peers in both knowledge and surgical skills," Plaintiff's logging of non-orthopedic procedures, and Plaintiff's logging of procedures that did not take place. Plaintiff was not present at the CCC meeting to address the evidence reviewed that led to the termination decision.

### C.      Plaintiff's Probation Grievance Hearing

The Resident Handbook, Section III.K., provided a right to appeal the imposition of academic probation and outlined the procedure for filing a written appeal.  If the written appeal was denied, the grievance procedures required a hearing to be held within 45 days.

Plaintiff followed these procedures and submitted a written appeal on July 11, 2012, which was denied.  Plaintiff then requested a grievance hearing.  Due to an oversight by Dr. William Cannon, Associate Dean for Graduate Medical Education, the hearing was not scheduled "until the 45-day period was almost up."  [See 408 at 17.]  Plaintiff agreed to extend the time for the hearing (see *id.*), authorizing it to be held "outside the program requirements dictated by the Resident Handbook" and the ACGME. [233, ¶ 111.]  As the Court previously observed [see 408, at 45], Dr. Cannon advised Plaintiff that it would be in his best interest to wait rather than facing a hastily convened panel.  Plaintiff alleges that he authorized the extension to September 20, 2012 "so that he could clear his name."  [233, ¶ 111.]

The probation hearing board that convened on September 20 included Drs. Derhammer, Hardin, and Kenton, with Drs. Hopkinson, Light, Bindra, Wu, and Belich in attendance as witnesses.  Prior to the hearing, Dr. Cannon told Plaintiff to "try to keep his probation appeal separate from his termination appeal," [406 at 200], which Plaintiff interpreted to mean that he should not tell the panel about his termination.  [408 at 18.]  Plaintiff followed this advice.  [See also 233, ¶ 119 (Dr. Cannon told Plaintiff not to inform the panel of his prior termination on September 17 because "it was not relevant.").]  The grievance panel upheld the probation determination made by Dr. Hopkinson in June, but at least one member of the Hearing Board did not know that Plaintiff had been terminated from the Residency Program a few days earlier, on

September 17, 2012, and "walked into the room believing that he had a role to play that could lead to a positive outcome" regarding the probation determination. [406 at 201.]

The grievance panel upheld the probation determination. In a letter explaining the reasons for the decision, the panel stated that Plaintiff lacked "clinical knowledge and operative skill," as well as "interpersonal skill" working within a team environment and made too many independent decisions. The letter further noted that Plaintiff demonstrated "unprofessional behavior," exhibited "vulnerability to process problems," and failed to appreciate that failure to follow department protocols had consequences. [406 at 204.] Plaintiff alleges that "[t]wo of the three members of the probation hearing board" (Hardin and Derhammer) "refused to" sign this letter. [233, ¶ 122.]

### D. Plaintiff's Termination Grievance Hearing

On September 24, 2012, Plaintiff requested a grievance hearing on the termination decision. That hearing took place on October 24, 2012. The members of the termination grievance panel included Drs. Cannon, Andrew Hotaling, John Santaniello, and Brigid Steele. All members except Dr. Cannon had military experience. The Resident Handbook provided that a grievance hearing involving dismissal from the Residency Program required consideration of all information for relevance and reliability, but Plaintiff has consistently maintained that the panel nonetheless simply relied on Dr. Hopkinson's report, which included false information that Plaintiff was required to retake Step 1 of his boards. [408 at 18.]

The grievance panel upheld the termination decision in a letter dated November 13, 2012. In that letter, the panel cited poor communication, poor professionalism, and lying as the reasons for Plaintiff's termination. The panel did not list failure to demonstrate substantial improvement on academic probation, as Dr. Hopkinson claimed in his September 17 letter, nor did it refer to any failures to attend mentorship and academic remediation sessions, absence from duty

assignments without departmental consent, lack of medical knowledge and surgical skill, or failing to do procedures as a basis for termination. The grievance panel's final determination is the basis for the Loyola Defendants' decision to affirm or uphold the original decision to dismiss Plaintiff made by the CCC. [408 at 18-19.]  The September 17 letter signed by Dr. Hopkinson is the basis for Hopkinson's determination to dismiss Plaintiff from the Residency Program, a determination that was subject to review and modification by the grievance panel based on Plaintiff's appeal.

E.      **This Lawsuit**

On September 11, 2013, Plaintiff brought this action in federal court alleging that his dismissal was motivated by military bias or animus in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et. seq.*, and alleging, *inter alia*, violations of Illinois common law based on theories of breach of contract and defamation.  All claims are based on allegations describing decisions by the named Defendants to place Plaintiff on probation on June 17, 2012 and to terminate him on September 17, 2012, before he began the fifth and final year as an orthopedic surgery resident in LUMC's Orthopedic Residency Program.

Plaintiff claims that the probation and termination decisions by the corporate Loyola Defendants and the individual Defendant, Dr. Hopkinson, were motivated by discriminatory anti-military bias in violation of USERRA; and that the probation and termination decisions, by the same named Defendants, were preceded by and resulted from anti-military animus and harassment creating a hostile work environment also in violation of USERRA.  Plaintiff further claims that LUMC and LUHS breached the GMEA because both the probation grievance hearing and termination hearing process violated various terms of that Agreement and the Resident Handbook. Plaintiff also claims that the individual Defendants, Drs. Hopkinson and Light, made defamatory

statements about Plaintiff that were published to other accredited residency programs. According to Plaintiff, the statements in question caused him to be rejected from those programs and thus unable to finish the fifth year of orthopedic residency. And without the opportunity to complete the final year of his residency, Plaintiff could not take his final medical licensing board exams and accept the Surgical Spine Fellowship offered to him by the University of Washington prior to his termination from LUMC's Residency Program.

The case set for trial thus includes two federal claims arising under USERRA in Count I, alleging termination and retaliation, and in Count II, alleging a hostile work environment; and two common law claims for breach of contract and defamation arising under Illinois law.[3] The

---

[3] Previously dismissed defendants include: Trinity [417], William Cannon, M.D. [408], Alexander Ghanayem M.D. [408] and Dane Salazar, M.D. [81]. The Court also dismissed or granted summary judgment on certain claims originally alleged that are no longer part of this case. Count III (42 U.S.C. § 1983) was dismissed in its entirety [81], both tortious interference with contract claims in Counts V (Ghanayem) and VI (Light) either were dismissed [81] or terminated on summary judgment [408], and Count VII (defamation, Ghanayem) also ended at the summary judgment stage.

Additionally, certain claims in the Second Amended Complaint that are proceeding to trial were asserted against multiple defendants, some of whom have been dismissed or granted summary judgment. Thus, for purposes of clarification of this large record, and because neither the electronic docketing system nor the Second Amended Complaint, filed with leave of Court [232], properly make note of the remaining parties named to the remaining claims in this case, the record in this case should reflect as follows:

1. Dr. Salazar [81] and CHE Trinity are no longer named defendants to Counts I or II. [417.]
2. Dr. Cannon is also no longer a named defendant to Count II. [408.]
3. Corporate defendant LUC is no longer a named party to Count III (breach of contract). [408.]
4. Dr. Hopkinson is still a named party to the defamation claim in Count IX, but the Court narrowed that claim to the allegations concerning "a statement at Plaintiff's termination hearing that Plaintiff failed" Step 1 "of the boards". [408 at 50.] The allegations in the SAC regarding allegedly false reports by Hopkinson related to the case logs transmitted to third parties during Plaintiff's search for another residency program after his termination are no longer part of this case [417.] The Court granted summary judgment on this aspect of the defamation claim in Count IX. [417.]

To that end, in a separate minute entry, the Court will direct the Clerk of the Court to terminate any remaining active party designations for these former parties in the CM/ECF System. The record will also reflect that the Court, on its own motion, strikes any reference to formerly named parties in 1-4, directly above, as to Counts I, II, III, or any reference to the allegations noted in Count IX. Additionally, the record reflects that the Court previously granted summary judgment as to Counts III, V, VI, and VII, in their entirety.

USERRA claims are asserted against the Loyola Defendants and Dr. Hopkinson. The breach of contract claim (Count IV) will proceed only against LUMC and LUHS. And the sole defendants to the defamation claims are Dr. Light (Count VIII) and Dr. Hopkinson (Count IX). All claims are based on decisions by the named Defendants to place Plaintiff on probation in May of 2012, and the decision to dismiss him from the Program in September 2012, before his fifth and final year of residency.

## II.    Defendants' Motions *In Limine* [449]

### A. Dr. Amy Wickman's Statements as Chief Resident in 2008 – **Denied.**

Defendants seek to exclude evidence of two statements allegedly made by Dr. Amy Wickman, Chief Resident at LUMC, to Plaintiff in 2008, during his first year as an orthopedic resident. Plaintiff is expected to testify that when he broached the subject of taking leave time from his clinical duties to fulfill his military service requirements as a commissioned officer in the MOANG, Dr. Wickman advised that "asking for special privileges would not be well received at Loyola" and separately warned that "by asking for such things" McDaniel would risk having "the deck stacked against [him] from the beginning by attracting attention to his military service." These statements are detailed in Plaintiff's written affidavit, dated January 21, 2014 [54-1].

Defendants believe Plaintiff will testify about this conversation at trial and will argue that Wickman's statements reflected evidence of an institutional, anti-military bias against residents serving concurrently in the military. Defendants contend that any testimony, evidence, or argument Plaintiff seeks to offer about Wickman's statements is inadmissible as "textbook hearsay" under Rule 801(d), does not fall within the hearsay exception for admissions by a party-opponent under Rule 801(d)(2)(D), and is otherwise not relevant to the issues in this case under Rule 401.

Citing case law that requires the subject matter of the admission to match the subject matter of the employee's job description, Defendants contend that a Chief Resident's duties do not encompass any managerial responsibility related to the decision-making process that led to the termination decision. Defendants admit that this rule does not mean Wickman needed to be personally involved in the decision to terminate Plaintiff. See *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (personal involvement only required where statement at issue is after-the-fact explanation of adverse employment action); see also *Aliotta v. Nat. R.R. Pass. Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) (personal involvement not required for statements where admission not related to hiring/firing context).

Plaintiff argues that Wickman's statements are probative of Defendants' anti-military animus or bias toward residents who required leave time to fulfill military training duties.[4] Although Plaintiff will argue that anti-military bias led to his termination, Plaintiff contends that Wickman's testimony is *not* offered for the specific purpose of establishing motivation for the termination, but rather to show that his requests for leave to satisfy military obligations stacked the deck against him prior to the termination decision. And because the statements are not offered for the purpose of establishing the basis for the termination, Plaintiff insists that it does not matter whether Wickman was a management level employee of the Loyola Defendants or the Residency Program, nor does she need to have been personally involved in the termination decision in 2012. Regardless, Plaintiff claims Wickman's statements qualify as statements of a party-opponent under the hearsay exception in Rule 801(d)(2)(D). In further support of this argument Plaintiff points to LUMC's ORTHOPEDIC SURGICAL RESIDENCY PROGRAM HANDBOOK, which states that the role of

---

[4] Whether Wickman's statements can be characterized as evidence of such bias is a question for the jury, since her statements may simply reflect disfavor with granting any exceptions for leave, for any reason, including military orders or training.

senior residents includes mentoring and serving as a role model for junior residents during clinical activity; supervision and evaluation of residents and students; resolving problems on clinical service for residents with the assistance of service attending physicians and or the Division director; and coordinating the call schedule [233, Ex. 1 at 39.] The same statements were made in the Program Handbooks of 2008 and 2012.

Based on these statements, Plaintiff insists that Wickman's role as Chief Resident in 2008 gave her knowledge of the call schedule protocols. It also meant that she regularly interfaced with attendings (*i.e.,* such as Dr. Light) and the Residency Program Director (*i.e.,* Dr. Hopkinson) to resolve problems related to the call schedule – which, one assumes, invariably involved requests for leave time. Wickman was also serving as a clinical role model and supervising Plaintiff when she made these statements, so she represented the institution they worked for at the time in satisfaction of the *Aliotta* standard. See 315 F.3d at 761 (a statement constitutes an admission of a party-opponent if it is "within the scope of [] employment" if the employee was "performing the duties of his employment when he comes in contact with the particular facts at issue").

The Court agrees with Defendants that any testimony, evidence or argument Plaintiff offers about Wickman's out-of-court statements in 2008 would constitute textbook hearsay, as any statement attributed to Wickman would be offered for the truth of the matter asserted (*i.e.,* requests for leave to attend military training would stack the deck against the resident) and as evidence from which the jury might infer that Defendants harbored anti-military animus or bias against residents in the military. However, the Court also agrees with Plaintiff that statements like Wickman's are admissible as statements of a party opponent under Rule 801(d)(2)(D) given her responsibilities as Chief Resident. While they might not carry the same weight as statements made by attendings or others higher in the Loyola hierarchy, Loyola's own Handbook cloaked Wickman

with sufficient authority over junior residents like Plaintiff to render her statements admissible under Rule 801(d)(2)(D).

Defendants also argue that even if Wickman's statements fall within the hearsay exception, they are not relevant under Rule 401 and create too much speculation under Rule 403. As Defendants see it, Wickman's statements about institutional protocols for residents as of 2008 are too distant temporally to be relevant to the circumstances surrounding Plaintiff's termination four years later in 2012.

Plaintiff responds that Wickman's statements go to the core of his termination and retaliation claim of discrimination under USERRA in Count I, because "a particular trigger for the anti-military animus McDaniel experienced was his requests for leave to fulfill his military obligations." [453 at 1.] Plaintiff also argues that throughout his residency, Defendants' attitude toward his requests for military leave to fulfill his military service obligations led to a hostile work environment and harassment by co-residents based on military animus in violation of USERRA (Count II), and that his request for leave during the last week of June 2012 was the last straw in a multi-year campaign against him based on anti-military bias leading to his termination (wrongful discharge under USERRA in Count I).

The Court agrees that the Rule 401/403 calculus tips in favor of admission of Wickman's statements, which go to the core issue of whether Defendants' decision to terminate him was motivated by anti-military animus or bias in violation of USERRA (the wrongful discharge claim in Count I), rather than any of the reasons listed by the grievance panel when upholding the CCC's termination decision in September 2012.[5] The Seventh Circuit's decision in *Arroyo v. Volvo*

---

[5] The issue of whether Plaintiff misled Dr. Hopkinson and/or Colonel Echterling (as well as other residents and staff in the Residency Program) regarding his efforts to obtain military orders during the last week in June 2012 is the subject of another motion in limine [451] addressed below.

*Group North America, LLC*, 805 F.3d 278 (7th Cir. 2015) is instructive. There, the court of appeals determined that circumstantial evidence dating back to "the beginning of [the plaintiff's] employment" and taken as a whole permitted the jury to infer that the defendants had "long-standing frustration" with the plaintiff's military service and the defendants' decision to terminate plaintiff was "motivated, at least in part, by anti-military animus" toward her. *Id*. at 284-85.

B. *Surgical Errors by Other Residents – **Denied.***

Defendants seek to bar evidence of surgical errors by other residents, arguing that "these other residents are not similarly-situated" to McDaniel and the prejudicial effect of the evidence outweighs its probative value. Defendants also argue for exclusion of a specific document referenced at Dr. Hopkinson's deposition on the ground that the document is subject to an Illinois state-law privilege protecting certain hospital documents. The Court will first address the objection to this entire line of inquiry on a general basis. It will then take up the matter of the contested document.

1. Dr. Hopkinson's Statements

In his deposition, Dr. Hopkinson testified about a surgical procedure during which he and the resident assisting him discovered that a patient's patellar tendon was disrupted before closing the incision made to operate for a different reason. When questioned by Plaintiff's counsel about this incident, Dr. Hopkinson testified that "[t]here [were] no actions in my recollection that disrupted the tendon. At the time of closure, we noticed it was disrupted. It could have been – my contention was it was part of the disease process. We immediately recognized it and repaired it." In other words, Dr. Hopkinson denied that that the actions of the unnamed resident (not the Plaintiff) during surgery caused the tendon to be disrupted [449, Ex. 1 (Hopkinson Dep. Tr. at 248)].

13

Dr. Hopkinson's deposition testimony regarding this incident is clearly admissible since he is a party and the surgical competency of Plaintiff and the residents in Plaintiff's cohort is relevant to the jury's assessment of the claims and defenses in this action. Defendants' argument to the contrary rests on the proposition that other residents who committed surgical errors are not similarly situated to McDaniel, who Defendants say was fired for "poor performance and dishonesty." [449 at 6]. Defendants read the definition of "similarly situated" too narrowly. The Seventh Circuit has "emphasized that the similarly situated inquiry is a flexible one that considers 'all relevant factors.'" *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). "As to the relevant factors, an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Id.* (quoting *Radue*, 219 F.3d at 218). In *Humphries*, the Seventh Circuit explained that a plaintiff is "not required to show an identity of wrongful conduct: 'the law is not this narrow.'" *Humphries*, 474 F.3d at 406 (quoting *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005)). It is "enough to show 'similar—not identical—conduct.' ... To find otherwise is to lose sight of the big-picture, common-sense perspective." *Id*. Thus, "in deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick v. IUPUI Athletics Dept.*, 510 F.3d 681, 689 (7th Cir. 2007). That standard is easily met here.

Dr. Hopkinson appeared at the grievance hearing relating to McDaniel's probation and told the grievance panel that "there was an issue of patient safety" and that McDaniel had "poor clinical judgment" and "poor technical skills." [See 453, Ex. B, Grievance Hearing Summary, at 4]. Dr. Hopkinson also testified at his deposition that "patient care" is included within the scope of "professionalism, teamwork, cooperation, respect for others" that Defendants claim are among

14

the reasons for McDaniel's probation and termination. [See *Id.,* Ex. C, Hopkinson Dep. 71:4-21]. A severed tendon is obviously "a patient safety concern," as are other surgical errors, and an orthopedic surgeon who severs a tendon may arguably have "poor clinical judgment" and "poor technical skills." [*Id.*].

To support their argument that the purported conduct or surgical error by a co-resident is not of "comparable seriousness" to the conduct Defendants attribute to Plaintiff, Defendants rely on *El-Bakly v. Autozone, Inc.*, 2009 U.S. Dist. LEXIS 1638, *17-18 (N.D. Ill. Jan. 9, 2009), where this Court rejected the plaintiff's supervisor as a comparator because he had no misconduct of "comparable seriousness" to the plaintiff's being caught with marijuana while driving. The Court finds that the facts of this case are inapposite to those of *El-Bakly* and rejects this argument.

At its core, the parties' dispute over surgical errors by Plaintiff and his fellow residents can be resolved only at trial. Defendants claim that the references to Plaintiff's surgical skills in the suspension and termination letters were "passing references," and that other reasons predominated in the decision to let Plaintiff go from the program. Plaintiff rightly points out that his skills were part of Defendants' overall assessment and it is for the jury to decide matters such as the weight of the evidence and the credibility of the witnesses. See *Pierick*, 510 F.3d at 689. The evidence shows that Defendants placed Plaintiff on probation in June 2012 and fired him in September of 2012 in part because of patient safety concerns. This evidence makes any evidence that other residents committed committing surgical errors relevant. Finally, to the extent that the evidence at trial confirms Defendants' characterization that Plaintiff's surgical skills were only factored in "passing," the Court can of course restrict Plaintiff to "passing" references in response to avoid cumulative evidence or waste of the jury's time on marginal matters.

Defendants' argument [449 at 9] that admitting the evidence would cause "unfair prejudice" or mislead the jury also falls short. "Rule 403 permits the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice." *Boutros v. Avis Rent a Car Sys., LLC*, 802 F.3d 918, 924 (7th Cir. 2015) (emphasis added). Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Thompson v. City of Chi.,* 722 F.3d 963, 971 (7th Cir. 2013). Defendants do not begin to explain how this evidence would be "unfairly" prejudicial or confusing to a jury.

In sum, to the extent that general evidence of surgical errors by other residents (which includes Dr. Hopkinson's deposition testimony about the unnamed resident) is at issue, the Court denies Defendants' motion. Among the non-discriminatory reasons for Plaintiff's dismissal identified in Dr. Hopkinson's letter of September 17, 2012, advising Plaintiff of his termination was an assessment by Dr. Cappello that Dr. McDaniel was "slightly behind [his] peers in both knowledge and surgical skills." [408, at 17.] Although the grievance panel did not expressly rely on that particular assessment to affirm Plaintiff's termination in the November 13, 2012 letter, that does not mean that this evidence was irrelevant to the general category of "poor professionalism" noted in the November letter. Evidence of other residents' surgical deficiencies could be probative of pretext for Plaintiff's firing to the extent that he can show that he was treated differently than similarly situated residents with regard to the assessment of his surgical skills.[6]

2. Documentary Evidence

Defendants also object to a document that Plaintiff sought to question Dr. Hopkinson about at the deposition. According to Defendants, the document related to the patellar tendon surgery

---

[6] The Court reserves until trial any hearsay objections to this evidence.

referenced above and was created as part of a post-surgical quality control review at LUMC. The document evidently was identified and marked as a deposition exhibit. Defendants objected to the document at the time of the deposition on the ground that it was unclear how Plaintiff came to be in possession of it and its authenticity had not been established. Dr. Hopkinson was not actually questioned about the document, but Defendants are concerned that Plaintiff may seek to introduce the document at trial for impeachment.

Defendants contend that any document "created as part of a post-surgical quality control review at LUMC" regarding a surgical procedure at issue qualifies as a privileged medical education document protected from disclosure by the Illinois Medical Studies Act ("IMSA"), 735 ILCS §§ 5/8-2101 and 2102. As such, Defendants insist that the document is not admissible "in any action of any kind in any court," full stop.[7]

Plaintiff responds that "[a]s the party seeking to invoke the privilege, . . . Defendants bear the burden of establishing its applicability[.]" [453, at 4-5]. Plaintiff further argues that "[b]y not identifying the document or offering it for in camera inspection, Defendants fail even to make the threshold showing that the IMSA privilege applies to the document." See, e.g., *Crook v. Dart*, 408 F. Supp. 3d 928, 930-31 (N.D. Ill. 2019) (citing Illinois appellate court decisions discussing burden of proof on party invoking IMSA privilege)). At the final pre-trial conference on June 10, counsel should be prepared to address, preferably with reference to case law, whether the IMSA privilege applies to a case involving federal and state law claims and/or in a case where the Federal Rules of Evidence apply. [453, at 13] (citing *Dunn v. Washington Co. Hosp.*, 429 F.3d 689, 693 (7th

---

[7] This statute provides, in relevant part: "[[a]ll information *** or data of *** accredited hospitals *** used in the course of internal quality control or medical study for the purpose of reducing morbidity or mortality, or for improving patient care *** shall be privileged *** [and] strictly confidential." The statute also provides that "[s]uch information or data" is not admissible "in any action of any kind in any court," and "[t]he disclosure of *** such information or data, whether proper or improper," has no effect on its "confidentiality, non-discoverability, or non-admissibility." 735 ILCS 5/8-2102 (West 2018).

Cir. 2005) (IMSA held inapplicable in Title VII case); *Crook v. Dart,* 408 F. Supp. 3d 928, 930 (N.D. Ill. 2019) (same); *Levitin v. NW Comm. Hosp.,* 2014 WL 5510949, 2014 U.S. Dist. LEXIS 154715 at *7 (N.D. Ill. 2014) (same). Counsel also should bring the document to court in case the Court needs to undertake an *in camera* review of its contents. Armed with additional argument, case law, and the document itself, the Court will endeavor to sort out this privilege issue prior to the first day of trial.

   *C. Dr. Terry Light's Alleged Racial Slur – **Granted.***

   Defendants seek to exclude argument, evidence, and testimony regarding an alleged racial slur made by Dr. Light to Plaintiff, arguing that the alleged slur is not admissible under Rule 401 and 402 because it is not relevant and has no probative value to the issues in this case. Alternatively, to the extent the statement might have any remote relevance based on the theory that it reflected dislike of a servile attitude equated with military service, Defendants argue that its probative value is outweighed by the danger of unfair prejudice, misleading the jury, or confusing the issues, and must be excluded pursuant to Rule 403. Additionally, Defendants argue that Plaintiff seeks to admit such evidence in violation of Rules 404 and 608(a) as extrinsic evidence to prove character in conformity with bad actions (or words).

   Plaintiff claims that Dr. Light responded negatively when he called him "Boss" during a conference they were attending. According to Plaintiff, Dr. Light disliked "servile attitudes" and the word "Boss" triggered a racial slur by Dr. Light comparing Plaintiff to a "N***er."

   The Court agrees with Defendants that the alleged racial slur is not admissible. Any purported link between the statement and Light's supposed dislike of a "servile attitude" reflected in Plaintiff's military service is too speculative to have much probative value, if any. Furthermore, even if this single comment were minimally probative of anti-military bias, the explosive nature

18

of the word allegedly used would create a significant risk of inflaming the jury. In sum, the risk of prejudice substantially outweighs the probative value of the utterance, thereby rendering it inadmissible under Rule 403.

### D. Dr. Dane Salazar's Alleged Misrepresentation Re: Military Rank – *Denied.*

Defendants also seek to exclude argument, evidence, and testimony related to Dr. Dane Salazar's alleged misrepresentation of his military rank before he officially received a promotion to Major. Defendants argue that the evidence is not relevant and has no probative value under Rules 401 and 402. Defendants further contend that if the Court concludes that the evidence is relevant, then any probative value it might have is outweighed by Rules 403, 404 and 608, because it unfairly characterizes Dr. Salazar as a liar, and would necessitate a "mini-trial" to prove that he simply misunderstood the timing of his promotion.

Defendants' arguments are not convincing. Plaintiff proposes to introduce the statement to cast doubt on Dr. Salazar's credibility and honesty. That evidence is relevant because, according to Plaintiff, Dr. Salazar accused Plaintiff of similar traits in a peer review he wrote for Drs. Light and Hopkinson. The alleged misrepresentation—whether it was a mistake or a lie, depending on how the jury views it—is not being offered for truth of matter asserted (when or how Dr. Salazar became a Major), but to show that he jumped the gun on claiming the promotion and that perhaps the jury should take his assessments of other people's character with a grain of salt. [See 453, at 9 ("one of McDaniel's chief antagonists was actually guilty of what he (wrongly) accused McDaniel of doing").] The argument that such evidence, if admitted, will necessitate a mini-trial and that the jury will have to "wade into matters of military process and discipline" is overstated. The Court can (and will) limit this line of testimony to prevent any such occurrence. In short, a few questions should suffice to elicit the sting and apply the balm.

19

E.  *Alleged Hearsay Re: Emails Exchanged Between Other Residents – **Denied.***

Defendants seek to exclude argument, evidence and testimony regarding certain emails sent by certain male co-residents of Plaintiff during his tenure as a resident in the LUMC Orthopedic Surgical Residency Program.  Defendants argue that the content of these emails is inadmissible under Rules 401 and 402 because they are irrelevant to the legal issues in this case. Alternatively, Defendants seek exclusion of the emails not only as a waste of time under Rule 403, but also as improper character evidence of incidents designed to paint these co-residents in a bad light, under Rule 608(b).  Defendants also claim the emails are inadmissible as hearsay under Rule 801, because they are out-of-court statements made by non-parties offered to prove that the co-residents exchanging the emails made the unprofessional statements (though not necessarily for the truth of what was stated in the emails), and do not fall within a hearsay exception. Finally, Defendants contend that the emails cannot be admitted under Rule 401, because they cannot be properly authenticated.

Plaintiff counters that this evidence is admissible, as it reflects unprofessional conduct by other residents in the Program who were not disciplined while Plaintiff was placed on probation and ultimately terminated, in part, based on allegations of unprofessional conduct involving different behaviors.  Moreover, Plaintiff again points to the fact that Loyola considered peer evaluations by some of these same co-residents in deciding whether to place Plaintiff on probation and ultimately to terminate him.  See Transcript of Final Pre-trial Conference I, on May 23, 2012, at 54-55.  Even if Plaintiff cannot show that any of the attendings or high level decisionmakers at Loyola received any of the "unprofessional" emails in question, Plaintiff can argue that the emails

reflect poorly on the credibility of their authors, some of whom accused Plaintiff of also exhibiting unprofessional behavior.[8]

Defendants' authentication challenge is not well-taken. Ample authority permits the admission of emails based on authentication of the email server and email accounts linked to that server for purposes of establishing the identity of the authors and the recipients of the emails. See *Richardson v. Chi. Transit Auth.*, 292 F. Supp. 3d 810, 814 n.2 (N.D. Ill. 2017) (production by a party of a document creates a presumption of authenticity); *Conway v. Done Rite Recovery Servs., Inc.,* 2016 U.S. Dist. LEXIS 159439, *8-10 (N.D. Ill. Nov. 17, 2016 (admitting electronic evidence based on its characteristics, including emails sent from plaintiff's email address and information contained); *U.S. v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) (emails admitted into evidence where names of senders or recipients included in either content of emails or signature blocks); *U.S. v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (emails admitted into evidence because they came from defendant's email address and contained information defendant would know. Provided that Plaintiff lays a proper foundation for these emails, the Court sees no reason why they cannot be authenticated and admitted. Plaintiff avers that he can show that the emails originated from and were received using LUMC Residency Program email servers and accounts associated with the professional resident email addresses of the correspondents. These addresses then can be linked directly to the identities of the email authors and recipients.

Defendants' contention that the identity of the residents concerned cannot be confirmed because there will be testimony that some residents would use the email accounts of other residents

---

[8] The Court has not drilled down on which individuals both (a) made unprofessional comments and (b) turned in peer reviews of Plaintiff. Nor has it matched up the to/from lines on the emails to confirm whether any of the emails made their way to anyone involved in evaluating Plaintiff or recommending his probation or termination. This ruling thus is not a blanket ticket to admission of any "unprofessional" emails. Plaintiff still will need to tie the emails to his allegedly wrongful termination or the allegedly hostile workplace or some other issue that the jury will need to resolve before they will be admitted at trial.

when not properly logged out to play practical jokes fares no better. The Court is unpersuaded because the account holder is responsible for all activity sent from the holder's account under the holder's name. Moreover, if there was in fact a spate of unauthorized and unprofessional behavior of this nature, one might have expected the residents or Defendants themselves to put an end to it. But there is no evidence of which the Court is aware to suggest that anyone did, at least prior to the initiation of this lawsuit. In short, given the content of the emails, Loyola's peer evaluation system, and the asserted grounds for Plaintiff's termination, these emails are (like the issue of Dr. Salazar's promotion) at least somewhat probative of the credibility of some of Plaintiff's evaluators and thus admissible at trial.

Finally, Defendants' hearsay objection misses the mark, as the contents of these emails include various vulgarities involving sexual comments about women on staff at LUMC, as well as other crude statements exchanged among the residents (sent and received) using the LUMC Residency Program server from the professional residency email accounts assigned to the residents. These emails plainly are not being offered for the truth of the matters asserted, but instead to show that Plaintiff's co-residents may not be very good judges of professionalism in the workplace notwithstanding their negative assessments of Plaintiff on that same topic.

### F. Light's Deferment of Military Service During Vietnam War– **Denied.**

Defendants next seek to exclude argument, evidence and testimony that Dr. Light, former chair of the Residency Program and the academic advisor for Plaintiff pre-probation, deferred his military service during the Vietnam War to attend medical school. They argue that such evidence is not relevant to the issues of this case, which have nothing to do with military service deferment or the character of Dr. Light. They also argue that, to the extent this evidence has any tangential relevance, it could lead to Plaintiff painting Dr. Light as a "draft dodger."

22

As a threshold matter, the Rule 403 objection is easily dispatched. The Court will not permit Plaintiff to besmirch Dr. Light in that manner and Plaintiff has expressly disavowed any such intention. Instead, Plaintiff proposes to introduce this evidence as probative of whether Dr. Light has an anti-military or anti-war bias. From this evidence, Plaintiff will ask the jury to infer that Dr. Light did not like Plaintiff and was biased against him because Plaintiff was trying to complete military service and a medical residency at the same time. Although it may take a lot more bricks to build a wall of any consequence from this brief line of testimony, the Court sees no basis for excluding it altogether.

G. *Dr. Schiff's Personal Relationship with a Nurse* – ***Granted.***

Finally, Defendants seek to exclude evidence that Dr. Schiff, one of the co-residents who authored a negative peer-review of Plaintiff, had a personal relationship with a nurse assigned to the emergency room during the Residency Program. Defendants argue that such evidence is not relevant or admissible. This evidence involves a personal relationship unrelated to Plaintiff or the professional duties of Plaintiff and Dr. Schiff. In response to the Court's inquiry at the final pre-trial conference, counsel confirmed that as of 2012 there were no rules against dating co-workers or subordinates at Loyola. The probative value of this testimony therefore is minimal and substantially outweighed by the risk of juror confusion (such as judging conduct from a decade ago under contemporary standards for workplace conduct) and wasting time on a distracting and time-consuming side show.

III. **Plaintiff's Motions *In Limine***

A. *Dr. Hegerty's Access to Patient Records* – **Granted**

Plaintiff's first motion *in limine* seeks to exclude argument or evidence regarding access to or use of patient medical records by Dr. Kathleen Hegarty [450], who is Plaintiff's spouse. At the

23

final pre-trial conference, the Court ascertained that none of the records purportedly accessed by Dr. Hegarty relate to the issues raised in this lawsuit. Moreover, there is no evidence that Dr. Hegerty was in Plaintiff's cohort, either as a comparator or as a peer reviewer. As the Court understands the situation, she will not be testifying to events that took place at work, but instead will offer testimony to support the effects of what allegedly happened at work on Plaintiff's mental state, career prospects, and the like. The relevance of any improper access to patient files thus has little or no probative value and the potential to create another time-wasting distraction. The motion therefore is granted.[9]

### B. *Military Orders* – **Denied**

Plaintiff's second motion *in limine* seeks to bar Defendants from making any argument or proffering any evidence regarding Plaintiff's efforts to obtain military orders from MOANG for the purpose of securing leave time during the last week of June and the last week of July 2012. This motion [451] is denied.

As a threshold matter, the Court again notes that in considering such evidence, the jury will be instructed to accept the validity of the military orders, as explained in the Court's summary judgment opinion. With that said, the Court did not, as Plaintiff suggests, "debunk[] Defendants' arguments that McDaniel made false statements to obtain the Military Orders" in that opinion. Among other reasons that the "debunking" argument misses the mark is the procedural posture of the case at the time of the Court's prior assessment: on a summary judgment motion by Defendants, the Court viewed disputed issues in the light most favorable to Plaintiff. At trial, the jury must resolve all disputed issues of material fact, including whether the statements Plaintiff made to obtain the June 2012 military orders were truthful. At a minimum, these statements are

---

[9] Counsel for Defendants acknowledged at the final pre-trial conference that her clients no longer are opposed to granting this motion. See Transcript of Final Pre-trial Conference I, on May 23, 2012, at 56.

material because they bear on Plaintiff's overall credibility. In addition, they may shed light on his hostile work environment and breach of contract claims, as well as on whether any animus that Plaintiff's co-workers and supervisors, including Defendants, exhibited toward him was motivated not by his military service, but rather by other aspects of his conduct, character, or demeanor. In short, the full story of Plaintiff's successful effort to obtain military orders in the summer of 2012 is more relevant than Plaintiff's motion recognizes and, with the benefit of carefully constructed jury instructions, any risk of juror confusion will be greatly minimized.

As noted above, Plaintiff sought leave from his residency program to complete study abroad requirements for the Executive MBA program. The study abroad involved a class held only during the last week of June and July in London. This timing was problematic from Defendants' perspective because the beginning of the LUMC Residency Program's academic year is July 1. The Residents' Handbook makes clear that residents are prohibited from taking leave during the last week of June and the first week of July to ensure adequate coverage on the clinical rotation and call during the transition period.

Plaintiff first requested leave time from Dr. Hopkinson for the EMBA study abroad course at the end of May 2012. In an email to Dr. Hopkinson, Plaintiff wrote that he needed to take one week of leave during the last week of June and the last week of July 2012 to "take care of a professional obligation required by the Air Guard for the past three years." [452], at 3 (citing Pl.'s Resp. to Defs.' Request for Admissions ("RFA"), Ex. D, No. 16). Plaintiff did not tell Dr. Hopkinson that the obligation was a study abroad class for his EMBA. According to Plaintiff, Dr. Hopkinson told him that he could make an exception granting leave during the last week of the

academic year (in June) only if Plaintiff obtained military orders indicating that the specific time requested was necessary for military service [233, ¶¶ 81-82].[10]

In response, Plaintiff initiated email contact with Lt. Colonel Echterling, his superior officer in MOANG, informing him that Plaintiff "need[ed]" time off "to go overseas for a week in June for an MBA class" and that the Residency Program required military orders to grant his leave request. [452, Ex. A, Attachment 1.] In a response email, dated June 1, 2012, Lt. Colonel Echterling wrote: "I see all you do in school as adding value" to MOANG "so I have no reservations with saying it is for the good [sic] of your service to your country." The pronoun "it" (as used here) apparently refers to the military orders and the justification Plaintiff provided for them.

Apparently, the military orders were not immediately issued, so Plaintiff sent a follow-up email to Lt. Colonel Echterling, dated June 12, 2012. In that email, Plaintiff made it clear that but for the military orders permitting him to study abroad during the "last week of June" – a time period Plaintiff characterized as a "deciding moment" – he would be dismissed from the EMBA program and lose substantial sums of money. [452, Ex. A, Attachment 2.] Plaintiff did not notify Lt. Colonel Echterling that the Residency Program at LUMC had placed him on academic probation or that any failure to abide by the requirements of the probation agreement would result in dismissal from the residency program in September. Nor is there any evidence that Plaintiff advised the Colonel of LUMC's general policy against leave during the resident transition period. Indeed, in his deposition, Lt. Colonel Echterling stated that Plaintiff told him that LUMC was "ok"

---

[10] Plaintiff's account in the SAC does not reference a specific email/conversation where Dr. Hopkinson conditions leave on Plaintiff successfully obtaining coverage for his clinical calls; the SAC only says that Dr. Hopkinson demanded to see military orders before granting leave.

with taking leave to study abroad in the EMBA Program so long as he had military orders.[11] Regardless, the military orders were issued on June 20. Plaintiff then took two weeks of leave to attend the EMBA classes in London, one week at the end of June and the other at the end of July.

Defendants claim that Plaintiff lied to Dr. Hopkinson, telling him the class at the end of June was required by the military. They point to an email from London asking Dr. Hopkinson to confirm to another doctor that Plaintiff's absence from the clinical rotation was for official military service and characterizing the class he was attending as requiring "PT" (physical training) assessments that were more difficult to satisfy at the age of 45. From Defendants' perspective, Plaintiff engaged in "machinations" to obtain military orders to attend a non-military class not necessary for military training at the expense of the Residency Program's expressed needs for full coverage by fourth year residents and its no-leave policy. Plaintiff defends his statements to Dr. Hopkinson and the other Defendants by pointing to Colonel Echterling's conclusion that the EMBA class was a benefit to his military service and his issuance of the requested orders.

Defendants are within their rights to put on evidence supporting their theory that the evidence, taken as a whole, shows that the decision to terminate Plaintiff was motivated by factors other than anti-military bias and that their overall handling of Plaintiff's leave taken pursuant to

<hr/>

[11] Review of the emails includes a representation from Plaintiff that "[r]esidency is without a care about this." [See *id.*, Ex. A, Attachment 2.] Plaintiff did alert Lt. Colonel Echterling to the conflict between himself and the Residency Program in a June 1, 2012, email in which Plaintiff recounted that LUMC was "giving [him] trouble over the MBA effort" and other residents were "weird" because he was getting "two degrees" when they were getting only "one." [*Id.*, Attachment 3.] The phrase "without a care about this" also appears to be ambiguous. Lt. Colonel Echterling seems to have taken this statement to mean that Defendants were "ok" with Plaintiff taking the last week of June for leave to attend the EMBA class in London. Alternatively, the statement could be read as Plaintiff advising Lt. Colonel Echterling that Defendants would not grant the leave request without the military order because they did not care about him finishing the EMBA degree.

his June 2012 military orders confirms that position.[12]  The content and timing of the statements that Plaintiff made *to Defendants* about his absence plainly will assist the jury in resolving that question.  And the statements that Plaintiff made *to MOANG* at the same time also are relevant, at the very least because they will help the jury assess the veracity of what Plaintiff said to Defendants.  If the jurors conclude that Plaintiff offered two different version of the same events, each tailored to his respective audience, they might wonder about the credibility of other aspects of his testimony.

## IV.    Conclusion

For the reasons stated above, Defendants' motions in limine [449] are granted in part and denied in part.  One of Plaintiff's motions in limine [450] is granted and the other [451] is denied. Defendants' motion to exclude expert testimony or to bifurcate [478] remains under advisement and will be discussed with counsel at the final pre-trial conference on June 10, 2022.

In addition, the Clerk of the Court is also directed to terminate active party designations for parties formerly dismissed pursuant to the Court's previous orders [81, 408, 417] in the CM/ECF System—namely Drs. Cannon, Salazar and CHE Trinity.  In addition, the record will reflect that the court granted summary judgment as to Counts III, V, VI, and VII, in their entirety [408, 417] and that only Counts I, II, IV, VIII and IX will proceed to trial.  See *supra* n. 3, at 8.

Dated: June 9, 2022

Robert M. Dow, Jr.
United States District Judge

---

[12] Defendants likely will highlight that once the military orders were presented, they let Plaintiff go to London and covered his duties notwithstanding the hardship that his absence presented, thereby refuting any inference of anti-military animus.  Plaintiff will counter that scheduling him for clinical and asking him to find substitute coverage on the first day of his orders violated USERRA.