IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK MCDANIEL, M.D., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LOYOLA UNIVERSITY MEDICAL ) <br> CENTER, LOYOLA UNIVERSITY ) <br> CHICAGO, LOYOLA UNIVERSITY ) <br> HEALTH SYSTEMS, WILLIAM ) <br> HOPKINSON, M.D., and TERRY ) <br> LIGHT, M.D., ) <br> ) <br> Defendants. ) | Case No. 13-cv-6500 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, Plaintiff Mark McDaniel's motion for a new trial [517] is respectfully denied. Briefing on Defendants' bill of costs [535] will proceed as follows: any objections are due no later than July 11, 2023; any reply is due no later than August 1, 2023. The Court will issue a ruling by mail.

**I.     Background**

Plaintiff Mark McDaniel is a medical doctor. He sued Defendants Loyola University Medical Center, Loyola University Chicago, Loyola University Health Systems (collectively, "Loyola"), and two Loyola doctors, William Hopkinson and Terry Light, alleging that they discriminated against him in violation of his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311, when they terminated him from an orthopedic residency program in 2012. After a lengthy period of discovery supervised by the Magistrate Judge, this Court granted in part and denied in part Defendants' motion for summary judgment [see 408, 417] and set the case for trial [422].

1

After lengthy delays on account of the pandemic, the case proceeded to a 15-day jury trial in June and July 2022. The parties called 19 witnessed, introduced approximately 400 exhibits, and generated a transcript consisting of 2,700 pages of testimony. The jury returned a verdict [516] in favor of Defendants. McDaniel has moved for a new trial, contending that the jury's rejection of his claim was against the manifest weight of the evidence.

In the fall of 2008, McDaniel enrolled in a five-year orthopedic surgery residency program at Loyola University Medical Center. At the time, McDaniel was also a reservist in the Missouri Air National Guard ("MOANG"). Loyola and the doctors running the residency program, including Defendants Hopkinson and Light, were aware of McDaniel's ongoing obligations to the MOANG.

Unbeknownst to Loyola and the doctors running the residency program, McDaniel also enrolled in an Executive MBA program at the University of Chicago's Booth School of Business. At the time of McDaniel's enrollment, Booth required a letter of company support, the purpose of which was to communicate to a student's employer the understanding that the student would need to complete the academic requirements of the program while working full-time. Although McDaniel's obligations to Loyola were far more onerous than his military obligations at that time, McDaniel obtained the letter of support from his superiors at MOANG, not Loyola.

McDaniel kept his EMBA program on the "down low" because he sensed that his additional academic obligations would not be well received at Loyola. After all, a surgical residency program brings heavy responsibilities and long hours. Moreover, McDaniel's scores on an annual test called the Orthopaedic In-Training Examination ("OITE") placed him in the 2nd, 10th, and 1st percentiles nationwide in his first three years of residency. These low scores and other perceived deficiencies in McDaniel's progress led Hopkinson and Light to raise with

McDaniel the possibility of his resigning from the program during his third year. McDaniel chose instead to participate in an academic remediation program with Light serving as his advisor.

McDaniel's cohort at Loyola consisted of five orthopedic surgical residents in his year. Given the length of the program, approximately two dozen residents were on staff at any given time. Residents worked long hours together, often in teams, trying to master the information they needed to someday operate independently as surgeons. They shared responsibility for the "consult pager," also known as the "bomb," which was a means of communicating when a resident would be needed to attend to patient needs, sometimes on an emergency basis. Residents were given latitude to trade off days on which they carried the "bomb," but given the relatively small size of the group, scheduling of this responsibility occasionally caused tension among the group.

The trial testimony focused a great deal on growing tension between McDaniel on the one hand and the four other members of his cohort on the other. McDaniel acknowledged that he was in some senses "a lone wolf" among the group, but there was ample evidence of attempts to work together on common issues, including the pager schedule. Nevertheless, by the spring of 2012, which was in the fourth year of the program, McDaniel had become increasingly isolated, at least in a social sense, and the others either pointed out his deficiencies (from their perspective) or ganged up on him (from his perspective), including by going to the bosses with their concerns. These concerns surfaced most prominently during a meeting at Light's house attended by all the PGY-4 residents except McDaniel and in written "peer reviews" subsequently submitted by those residents at Light's request.

3

About a month after the meeting at his house, Light sent Hopkinson a letter detailing his concerns about McDaniel. The letter was unsparing in its criticism, noting that in his 35-year career, Light had never previously encountered a resident whose behavior was as "egregious and unapologetic" as McDaniel. Light went on to discuss what he perceived to be a lack of professionalism on McDaniel's part, as well as a dysfunctional relationship with his peers. According to Hopkinson's trial testimony, he began the process of placing McDaniel on probation shortly after receiving Light's letter. However, a letter formally placing McDaniel on probation was not tendered to him until June 14, 2012, with the probation to begin as of July 1.

Around this same time frame, McDaniel moved in earnest to obtain permission to attend a week of overseas study required by the EMBA program. McDaniel obtained military orders from a MOANG colonel to attend the London portion of the program, having convinced the colonel that the EMBA would provide long-term benefits to the military when McDaniel returned to Guard duty after finishing his residency. Loyola policy required thirty days' notice for leave requests. McDaniel did not meet that deadline. In addition, because of resident turnover at the end of June, Loyola generally prohibited taking leave at that time to ensure adequate coverage. Still, Hopkinson approved McDaniel's leave request and he attended the EMBA program in London.

The probationary period was due to end on September 9, 2012. After evaluating the extent of McDaniel's compliance with the terms of his probation, Hopkinson recommended that the Clinical Competency Committee terminate McDaniel. The Committee concurred in Hopkinson's recommendation. Hopkinson conveyed the termination to McDaniel and handed him a termination letter on September 17, upon his return from another week of EMBA work.

McDaniel pursued a grievance before a committee comprised of three physicians who had prior military service. The grievance committee upheld the termination decision.

## II.     Legal Standard

As noted above, McDaniel seeks a new trial on the ground that the verdict rendered by the jury was against the manifest weight of the evidence. This is a valid ground for seeking such relief. See *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) ("a district court can grant a motion for a new trial if the verdict was against the weight of the evidence"). The Seventh Circuit has explained that a "new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021). In assessing a new trial motion, the district judge must "perform 'its own assessment of the evidence presented,'" doing so "neutrally" rather than with a thumb on the scale in favor of or against the verdict. *Lewis v. McLean*, 941 F.3d 886, 893 (7th Cir. 2019). The judge "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633.

## III.    Analysis

The parties devote a lot of attention to the reasons given by Hopkinson, the Clinical Competency Committee, and the grievance committee for terminating McDaniel. But what matters most for present purposes in not precisely why Loyola cut McDaniel loose from the program; instead, the critical question is whether anti-military animus played any role in the decision, for his claim arises under the USERRA.

McDaniel claims to have a smoking gun: Hopkinson's "admission" at the grievance committee hearing that McDaniel's "military leave became an issue" in the months prior to his

termination. But that statement alone falls well short of acknowledging that McDaniel's military leave was a factor in his dismissal. Looking at the record "neutrally," *Lewis*, 941 F.3d at 893, it cannot be denied that his request for military leave "became an issue" for a lot of people. As noted above, McDaniel's request came late—after the 30-day advance deadline—and he sought leave during a week when leave was generally forbidden due to staff turnover. While waiting this long was consistent with McDaniel's desire to keep his EMBA pursuit quiet, it left his peers scrambling to find coverage. McDaniel surely understood the requirements of both his EMBA program and the residency, and thus knew or should have known of both the deadline and the rule against leave during the residency turnover period months, if not years, before springing it on Hopkinson and his fellow residents at the end of May 2012. Regardless of the *reason* for McDaniel's leave request, its *timing* plainly was problematic for the entire residency program, from top to bottom.

McDaniel further supports his request for a new trial by pointing to circumstantial evidence based on timing, inconsistencies in Loyola's explanations for probation and termination, and a lack of consistent punishment for similar transgressions relating to logging cases and other administrative requirements of the program. These arguments would be far stronger if the record were not replete with concerns about McDaniel's performance long before Loyola took any adverse action against him. For years, McDaniel struggled to keep pace with his classmates and indeed with the rest of the nation's aspiring orthopedic surgeons as measured by his consistently poor scores on the OITE. Recall that the aim of the program is to produce surgeons stamped with Loyola's seal of approval as competent to perform invasive medical procedures. Recall also that teamwork is important in this field and, at least in Light's eyes,

McDaniel had sunk to the bottom of the barrel by that measure before Light or Hopkinson had any notion that McDaniel needed "military leave" to attend his EMBA classes in London.

The jury heard three weeks of testimony, learning in excruciating detail about the personality conflicts among the residents in McDaniel's residency class, the struggles McDaniel endured to balance his family, residency, and EMBA obligations, and the ways in which the busy surgeons managing Loyola's program took in and processed the information they obtained about McDaniel's professional competency, interpersonal relationships, and willingness to remediate his deficiencies. The jury was accurately instructed on the applicable law—indeed, no challenge to the instructions has been proffered. In the end, the jury decided that anti-military animus was not a factor in Loyola's decision to terminate McDaniel's participation in the residency program.

McDaniel submits that the jury's conclusion was against the manifest weight of the evidence. As explained above, in evaluating this contention, the Court must "perform its own assessment" of "the general sense of the evidence," weighing that evidence "neutrally." *Lewis*, 941 F.3d at 893; *Mejia*, 650 F.3d at 633. In considering the entire "pot of evidence," McDaniel urges the Court to conclude that "no rational jury could have rendered the verdict" it reached, and therefore to give him a chance to present his case to another group of jurors at a second trial.

The Court has carefully studied the record, the briefs, and its own notes from trial and performed the precise inquiry McDaniel has requested. But it concludes that the result in this case was neither a "miscarriage of justice," nor a verdict that "cries out to be overturned," nor an outcome that "shocks [the] conscience." See [518, at 7-8 (McDaniel opening brief) (citing *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995))]. Instead, the verdict was an entirely rational conclusion to be drawn from the evidence. Had the jury found for McDaniel, the Court likely would have upheld that result as well. Each side here was represented by very capable counsel

and had more than ample opportunity to present its view of the evidence. The applicable law was correctly placed before the jury, and it promptly reached a unanimous verdict. Barring an anomaly—and none has been presented here—that is all a plaintiff gets at the trial court level in our system. Subjecting another group of jurors to 15 days of testimony and evidence on the off chance that a second jury might reach a different result is not warranted on this record.

**III.     Conclusion**

For the foregoing reasons, Plaintiff Mark McDaniel's motion for a new trial [517] is respectfully denied. Briefing on Defendants' bill of costs [535] will proceed as follows: any objections are due no later than July 11, 2023; any reply is due no later than August 1, 2023. The Court will issue a ruling by mail.

Dated: June 20, 2023

_____
Robert M. Dow, Jr.
United States District Judge